**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAZZ PHARMACEUTICALS, INC.,

*Plaintiff*,

v.

XAVIER BECERRA, Secretary of Health
and Human Services; U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
ROBERT CALIFF, Commissioner of Food
and Drugs; U.S. FOOD AND DRUG
ADMINISTRATION,

*Defendants*,

AVADEL CNS PHARMACEUTICALS,
LLC,

*Intervenor-Defendant*.

Case No. 1:23-cv-1819-APM

Filed under seal

**COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Peter A. Bruland (D.C. Bar No. 1600717)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
tlosseaton@sidley.com
pbruland@sidley.com

*Counsel for Plaintiff Jazz Pharmaceuticals Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT.....................................................1

ARGUMENT........................................................................................................................8

I.     FDA lacked statutory authority to approve Lumryz during Xywav's exclusivity period because Xywav and Lumryz are "the same drug."...........................................................8

     A.     In section 527(a), "the same drug" unambiguously refers to the "drug designated" under section 526, which is the active moiety of a small-molecule drug. ............................................................................................................9

     B.     Congress did not codify FDA's clinical-superiority exception. .....................13

     C.     FDA and Avadel's remaining arguments fail...............................................18

     D.     FDA's interpretation of "same drug" warrants no deference.........................21

II.     OOPD's "major contribution to patient care" finding departs from longstanding FDA policy without acknowledgment or adequate explanation. ................................................24

III.     OOPD acted arbitrarily and capriciously by departing from inter-agency dispute resolution procedures without explanation. ...................................................................34

IV.     OOPD's determination was inconsistent with prior FDA determinations and the scientific literature. ...........................................................................................................38

     A.     FDA failed to grapple with the clinical significance of Lumryz's sodium burden. ........................................................................................................39

     B.     The record does not support FDA's assertions that twice-nightly dosing harms patients and that once-nightly dosing can normalize sleep. ...........................40

V.     Approval for Lumryz must be vacated. ..........................................................................43

CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpharma, Inc. v. Leavitt,*
    460 F.3d 1 (D.C. Cir. 2006) ................................................................29

*Am. Hosp. Ass'n v. Becerra,*
    142 S. Ct. 1896 (2022) ............................................................... 20, 21

*Ame. Waterways Operators v. Wheeler,*
    507 F. Supp. 3d 47 (D.D.C. 2020) ......................................................36

*AT&T Wireless Servs., Inc. v. FCC,*
    270 F.3d 959 (D.C. Cir. 2001) ...........................................................39

\* *Baker Norton Pharms., Inc. v. FDA,*
    132 F. Supp. 2d 31 (D.D.C. 2001) ...............................................*passim*

*Borden v. United States,*
    141 S. Ct. 1817 (2021) ......................................................................17

*Bruesewitz v. Wyeth LLC,*
    562 U.S. 223 (2011) .................................................................... 15, 16

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) .........................................................................41

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
    566 U.S. 399 (2012) .........................................................................22

\* *Catalyst Pharms., Inc. v. Becerra,*
    14 F.4th 1299 (11th Cir. 2021) ....................................................*passim*

*CBOE Futures Exch., LLC v. SEC,*
    77 F.4th 971 (D.C. Cir. 2023) ...........................................................44

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,*
    467 U.S. 837 (1984) .........................................................................23

\* *Cigar Ass'n of Am. v. FDA,*
    2023 WL 5094869 (D.D.C. Aug. 9, 2023) .........................................43

*Cigar Ass'n of Am. v. FDA,*
    436 F. Supp. 3d 70 (D.D.C. 2020) ......................................................39

*City of Kansas City v. HUD,*
    923 F.2d 188 (D.C. Cir. 1991) ................................................................21

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) ...................................................................44

*Confederated Tribes of Chehalis Rsrv. v. Mnuchin,*
    456 F. Supp. 3d 152 (D.D.C. 2020) .......................................................23

*CSX Corp. v. United States,*
    18 F.4th 672 (11th Cir. 2021) ................................................................15

*Ctr. for Auto Safety v. Fed. Highway Admin.,*
    956 F.2d 309 (D.C. Cir. 1992) ...............................................................41

*Cuozzo Speed Techs., LLC v. Lee*
    579 U.S. 261 (2016) ...............................................................................21

\* *Depomed, Inc. v. HHS,*
    66 F. Supp. 3d 217 (D.D.C. 2014) ................................................*passim*

\* *Eagle Pharms., Inc. v. Azar,*
    952 F.3d 323 (D.C. Cir. 2020) ......................................................*passim*

*Eagle Pharms., Inc. v. Azar,*
    2018 WL 3838265 (D.D.C. June 8, 2018) .............................................18

\* *Env't Def. v. Duke Energy Corp.,*
    549 U.S. 561 (2007) .........................................................................2, 14

\* *FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...............................................................................26

*Fed. Power Comm'n v. Fla. Power & Light Co.,*
    404 U.S. 453 (1972) ...............................................................................29

*Ferring Pharms., Inc. v. Azar,*
    296 F. Supp. 3d 166 (D.D.C. 2018) .......................................................22

*Food Mktg. Inst. v. Argus Leader Media,*
    139 S. Ct. 2356 (2019) ...........................................................................15

\* *Genuine Parts Co. v. EPA,*
    890 F.3d 304 (D.C. Cir. 2018) .........................................................39, 40

\* *George v. McDonough,*
    142 S. Ct. 1953 (2022) ...................................................................3, 15, 16

*Holyoke Water Power Co. v. FERC*,
    799 F.2d 755 (D.C. Cir. 1986) ..........................................................................28

*Jama v. ICE*,
    543 U.S. 335 (2005) ...........................................................................................16

*Lewis v. Dist. of Columbia*,
    2011 WL 321711 (D.C. Cir. Feb. 2, 2011) ........................................................43

*Logic Tech. Dev. LLC v. FDA*,
    84 F.4th 537 (3d Cir. 2023) ...............................................................................35

* *Mass. Fair Share v. L. Enf't Assistance Admin.*,
    758 F.2d 708 (D.C. Cir. 1985) ..........................................................................35

*Morissette v. United States*,
    342 U.S. 246 (1952) ...........................................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................... 38, 39

*Music Choice v. Copyright Royalty Bd.*,
    970 F.3d 418 (D.C. Cir. 2020) ..........................................................................42

*Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*,
    41 F.3d 721 (D.C. Cir. 1994) ............................................................................42

*Nat'l Fuel Gas Supply Co. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ..........................................................................42

*Nat'l Shooting Sports Found., Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ..........................................................................42

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
    672 F. Supp. 2d 61 (D.D.C. 2009) ....................................................................40

*NRDC v. EPA*,
    489 F.3d 1364 (D.C. Cir. 2007) ........................................................................43

*Patel v. Garland*,
    596 U.S. 328 (2022) ...........................................................................................20

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .............................................................................................26

*Prohibition Juice Co. v. FDA*,
    45 F.4th 8 (D.C. Cir. 2022) ...............................................................................42

*Pub. Citizen, Inc. v. FERC*,
    7 F.4th 1177 (D.C. Cir. 2021) ...................................................................................... 39

*Reuters Ltd. v. FCC*,
    781 F.2d 946 (D.C. Cir. 1986) ....................................................................................... 38

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ......................................................................................... 35

*Serono Labys., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ............................................................................... 12, 13

*Stokeling v. United States*,
    139 S. Ct. 544 (2019) ..................................................................................................... 17

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) ................................................................................................... 17

*United States v. Fahnbulleh*,
    742 F. Supp. 2d 137 (D.D.C. 2010) ............................................................................... 28

*United States v. Lachman*,
    387 F.3d 42 (1st Cir. 2004) ............................................................................................ 29

*United Student Aid Funds, Inc. v. Devos*,
    237 F. Supp. 3d 1 (D.D.C. 2017) ................................................................................... 29

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................................. 23, 24

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
    141 S. Ct. 2434 (2021) ................................................................................................... 16

**Statutes**

21 U.S.C. § 353a(b)(1)(A) ..................................................................................................... 14

21 U.S.C. § 355(c)(3)(E)(ii) ................................................................................................... 14

21 U.S.C. § 355(o)(4)(A) ....................................................................................................... 16

21 U.S.C. § 355(o)(4)(I) ......................................................................................................... 14

21 U.S.C. § 360aa(b) ................................................................................................................ 5

21 U.S.C. § 360bb(a)(1) .......................................................................................................... 10

21 U.S.C. § 360bb(d) ........................................................................................................... 5, 12

* 21 U.S.C. § 360cc(a) ....................................................................................................*passim*

21 U.S.C. § 360cc(a) (2012) ...........................................................................................18

21 U.S.C. § 360cc(b) ................................................................................................1, 18

21 U.S.C. § 360cc(c) ........................................................................................................3

21 U.S.C. § 360cc(c)(1) .......................................................................... 16, 18, 19, 31, 37

21 U.S.C. § 360cc(c)(2) ..................................................................................................24

21 U.S.C. § 360cc(d) .................................................................................................3, 22

21 U.S.C. § 360ccc(a)(3)(A)(ii) ......................................................................................16

21 U.S.C. § 360ccc-1(c)(2)(A) .......................................................................................16

21 U.S.C. § 360ccc-2(a)(2)(B) ........................................................................................16

21 U.S.C. § 371(a) ..........................................................................................................21

21 U.S.C. § 393(b)(4) ......................................................................................................38

42 U.S.C. § 262(i)(2)(A) ..................................................................................................13

42 U.S.C. § 262(k)(2)(A)(i)(I)(aa) ...................................................................................13

FDA Reauthorization Act of 2017, Pub. L. No. 115-52, 131 Stat. 1005...........................2, 14

**Other Authorities**

21 C.F.R. § 10.85(d) .......................................................................................................29

21 C.F.R. § 10.85(d)(1) ...................................................................................................26

21 C.F.R. § 10.85(e) ..................................................................................................26, 29

21 C.F.R. § 314.3..............................................................................................................1

21 C.F.R. § 316.3(b)(3) .............................................................................................24, 40

21 C.F.R. § 316.3(b)(14)(i) ...............................................................................................9

21 C.F.R. § 316.20(a) ................................................................................................31, 37

21 C.F.R. § 316.20(b)(4) .................................................................................................11

21 C.F.R. § 316.20(b)(5) .................................................................................................37

21 C.F.R. § 316.25(1)(3) .................................................................................................31

21 C.F.R. § 316.31(a) ............................................................................................................ 9

21 C.F.R. § 316.34(c) ........................................................................................................ 31, 37

56 Fed. Reg. 3338 (Jan. 29, 1991) ................................................................................... 12, 20

57 Fed. Reg. 62076 (Dec. 29, 1992) ................................................................................. 9, 27

76 Fed. Reg. 64868 (Oct. 19, 2011) ................................................................... 25, 26, 27, 28

78 Fed. Reg. 35117 (June 12, 2013) ...................................................................................... 27

Fed. R. App. P. 8 ................................................................................................................... 45

Fed. R. App. P. 8(a)(1)(B) .................................................................................................... 45

Fed. R. App. P. 8(a)(2)(E) .................................................................................................... 45

FDA, *Clinical Superiority Findings* ....................................................................................... 33

FDA, *Frequently Asked Questions About Designating an Orphan Product* (May 11, 2023) ............................ 10

FDA, *List of Approved NDAs for Biological Products that were Deemed to be BLAs on March 23, 2020* ....................................................................................... 13

## INTRODUCTION AND SUMMARY OF ARGUMENT

**I.**    FDA lacked statutory authority to approve Lumryz. FDA and Avadel contend that Section 527(a) is ambiguous, or that Congress ratified FDA's regulatory language without saying it was doing so, but those arguments fail to take seriously the words that Congress actually enacted into law and also fail to account for the actual history of the provision.

Congress could not have been clearer: Apart from exceptions that all agree are inapplicable, *see* 21 U.S.C. § 360cc(b), orphan-drug exclusivity is triggered when FDA approves an application "for a *drug designated* under [FDCA section 526] for a *rare disease or condition*." *Id.* § 360cc(a) (emphasis added). In the next clause of the same sentence, Congress commanded that once exclusivity attaches, FDA "may not approve another [application] for *the same drug for the same disease or condition* … until the expiration of seven years from the date of the approval of the approved application." *Id.* (emphasis added). And that command applies unless the drug is in short supply or the exclusivity-holder consents. *See id.* § 360cc(b)(1)-(2).

**A.**    There is only one way to read this sentence. "[T]he same drug" simply refers to the "drug" in the immediately prior clause—the drug that was designated as an orphan product—just as "same disease or condition" refers to the immediately prior clause—the disease/condition designated as an orphan use. *See Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1308 (11th Cir. 2021) (in "same disease or condition" in this statutory phrase, "the word 'same' is being used in the sense of 'being the one under discussion or already referred to'"); *see also* AR2186 ("the term 'drug' is used to describe a drug … that has previously been orphan designated").

For small-molecule drugs like the ones at issue, FDA has always read "drug" in section 526 to refer to the "active moiety"—that is, the portion of the drug substance "responsible for [its] physiological or pharmacological action." 21 C.F.R. § 314.3. Thus, FDA has always understood its orphan-drug designations to apply to active moieties, and not to individual finished drug products.

Which was the case here—Jazz obtained FDA's designation of "oxybate" as an orphan drug under section 526. *See* AR1355 n.84 ("[T]he [orphan-drug designation] applies to the active moiety (here, oxybate for the treatment of narcolepsy."). So when Jazz earned approval for Xywav in 2020, it earned seven years of orphan-drug exclusivity under section 527 for "the same drug" that had been designated under section 526, *i.e.*, "oxybate." FDA violated that exclusivity when it approved Avadel's version of "oxybate" to treat the same rare disease before Jazz's exclusivity expires in 2027. *See* AR1358 (recognizing that "Avadel requested [orphan-drug designation] for oxybate for the treatment of narcolepsy."). That approval was unlawful and should be vacated.

**B.**     Although the words "same" and "drug" have a clear ordinary meaning, FDA and Avadel refuse to apply it. *See* FDA Br. 13–15; Avadel Br. 19–23. Rather, they say, Congress used "same drug" as a term of art when it revised the Orphan Drug Act in 2017. They contend that in doing so, Congress intended to implicitly incorporate a regulatory definition of "same drug" that FDA had devised to interpret the words "such drug" in the pre-amendment statute—including FDA's view that "two drugs are the same drug if they have the same active moiety unless one is clinically superior." *Baker Norton Pharms., Inc. v. FDA*, 132 F. Supp. 2d 31, 34–35 (D.D.C. 2001).

FDA and Avadel ignore, however, that implicit incorporation arguments of this kind must be treated with skepticism. "Congress's failure to use [] an *express* incorporation of prior regulations … cuts against any suggestion that Congress intended to incorporate into the Act the preexisting regulatory definition[.]" *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007) (cleaned up) (emphasis added). And here, statutory text and context unambiguously refute FDA's and Avadel's argument that Congress impliedly used "same drug" as a term of art.

**1.**     As FDA emphasizes (at 7–8 & n.4), Congress struck "such drug for such disease or condition" and replaced it with "the same drug for the same disease or condition." FDA Reauthorization Act of 2017, Pub. L. No. 115-52, § 607(a)(1), 131 Stat. 1005, 1049. Neither FDA nor

Avadel claims that "the same disease or condition" is a term of art. So their argument asks the Court to accept that, within the space of a few short words, Congress used "the same" once in a plain sense and once in a term-of-art sense—all without providing any express indication that "the same" should carry two very different meanings within the single phrase.

2.      Implicit incorporation is most often apt when Congress copies exact regulatory phrasing, and in so doing adopts an "unusual" phrase, such as language that "appears nowhere else in the entire United States Code." *George v. McDonough*, 142 S. Ct. 1953, 1959 (2022). Here, Congress used common words—"same drug"—that appear in several other places in the FDCA where they could not possibly bear the term-of-art meaning that FDA proposes here.

3.      In the same 2017 enactment, Congress added an entire subsection—new 527(c)—that addresses "clinical superiority." 21 U.S.C. § 360cc(c). That subsection was the first (and remains the only) provision of the Orphan Drug Act to address clinical superiority. In fact, in section 527(c)(2), Congress adopted a definition of "clinically superior" that differs from FDA's preexisting regulatory definition in several particulars. And when Congress later enacted section 527(c)(3), it took care to explain precisely where the new "clinical-superiority" provision would apply. FDA thus asks the Court to accept that Congress incorporated the concept of "clinical superiority" twice in section 527—once expressly through a carefully crafted subsection, and once impliedly through two words, neither of which is "clinical" or "superior."

4.      If more support were needed, Congress supplied it by stating that FDA could temporarily continue using its pre-existing regulatory definitions, only "until such time as [FDA] promulgates regulations in accordance with this subsection," which authorized *only* "regulations for the implementation of subsection (c)," and *only* "to the extent such definitions are not inconsistent with the terms of this section, as amended." 21 U.S.C. § 360cc(d). Far from "ratifying" FDA's prior regulations, FDA Br. 16, Congress made clear that its own words control. And those words require

3

normal statutory interpretation—focusing on the plain language of the text, not the regulatory language that Congress could have expressly referenced but did not.

5.      Subsection (d) also rules out FDA's argument that uncodified language from the 2017 public law precluding retroactive application was somehow meant to preserve FDA's interpretation of language ("such drug") that Congress was striking from the statute. *See* FDA Br. 21. The obvious interpretation of the uncodified language, and the only one that squares with text, context, and general non-retroactivity presumptions, is that Congress was declining to unsettle past adjudications, not enshrining for all time FDA's interpretation of defunct legislative language.

FDA's argument also misses the larger point. There was no reason for Congress to say that its changes to subsection (a) would not affect determinations made in the past *unless Congress thought it was changing the law* going forward. That too, refutes FDA's claim that Congress was trying to ratify the agency's past interpretations of law.

6.      There is a far simpler explanation than FDA's theory—one that unifies all of these points. Before 2017, FDA had claimed, and courts had found, that the term "such drug" was ambiguous because it could be read to refer to two alternative antecedents. For instance, the plaintiff in the older case on which FDA primarily relies argued that "such drug" did not refer to the active moiety "designated under [section 526]" but instead to the finished product identified in the "application filed pursuant to [section 505]." *See Baker Norton*, 132 F. Supp. 2d at 34. By changing "such" to "the same," Congress eliminated the ambiguity and specified that the proper antecedent of "drug" is the active moiety designated under section 526.

C.      FDA and Avadel alternatively claim that the plain language of the statute yields no answer because Congress amended the statute in a way that left "the same drug" just as ambiguous as the prior phrase "such drug." They thus assert that the 2017 amendments to section 527(a) *made no change at all* and left FDA to fill the same gap. On that basis, they claim that FDA retains broad

discretion to decide for itself just how far Congress went in prohibiting approval of new drug applications during the exclusivity period. *See* FDA Br. 16; Avadel Br. 12–13.

The "gap-to-fill" argument cannot be squared with statute. FDA and Avadel have no good argument, for instance, for why Congress declined to give FDA express authority to make rules under 527(*a*) when it responded to *Depomed* by giving FDA express authority to make rules under section 527(*c*)—a choice that is particularly notable given how carefully Congress parceled out rulemaking authority elsewhere in the Orphan Drug Act. *See* 21 U.S.C. §§ 360aa(b) (granting rulemaking authority for "subsection (a)"); 360bb(d) (same). And they glaringly fail to offer any reason *why* Congress would have taken language that courts had found ambiguous ("such drug"), revised it (now, "the same drug") but left the statute just as ambiguous as before. And, of course, their argument improperly treats Congress's revision of section 527(a) as a nullity.

There is an especially strong reason not to accept a nullity argument here because, as explained above, there is a ready explanation for why Congress changed "such drug" to "the same drug" that aligns with plain meaning: Congress wanted to make clear that "the same drug" referred back to the "drug designated under section 360bb of this title." That reading gives effect to Congress's amendment by understanding it to have clarified *and removed the ambiguity from* section 527(a). And it has the additional virtue of aligning with the Eleventh Circuit's holding that the *post*-amendment statutory phrase is unambiguous, *Catalyst*, 14 F.4th at 1312—in sharp contrast to Avadel's recital of cases finding ambiguity in the *pre*-amendment text.

**D.**     That leaves policy. Avadel makes much of a concern that a plain-language reading of section 527(a) would leave FDA without discretion to break unexpired orphan-drug exclusivity when it thinks a new drug would be useful for patients. But in advancing this argument, Avadel ignores that "inherent in any sort of exclusivity period is a tradeoff between incentivizing research and development and promoting competition." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 337 (D.C. Cir.

5

2020) ("*Eagle II*"). The more discretion FDA has to break exclusivity to approve *follow-on* drugs like Lumryz, the less incentive innovators have to earn exclusivity in the first place. Perhaps Congress could be persuaded that trade-off is worth it. But as the Court of Appeals admonished, *id.* at 337, 339, that is a question for the halls of Congress. In the courtroom, the only apt question is whether Congress has *already* carved out a clinical superiority exception that authorizes FDA to break unexpired periods of exclusivity. It has not.

**II.**     Statutory authority aside, FDA violated the APA through arbitrary and capricious departures from policy. Until FDA's approval of Lumryz, which FDA concedes is *less safe* than Xywav, FDA had never found that a successor drug makes a "major contribution to patient care" unless the successor drug had been first shown to provide comparable safety and effectiveness.

FDA's only answer is to deny that it ever adopted a comparable safety requirement. But that response is refuted by FDA's own 2011 Federal Register preamble, which publicized the existence of the requirement and even declared (in language that FDA's lawyers conspicuously ignore today) that the requirement was already "***longstanding policy***" back then. FDA cannot wish away that policy now—and certainly not by arguing that Jazz somehow failed to identify a prior example of the comparable safety requirement being applied in exactly the right way in the small sample of documents that have emerged from FDA's confidential archives. To change its policy, FDA would have to openly acknowledge the decision to shift course, and then rationally explain it, including by articulating why expanding the "major contribution" prong of the clinical superiority standard is consistent with the statutory design and does not unfairly unsettle the investment-backed expectations of exclusivity holders like Jazz. FDA did neither.

**III.**     Jazz also showed (at 28–30) that FDA's Office of Orphan Products Development ("OOPD") violated its own standard operating procedure ("SOP") and FDA's staff manual guides ("SMGs") by seeking a second opinion from officials who regulate *devices* not *drugs*, and who have no

assigned role under the Orphan Drug Act. FDA argues (at 27) that the SOP is irrelevant because it applies "only to the process of determining eligibility for exclusivity," but OOPD did exactly that here—the same faulty clinical-superiority finding both granted Lumryz its own exclusivity and broke Xywav's exclusivity. FDA also argues (at 28-29) that unacknowledged departures from policy are not reviewable because they did not regulate Jazz's rights. That makes no sense: Jazz earned orphan-drug exclusivity through its innovation in the narcolepsy space, and OOPD has violated that right to exclusivity (a statutory entitlement if not a vested property right), exposing Jazz to unlawful competition.

    **IV.**    FDA also acted arbitrarily and capriciously by failing to actually and rationally weigh the evidence before it regarding the clinical significance of Lumryz's sodium content and the risks and benefits of the drugs' respective dosing schedules.

    **A.**    As to sodium, FDA claims that OOPD adequately weighed the evidence—but it cannot dispute that OOPD's decision letter does not actually quantify or otherwise describe in any detail the serious cardiovascular risks that it supposedly weighed. Simply *mentioning* a risk does not cut it: the Army Corps of Engineers could not rationally weigh whether to build a new dam merely by acknowledging that it could cause "flooding." It would have to explain what the risks look like by addressing the facts about, for example, how frequently inundation might occur and who might be harmed. The same goes for FDA's "finding" that "there are other ways" for oxybate patients to "reduce sodium in their diet." AR555. FDA says (at 29) that *Jazz* has not shown it "impossible." Fair enough, but the question the APA makes central is whether *OOPD* considered the possibilities. For example: How likely is it that Lumryz patients will be able to achieve sodium reduction in "other ways"? How would those reductions, if any, compare to Lumryz's increased sodium burden? And what would it ultimately mean for patient health? OOPD did not address any of this in any detail. And that means OOPD did not engage in reasoned decisionmaking.

**B.**     Finally, there is dosing schedule. Here, the agency literally offered no evidence to support its overblown claims about the supposed dangers of Xywav's twice-nightly dosing or the putative benefits of Lumryz's once-nightly dosing. The result is that even FDA and Avadel's lawyers must now concede that twice-nightly dosing *is* effective at improving the sleep of patients with narcolepsy, *see* FDA Br. 31, Avadel Br. 38, which is a clear abandonment of OOPD's false claim that twice-nightly dosing "is antithetical to the goal of improving sleep," AR1370; *see* AR1374. Yet OOPD's decision depended on that now-abandoned conclusion. This is not reasoned decisionmaking. Nor is it science. It is bluster, and the agency cannot back it up.

**V.**     For all these reasons, FDA's order cannot stand. FDA does not contest Jazz's argument that vacatur is the proper remedy here. With good reason: When an agency exceeds its statutory authority, modifies existing policy to expand its power without acknowledgment or explanation, ignores its own internal decisionmaking procedures, and makes a hash of the science, there is no realistic chance of salvaging its decision on remand. Nor would remand without vacatur be remotely equitable to Jazz. The clock on Xywav's exclusivity is ticking down, and Jazz has already incurred months of unlawful competition, in violation of its statutory rights. The proper remedy here is the usual one: The Court should vacate the Lumryz approval.

## ARGUMENT

### I.     FDA lacked statutory authority to approve Lumryz during Xywav's exclusivity period because Xywav and Lumryz are "the same drug."

The key dispute here is the meaning of "the same drug," as used in section 527(a) to describe the scope of applications that FDA "may not approve" during an exclusivity period. That exclusivity period begins when FDA "approves an application filed pursuant to section 355 of this title … *for a drug designated under section 360bb* of this title *for a rare disease or condition*." 21 U.S.C. § 360cc(a) (emphasis added). And once the exclusivity begins, FDA "may not approve another [application] for *the same drug*

*for the same disease or condition* for a person who is not the holder of such approved application" until the exclusivity expires. *Id.* (emphasis added).

FDA and Avadel contend that the words "the same drug" may or must be construed to implicitly incorporate the regulatory scheme that FDA created in 1992 under a prior version of the statute. Prior to 2017, the relevant statutory phrase had been "such drug for such disease or condition." FDA declared "such drug" to be ambiguous, 57 Fed. Reg. 62076, 62078 (Dec. 29, 1992), and promulgated a regulation replacing the statutory phrase "such drug for such disease or condition" with the regulatory phrase "the same drug for the same use or indication," 21 C.F.R. § 316.31(a). FDA then defined the regulatory term "same drug" to *generally* refer to "a drug that contains the same active moiety as a previously approved drug and is intended for the same use" and added this carveout: "*except* that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug." 21 C.F.R. § 316.3(b)(14)(i).

Any argument that, in the 2017 amendment, Congress intended to implicitly incorporate the above regulatory scheme into section 527(a) is incorrect. When it amended section 527(a), Congress included the term "the same drug" to unambiguously refer back to the "drug" that was designated under section 526, which indisputably means the active moiety of a small molecule drug. As a result, the amended statute asks only whether two small molecule drugs have the "same active moiety," leaving no room for FDA's "clinical superiority" carve-out. Only this reading gives full effect to the statute's plain language, structure, history, and context.

> **A.     In section 527(a), "the same drug" unambiguously refers to the "drug designated" under section 526, which is the active moiety of a small-molecule drug.**

The path to orphan-drug exclusivity begins with a request. "The manufacturer or the sponsor of a drug may request the Secretary to designate the drug as a drug for a rare disease or condition."

21 U.S.C. § 360bb(a)(1). If the prerequisites for designation are met, FDA "shall designate the drug as a drug for such disease or condition." *Id.*

For small-molecule drugs like Xyrem, Xywav, and Lumryz, FDA has always understood the term "drug" *in section 526* to mean "active moiety." In FDA's words: "Under the regulatory scheme implementing the orphan drug provisions of the statute, the word 'drug' in the context of small molecule drugs [like oxybate] means 'active moiety.'" Memo from Elizabeth Dickinson, Office of the Chief Counsel, FDA to Tan Nguyen, Director, Office of Orphan Product Development, FDA, at 3 (Apr. 25, 2006) (Griffin Decl. Ex. 9);[1] *see* FDA, *Frequently Asked Questions About Designating an Orphan Product* (May 11, 2023), https://bit.ly/3QFczQC ("Orphan drug designation is generally granted to the active moiety rather than the product formulation so changes to the product formulation should not generally affect orphan drug designation status."). At least with respect to section 526 designation, that continues to be FDA's position today. In the decision letter challenged here, OOPD stated that "the [orphan-drug designation] *applies to the active moiety* (here, oxybate for the treatment of narcolepsy)." AR1355 n.84 (emphasis added).

OOPD's agreement that the "drug" designated under section 526 was the active moiety oxybate suffices to resolve this case because it also settles the meaning of "drug" in "the same drug" in section 527(a). Again, the critical language reads: When FDA "approves an application … *for a drug designated under section 360bb*," it "may not approve another application … *for the same drug* for the same disease or condition." 21 U.S.C. § 360cc(a) (emphasis added). Under a plain reading of the statute, the term "the same drug" must refer back to the "drug designated" under section 526 because the word

---

[1] The agency now distances itself from that statement, protesting that the memo also discusses clinical superiority. FDA Br. 18. But that conflates two separate questions: (i) which sense of "drug" Congress meant to convey in section 526 in the first instance and then derivatively in section 527(a), and (ii) whether the pre-amendment statute could nonetheless be fairly read to authorize FDA to treat certain versions of the same active moiety as different because one allegedly is clinically superior. On the first question, the memo's position is unambiguous, just as the quoted passage shows.

"same" "is being used in the sense of 'being the one under discussion or already referred to.'" *Catalyst*, 14 F.4th at 1308. The statutory question is just that simple.

Indeed, this case is on all fours with *Catalyst*. There, the parties disputed whether the phrase "the same disease or condition" in the amended statute should be given its plain meaning or whether it should be read to incorporate the more specific meaning ("same use or indication") that FDA had established in its 1992 regulations. The plaintiff in *Catalyst* successfully argued that the meaning of "same disease or condition" in section 527(a) was plain and simply referred back to the disease or condition that had been designated under section 526. It wrote:

> '[S]ame' in this text unambiguously refers back to the designated disease or condition. The use of the term 'same' connotes that Congress is referring to an item that has previously been identified. *Cf. Same, Black's Law Dictionary* (11th ed. 2019) (defining "same" as "[i]dentical or equal; resembling in every relevant respect"). And in this provision the only "disease or condition" that has been identified (and so the only referent that the "same" connotation could apply to) is the "rare disease or condition" that was 'designated under section 360bb.'
>
> …
>
> Because the statutory text is unambiguous, it does not matter that FDA's 'interpretation' was codified as a regulation …. FDA's regulation cannot be validly applied here, as foundational administrative law principles make crystal clear.

Br. for Appellant Catalyst Pharms., Inc., at 31, 35-36, *Catalyst Pharms. Inc. v. Becerra*, No. 20-13922 (11th Cir., filed Nov. 13, 2020). Notably, the same lawyers who wrote the above for Catalyst presently represent Avadel in this case.

The argument that Avadel's lawyers made in *Catalyst* also addresses the observation that orphan-drug exclusivity applies differently with respect to "large molecule drugs." *See* FDA Br. 19; Avadel Br. 18-19. True enough, but that difference exists only because FDA treats macromolecules differently *at the designation stage under section 526*. For macromolecules, an orphan-drug designation covers any substance with the same "principal molecular structural features." *See, e.g.,* 21 C.F.R.

§ 316.20(b)(4) (designation requests for "macromolecules" must contain a "description of the drug, to include … the principal molecular structural features"). As FDA explained long ago, sound science supports the decision to use a broader standard for macromolecules. *See, e.g.*, 56 Fed. Reg. 3338, 3341 (Jan. 29, 1991) ("small differences may affect the function of macromolecules much less than that of small molecules").

More importantly, Congress explicitly gave FDA authority to draw those sorts of lines *at the designation stage. See* 21 U.S.C. § 360bb(d) (FDA "shall" promulgate regulations for the orphan-drug designation process). The courts have stressed that *the designation stage* is where FDA can properly exercise its discretion. *See Eagle Pharms, Inc. v. Azar*, 952 F.3d 323, 336 (D.C. Cir. 2020) ("*Eagle II*") (noting hypothetically that FDA could "*change its regulations for designation* to take into account both the active moiety and the formulation") (emphasis added);[2] *Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217, 230-31 (D.D.C. 2014) (Jackson, J.) (FDA can "control the circumstances under which marketing exclusivity attaches because the FDA is responsible for determining *when to designate a drug* as an orphan drug under section 360bb") (emphasis added). But the logic and plain meaning of section 527(a) remain the same. Even for large molecules, the term "same drug" in section 527(a) continues to refer back to the designation that FDA made under section 526.[3]

_____

[2] Avadel's quotation of *Eagle II* conspicuously omitted the emphasized portion of the D.C. Circuit's statement ("change its regulations for designation"). *See* Avadel Br. 12-13.

[3] That there are important differences between small- and large-molecule products, which FDA accounted for by adopting different approaches at designation stage under section 526, also reveals Avadel's mistake when it argues that "the same drug" in section 527(a) should be read to include both structural and functional features. *See* Avadel Br. 18 (citing *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998)). In *Serono*, the Court of Appeals actually affirmed the general point that "same as" normally means "identical to." 158 F.3d at 1320 ("we defer to an agency's reading of its own regulations, here the regulation defining 'same as' as 'identical to'"). The difficulty in that case arose from assessing the "sameness" of two complex biological products. Natural variation that occurs in the carbohydrate elements of large proteins leads to different "isoforms" of the protein even within the same batch of a drug. *See id.* at 1317–18. The plaintiff argued that this natural variation made it impossible to show that a follow-on product had the same "active ingredient" as its product. The court concluded that FDA acted reasonably when it "endeavored to guarantee the greatest degree of

In sum, the meaning of the statute is plain. "Same drug" in section 527(a) unambiguously refers to the active moiety that was designated in section 526, which in this case was "oxybate." The statute leaves no room for FDA to use the concept of "clinical superiority" to limit the scope of orphan-drug exclusivity.

**B.      Congress did not codify FDA's clinical-superiority exception.**

FDA and Avadel argue, in essence, that "the same drug" should be read to mean "drug of the same chemical structure, excluding a drug of the same chemical structure that has certain clinical advantages as judged by FDA." *See* FDA Br. 18; Avadel Br. 2. Yet neither asserts that this is a plain or ordinary meaning. Nor has anyone found another statute where "same drug" has that meaning. Instead, Avadel and FDA both skip past plain meaning to claim that the phrase "cannot be understood without reference to the regulatory definition." FDA Br. 15; *see* Avadel Br. 7–8.

This theory rests on four separate premises.

One: Congress authorized the agency to promulgate regulations interpreting section 527(a). Two: In 1992, FDA reasonably interpreted the statutory phrase "such drug" to mean "same drug," and defined "same drug" to "exclude a clinically superior drug." FDA Br. 2. Three: In 2017, Congress intended to "conform[] the statutory language to FDA's regulat[ion]" when it replaced the words

---

'sameness' possible for this kind of product, by ensuring an identical chemical structure where possible (in the primary structure), while reducing natural batch-to-batch variance (in the carbohydrate side chains)." *Id.* at 1320. Oxybate is completely unlike the macromolecules at issue in Serono and is not subject to that sort of variation. *Cf. id.* at 1319 ("[T]he statutory phrase must be read in the context of the kind of drug at issue."). In any event, Congress subsequently superseded *Serono* and similar cases by passing the Biologics Price Competition and Innovation Act of 2009 ("BPCIA"). The BPCIA established a new approval pathway for follow-on biological products ("biosimilars") that does not require a showing of chemical identity or sameness, but rather relies on a high degree of similarity and confirmatory clinical trials. *See, e.g.*, 42 U.S.C. § 262(i)(2)(A), (k)(2)(A)(i)(I)(aa). The BPCIA further decreed that FDA must stop regulating protein products as drugs under the FDCA (as it did in *Serono*) and must begin to regulate previously approved proteins—including the proteins at issue in *Serono*— as biological products under the Public Health Services Act. *See* FDA, *List of Approved NDAs for Biological Products that were Deemed to be BLAs on March 23, 2020*, https://bit.ly/47DFuvv (last visited Nov. 15, 2023).

"such drug" with "same drug." FDA Br. 15. Four: that amendment "necessarily adopted … FDA's full regulatory definition." FDA Br. 17.

Each of those premises is wrong, and each provides independent grounds to reject the agency's position. As Jazz previously showed, FDA did not have authority to interpret section 527 in 1992, and it continues to lack authority to interpret subsection (a) today. *See* Jazz Br. 23–24. Nor was it reasonable to read a clinical-superiority exception into the pre-amendment statute. *See id.* at 21–23. Finally—as explained next—Congress did not intend in 2017 to conform section 527(a) to FDA's regulation, let alone silently adopt a clinical-superiority exception.

1.      There is no evidence that Congress modeled the amended section 527(a) on FDA's 1992 regulation. For starters, section 527(a) expresses no intention to incorporate the regulation— indeed, it does not mention the rule at all. Of course, Congress knows how to expressly incorporate FDA regulations when it wants to do so. *E.g.*, 21 U.S.C. § 355(c)(3)(E)(ii) ("as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations"); *id.* § 355(o)(4)(I) (similar); 21 U.S.C. § 353a(b)(1)(A) (similar). So its decision not to do so in section 527(a) is telling. It points toward the usual rule that "Congress's failure to use such an express incorporation of prior regulations … cuts against any suggestion that Congress intended to incorporate into the Act the preexisting regulatory definition." *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007) (cleaned up).

2.      In fact, Congress's drafting choices show that it *did not* intend to "conform[] the statutory language to FDA's regulatory definition." FDA Br. 15. When Congress amended section 527(a), it did not just swap "the same drug" for "such drug." Instead, it struck the entire phrase "such drug for such disease or condition" and replaced it with "the same drug for the same disease or condition." Pub. L. No. 115-52, § 607(a)(1), 131 Stat. at 1049. The resulting provision shares the adjectival phrase "the same" with FDA's regulation, but that is where the similarities end. Instead of

adopting the second half of FDA's formulation—"use or indication"—Congress kept the disjunctive noun phrase that had appeared in the original statute:

| Original statute: | "such drug for such disease or condition" |
|---|---|
| FDA regulation: | "the same drug for the same use or indication" |
| Amended statute: | "the same drug for the same disease or condition" |

So Congress did not borrow FDA's words. As Avadel's lawyers previously explained in *Catalyst*, Congress's decision to not adopt FDA's words was an "intentional choice" that "must be honored." *See* Reply Br. for Appellant Catalyst Pharms., Inc., at 15, *Cataylst Pharms. Inc. v. Becerra*, No. 20-13922 (11th Cir., filed Dec. 28, 2020) ("Congress specifically chose to use the words 'disease or condition' … not 'indication' or 'use,' which it used elsewhere in the FDCA."). And they were correct—courts should not "imbue statutory terms with a specialized [regulatory] meaning when Congress hasn't itself invoked the [regulatory] terms of art associated with that meaning." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2365 (2019); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 234 (2011) (rejecting implicit codification argument where, *inter alia*, the statute used "unavoidable" rather than the closely related word in the supposed source material—"unavoidably"); *see CSX Corp. v. United States*, 18 F.4th 672, 681 (11th Cir. 2021) (rejecting implicit codification argument because statute and regulation differed by two words).

At the same time, neither FDA nor Avadel claims here that "the same disease or condition" is a term of art. So their term-of-art argument asks the Court to accept that, within the space of a few short words, Congress used "the same" once in a plain-language sense and once in a term-of-art sense—all without providing any sign that "the same" should carry two very different meanings within the single phrase.

**2.** Nor does context support FDA's codification theory. FDA cites *George v. McDonough*, but the contrast between this case and that one speaks volumes. FDA Br. 17–18. There the Supreme

Court deemed it "obvious" that Congress had "transplanted" an atypical phrase that "appear[ed] nowhere else in the entire United States Code" yet "had a long regulatory history." 142 S. Ct. 1953, 1959 (2022). The phrase "same drug" by contrast, unsurprisingly appears in multiple places in the Food, Drug, and Cosmetic Act. *See, e.g.*, 21 U.S.C. § 360ccc(a)(3)(A)(ii) ("same drug in the same dosage"); *id.* § 360ccc-1(c)(2)(A) (same); *id.* § 360ccc-2(a)(2)(B) (same); *id.* § 355(o)(4)(A) ("same drug approved under subsection (b)"). At bottom, "same drug" is "too common and context dependent" a phrase to assume that it bears the agency's "loaded meaning wherever it appears." *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2445 (2021); *see also Bruesewitz*, 562 U.S. at 235 (rejecting implicit codification theory where statutory term was "hardly a rarely used word").[4]

      **3.**      Further, it is implausible that Congress adopted an implicit clinical-superiority exception in section 527(a), while addressing the concept of clinical superiority explicitly in section 527(c). *See* Jazz Br. 22. FDA protests that there was "no … need for Congress to add an express clinical superiority requirement" to subsection (a) because it "accomplish[ed] the same thing by simply adopting the term 'same drug.'" FDA Br. 20–21 (parentheses omitted). But that just assumes FDA's preferred conclusion. And courts do "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," especially "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. ICE*, 543 U.S. 335, 341 (2005). And besides that, FDA's reading makes a hash of 527(c). Subsection (c) requires a sponsor to prove that its drug is "clinically superior to any already approved or licensed drug that is the same drug." 21 U.S.C. § 360cc(c)(1). If "same drug" actually means "same drug, excluding a clinically superior drug," then subsection (c) requires a sponsor to prove that its drug is

---

[4] FDA misunderstands *Yellen*. Far from "reading 'statutory language as a term of art,'" FDA Br. 14, the Supreme Court *rejected* such an approach (at the government's urging). The Court held that "statutory context" did not warrant "discard[ing] the plain meaning of the [relevant statutory phrase] in favor of a term-of-art construction." 141 S. Ct. at 2443. So too here.

"clinically superior to any already approved or licensed drug that is the same drug, excluding a clinically superior drug." That makes no sense.

4.    Nor does the old-soil canon help FDA. *Contra* FDA Br. 15. That canon normally applies "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice." *Morissette v. United States*, 342 U.S. 246, 263 (1952). When that happens, courts "presum[e]" that Congress "knows and adopts the cluster of ideas that were attached to each borrowed word … and the meaning its use will convey to the judicial mind." *Id.* In *Taggart v. Lorenzen*, for example, it was "obvious[]" that the phrase "operates as an injunction" borrowed "traditional principles of equity practice" that have "long governed how courts enforce injunctions." 139 S. Ct. 1795, 1801 (2019). And in *Stokeling v. United States*, 139 S. Ct. 544, 551 (2019), the phrase "force or violence" clearly incorporated principles from the common law of robbery. There is no equivalent longevity here, and no such judicially settled meaning. FDA's interpretation may rest on a "quarter-century of regulatory practice," FDA Br. 14, but that practice was vacated by four separate courts (*Depomed*, *Eagle I*, *Eagle II*, and *United Therapeutics*). It is implausible that legislators read the words "the same drug" and associated them with that oft-rejected "cluster of ideas."

At bottom, FDA's codification theory goes something like this: Congress borrowed a phrase ("the same drug for the same use or indication") from a 1992 regulation, kept the everyday words ("the same") while tossing the specialized ones ("use or indication"), enacted "the same" once with its plain meaning ("the same disease or condition"), but also enacted "the same" as a term of art just a few words away ("the same drug")—all to telegraph a silent ratification of a regulatory concept (clinical superiority) that it mentioned explicitly in a later subsection (section 527(c)) when applying that concept in a different context (serial exclusivity). "That is no way to do statutory construction." *Borden v. United States*, 141 S. Ct. 1817, 1828 (2021).

*         *         *

17

There is a far simpler explanation. Before Congress amended section 527(a), FDA claimed and courts accepted that the phrase "such drug" was ambiguous. *E.g.*, *Baker Norton*, 132 F. Supp. 2d at 36 ("The Court does not find that § 360cc(a) is clear and unambiguous."); *Depomed, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 66 F. Supp. 3d 217, 232 (D.D.C. 2014) (discussing "'such drug' ambiguity"); *Eagle Pharms., Inc. v. Azar*, No. 16-790 (TJK), 2018 WL 3838265, at *10 (D.D.C. June 8, 2018) ("*Eagle I*") (similar). The ambiguity stemmed from the fact that "such drug" could plausibly have referred to one of two antecedents: the drug named in the "application filed" with FDA (*i.e.*, a finished drug product) or the drug substance "designated under section 360bb" (*i.e.*, an active moiety, in the small molecule context). 21 U.S.C. § 360cc(a) (2012). When Congress replaced "such" with "the same," it was merely tethering the word "drug" to its immediate antecedent—the "drug designated," which for small molecule drugs had always been the active moiety. In other words: Congress was using a common phrase to resolve a specific grammatical ambiguity, not "adopt[ing] verbatim FDA's longstanding defined term." Avadel Br. 8.

### C.    FDA and Avadel's remaining arguments fail.

FDA points to section 527(c)(1), which requires a drugmaker to prove clinical superiority before receiving another round of orphan-drug exclusivity for a drug that is "otherwise the same" as an "already approved drug." 21 U.S.C. § 360cc(c)(1); *see* FDA Br. 15. In the agency's view, saying "that a 'clinically superior' drug may be '*otherwise* the same' as an approved drug … confirm[s] that a clinically superior drug is not *actually* the same drug." FDA Br. 2. But this is yet another place where FDA's proposed interpretation would make a hash of the statute.

Congress also used the phrase "otherwise the same" in section 527(b), which is the provision that creates two express exceptions to the seven-year exclusivity period. One exception applies when the exclusivity holder "cannot ensure the availability of sufficient quantities of the drug." 21 U.S.C. § 360cc(b)(1). The other applies when the exclusivity holder consents to the approval. *Id.*

§ 360cc(b)(2). These provisions can only apply if the two drugs at issue are "*the same drug*" referenced in subsection (a)—only then would there be any need for FDA to break orphan-drug exclusivity. Indeed, OOPD made this exact point. *See* AR1348-49 (explaining that the section 527(b) exceptions "concern instances where FDA determines that a drug *is the same drug* … but is approvable nonetheless despite *another same drug's* unexpired ODE") (emphases added).

Section 527(b)'s usage of "otherwise the same" points to the correct understanding of "otherwise" in subsections (b) and (c) alike. As Avadel concedes (at 20), "otherwise" does not always have a negative connotation; it can just mean "in other respects." In Avadel's example, the black iPhone 15 and the blue iPhone 15 are both iPhone 15s. They are "the same phone"; just as in subsection (b) the drug holding exclusivity and the drug which can be approved on consent of the exclusivity-holder are "the same drug." The same holds for "otherwise the same" in subsection (c). Indeed, FDA ignores that Congress confirmed this understanding of "otherwise the same" later in the same sentence. Congress wrote that a drug seeking serial exclusivity must be shown to be "clinically superior" to any "already approved or licensed drug that is *the same drug*." 21 U.S.C. § 360cc(c)(1) (emphasis added). Congress could have written a clinical superiority clause into either subsection (a) or subsection (b). It just chose not do so.

Avadel eventually falls back on policy. According to Avadel, applying the statute as written will stifle drug development—consigning patients to "enjoy, at best, one innovation every 7 years." Avadel Br. 17. But orphan-drug exclusivity does not stop FDA from approving the same drug for a different condition. Or a different drug for the same condition. Or even the same drug for the same condition, as long as the exclusivity-holder consents. The statute thus leaves ample room for innovation, particularly given typically lengthy biopharmaceutical development timelines. Indeed, experience with narcolepsy proves that the Orphan Drug Act has not been a barrier to real innovation, as other companies have developed and are developing other active moieties to treat the symptoms

of narcolepsy. *Cf.* 56 Fed. Reg. at 3341 (per FDA, "the development of an agent with a novel active moiety is not a financially or intellectually trivial matter; it represents a considerable effort and a substantial risk, as the results of changes in small molecules are difficult to predict").

The Orphan Drug Act does temporarily block the marketing of the same active moiety to treat the same rare disease. That is of concern to Avadel, given its chosen business strategy, but it does not appear to be a common fact pattern. As far as Jazz can tell, there have been fewer than a handful of cases in the past 40 years where an applicant has challenged the scope of orphan-drug exclusivity.[5] That infrequency suggests both that Avadel's policy concerns do not commonly arise in the real world and that FDA's clinical superiority carve-out is not necessary to spur innovation. And to the extent an otherwise approvable drug is from time-to-time blocked by orphan-drug exclusivity, that is an "inherent" part of Congress's design. *Eagle II*, 952 F.3d at 337 Avadel's "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022).

On the other hand, if Congress were to create the sort of carveout that Avadel seeks, doing so would reduce the incentive to develop orphan drugs in the first place. Against that backdrop, the 2017 amendments should be seen as a decision by Congress to maximize the incentive for innovative drugmakers to seek exclusivity. Congress both enabled companies to win serial exclusivity through innovation (as Jazz did for Xywav) and preserved the value of all orphan-drug exclusivities by ***not*** recognizing a third exception for clinical superiority. True, that choice sometimes results in "a race for orphan drug approval," *Baker Norton*, 132 F. Supp. 2d at 32, as it did here. But "this Court is not the forum" to reconsider Congress's policy decisions. *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1905–06 (2022). If Avadel or FDA think that section 527(a) is "bad policy or is working in unintended ways,"

---

[5] The examples that are public include this case, plus *Catalyst*, *Baker Norton*, and *Genentech*.

the solution is to "ask Congress to change the law." *Id.* But under the law, Avadel must wait to market Lumryz until 2027.

**D.      FDA's interpretation of "same drug" warrants no deference.**

*Chevron* deference does not apply here. *Contra* FDA Br. 15, 21–22; Avadel Br. 16. First, FDA lacks interpretive authority over section 527(a), which means this Court's review is *de novo*. And, second, FDA's reading fails at both steps of *Chevron* regardless.

**1.**      Deference is not warranted because Congress did not grant FDA interpretive authority over section 527(a). *See City of Kansas City v. HUD*, 923 F.2d 188, 191–92 (D.C. Cir. 1991) ("[I]t is only legislative intent to delegate [interpretive] authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*."); *see* Jazz Br. 23–24.[6]

FDA protests (at 21) that the agency has "general rulemaking authority" under 21 U.S.C. § 371(a). *See also* Avadel Br. 16. But FDA said the same thing in *Depomed*. *See* Federal Defendants' Opening Br., at 27, in *Depomed Inc. v. HHS*, No. 12-1592 (D.D.C., filed Feb. 8, 2013), ECF No. 21. That did not persuade then-Judge Jackson, who called section 527(a) "exactly the kind of 'thou shalt not' statute that … 'expressly negate[s] the existence of a claimed administrative power' to interpret the circumstances in which the provision applies." *Depomed*, 66 F. Supp. 3d at 233 (citation omitted). And it did not persuade the D.C. Circuit in *Eagle II*, where the court held that the pre-amendment section 527 "contain[ed] no express delegation from the Congress to promulgate regulations under that section, further evidencing that it did not intend the FDA to alter the plain text requirements." *Eagle II,* 952 F.3d at 334 n.14. Given that holding from the D.C. Circuit, anything *Baker Norton* said on this point is irrelevant. *Contra* FDA Br. 16; Avadel Br. 13.

---

[6] *Contra* Avadel (at 15–16), *Cuozzo Speed Technologies, LLC v. Lee* stands for the same proposition. In the same paragraph that Avadel quotes, the Supreme Court explained that the patent statute at issue does not just "contains such a gap," but *also* "expressly authorizes the Patent Office to engage in the process of rulemaking to address that gap." 579 U.S. 261, 277 (2016) (cleaned up).

Neither did the 2017 amendments "expressly delegate[] interpretive authority" over section 527(a). Avadel Br. 16. In truth, the only grant of rulemaking authority in the 2017 amendments was to "promulgate regulations for the implementation of subsection (c)." 21 U.S.C. §§ 360cc(d). The negative inference is clear—Congress did *not* grant FDA such authority over subsections (b) or (a). Avadel protests (at 22) that the negative inference cannot be drawn because Congress did not use the word "'only'" in subsection (d). But Congress was not obligated to use the word "only" when it was explicitly limiting rulemaking authority to a specific statutory provision. Indeed, that was the point made by the courts in *Depomed* and *Eagle II*: Because the grant of rulemaking authority in section 526(d) was *specific to that section*, the courts drew the negative inference and determined that the rulemaking authority was *not* broad and could *not* be read to apply to section 527. And in any event, "the mere possibility of clearer phrasing cannot defeat the most natural reading of a statute." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012).

Nor does section 527(d) show that Congress "explicitly embraced" or "preserved" FDA's existing regulations. Avadel Br. 21. That transitional provision allowed FDA to apply its existing definitions only to subsection (c), only until the agency promulgated new regulations "in accordance with this subsection," and only "to the extent such definitions are not inconsistent with" the words that Congress used in the amended statute. 21 U.S.C. § 360cc(d). And as Jazz has shown, applying the 1992 regulations to section 527(a) would fail that test.

Finally, the phrase "determined by the Secretary" in section 527(*b*) is not authority to rewrite section 527(*a*) to include the concept of clinical superiority. That provision simply makes clear that it is FDA's job to determine whether a proposed product in fact contains the active moiety or macromolecule that was designated under section 526 and, therefore, would be blocked by the orphan-drug exclusivity provided by section 527(a). In many cases (including this one), the answer is self-evident. But that is not always true. *See, e.g., Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166, 172-73

(D.D.C. 2018) (describing FDA's conclusion that the active moiety in sodium picosulfate was not "picosulfate," as had been assumed by the plaintiff, but was instead "bis-(p-hydroxyphenyl)-pyridyl-2-methane"). But FDA's responsibility to answer that technical question does not allow it to redefine the exclusivity guaranteed by the Orphan Drug Act.

2.      Even if FDA has interpretive authority over section 527(a), its reading fails under *Chevron*. For all the reasons above, the "traditional tools of statutory construction" unambiguously foreclose FDA's position. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984). It is thus irrelevant how old FDA's rules are. Even "well-settled" interpretations "cannot override congressional intent conveyed through a statute's plain text." *Confederated Tribes of Chehalis Rsrv. v. Mnuchin*, 456 F. Supp. 3d 152, 169 (D.D.C. 2020) (Mehta, J.). But even if "same drug" were ambiguous, FDA's clinical-superiority exception exceeds "the bounds of reasonable interpretation." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014).

Reading "same drug" to include clinical superiority would upend the statutory scheme. Recall that in 2017, Congress amended the statute to allow for subsequent or "serial" periods of exclusivity where clinical superiority is proven. Xywav earned a serial exclusivity because its low-sodium formulation provides greater safety than Xyrem's high-sodium formulation. If that conclusion were allowed to spill over from section 527(c) to section 527(a), it would mean that Xywav and Xyrem are "not the same drug." Enter Lumryz—which has exactly the same high-sodium load as Xyrem. Under FDA's theory, it follows that Xywav and Lumryz also are "not the same drug" because Lumryz is the same as Xyrem and thus ***inferior*** to Xywav. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████This shows that FDA cannot apply its theory consistently or deal with its

logical consequences—it knows that doing so would eviscerate the value of any serial exclusivity earned pursuant to section 527(c). In other words, the agency knows that if its interpretation were taken to its logical conclusion, a serial exclusivity would never block ***inferior*** products. Literally any abbreviated new drug application ("ANDA") or section 505(b)(2) application could come to market simply by identifying an older, inferior product as the listed drug. That result would destroy the value of the serial exclusivity that Congress created in section 527(c), which shows that FDA's reading of "the same drug" is not a reasonable construction of the Orphan Drug Act. *See Util. Air Regul. Grp.*, 573 U.S. at 321 (rejecting as unreasonable an agency interpretation that "would be inconsistent with—in fact, would overthrow—the Act's structure and design").[7]

\*     \*     \*

Because Xywav and Lumryz are "the same drug," FDA lacked authority to approve Lumryz during Xywav's exclusivity period. FDA's decision to do so must be vacated.

## II.   OOPD's "major contribution to patient care" finding departs from longstanding FDA policy without acknowledgment or adequate explanation.

Even if section 527(a) included a "clinical superiority" exception, FDA acted arbitrarily and capriciously in applying it. FDA's regulations have always defined clinical superiority as "a significant therapeutic advantage *over and above* that provided by an approved drug." 21 C.F.R. § 316.3(b)(3) (emphasis added). The 2017 amendment used similar language. *See* 21 U.S.C. § 360cc(c)(2). That

---

[7] It is no response for FDA to say (at 20) that the *Baker Norton* court upheld FDA's interpretation. In *Baker Norton*, rival companies developed the same active moiety for the same rare disease. *See* 132 F. Supp. 2d at 33. After losing the "race for orphan drug approval," the plaintiff sued FDA, arguing that the winning drugmaker's exclusivity should not block its competing drug because "Congress clearly intended for the term 'drug' in [section 527(a)] to mean a 'finished drug product,'" *Id.* at 32–33, 35. The court found that it was "permissible" for FDA to "regard[] two drugs as different if they differ with respect to the chemical structure of their active moieties." *Id.* at 37–38. The concept of clinical superiority simply was not at issue. More importantly, and as discussed, the ambiguity that the *Baker Norton* court identified has since been removed from the statute. As amended, the only permissible antecedent for "drug" is the active moiety designated under section 526.

language implies forward progress, not backsliding. And as Jazz has explained (at 24–28), FDA used to agree. It has acknowledged more than once that the major-contribution version of clinical superiority "is meaningful *only* when the subsequent drug provides safety or effectiveness comparable to the approved drug." 76 Fed. Reg. 64868, 64871 (Oct. 19, 2011) (emphasis added); *see* Griffin Decl. Ex. 1 at 2 (same quote). FDA previously referred to that comparable safety requirement as its "longstanding policy," 76 Fed. Reg. at 64876—a statement FDA's summary-judgment brief nowhere acknowledges. That requirement should have been dispositive here.

As to effectiveness, there may be equivalence, but no more than that. Avadel has never argued that Lumryz is more effective, the Review Division found that there is "no evidence" to support such a claim, *see* AR479, and OOPD agreed, *see* AR1369.

But Lumryz does not provide comparable safety. Avadel did try to argue that once-nightly dosing makes for a safer product, but the Review Division rejected that claim too, *see* AR480, and OOPD again agreed, *see* AR1369.[8] Most importantly, OOPD acknowledged that Lumryz is **less safe** than Xywav due to the safety concern presented by Lumryz's elevated sodium burden and the corresponding increased cardiovascular risk. *See* AR1373.

---

[8] The amicus brief continues to press this greater-safety argument based on anecdotes drawn from Internet sites, such as a Reddit forum. *See* Amicus Br. at 4 n.3. But amici do not acknowledge that FDA considered and rejected the same safety arguments below. *See* AR1369. And that is not the only thing the amicus brief gets badly wrong. For example, amici contend that if Jazz's statutory argument is accepted, "an exclusivity holder will have an incentive to introduce marginal improvements just before its exclusivity expires." Amicus Br. 18. This policy argument misses the fact that Congress addressed that exact concern by enacting Section 527(c), which limits serial exclusivity to where a new drug has been demonstrated to be clinically superior. In other words, the 2017 amendment already addressed amici's policy preference that serial exclusivity be limited to a "major improvement." Amicus Br. 17. Amici also err in suggesting that Xywav was a "simple tweak[]." *Id.* at 18. As FDA found (but amici ignore), Xywav earned exclusivity by making a sodium reduction that "will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients." AR1357. An amicus brief that relies on anonymized Internet comments, makes basic errors in describing the statute, and ignores the agency's decisionmaking where inconvenient, offers nothing to the Court's consideration of this case. It confuses far more than it could possibly illuminate.

FDA and Avadel cannot brush that fact aside. FDA first protests (at 23) that the agency's "regulations themselves do not establish" a comparable safety requirement. *See also* Avadel Br. 25. But agencies can and do interpret their own regulations, including through issuing interpretive rules "to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995)). Having announced that it understands the "major-contribution" provision of its rules to include a comparable-safety requirement, FDA could not depart from that policy without acknowledging and rationally explaining the change. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not … depart from a prior policy sub silentio or simply disregard rules that are still on the books.").

Changing tack, FDA faults Jazz for relying on a preamble to a proposed rule. FDA Br. 23–24; *see also* Avadel Br. 26. Yet agencies often articulate their policy positions in preamble, and FDA's own regulations state that it may announce a "statement of policy or interpretation" in "a preamble to a proposed or final regulation." 21 C.F.R. § 10.85(d)(1). FDA's regulations also provide that such a preamble statement is an "advisory opinion" that FDA generally must "follow … until it is amended or revoked." *Id.* § 10.85(e). So when FDA explained in its economic analysis that this aspect of the proposed rule would impose no new costs on industry because the new language was just a "*minor clarification*" designed to "*make explicit* that a drug shown to be clinically superior to an approved drug for making a major contribution to patient care would also have to be demonstrated to provide safety and effectiveness comparable to the approved drug," and further said that this rule was "consistent with *longstanding policy*," 76 Fed. Reg. at 64876 (emphases added), the agency's words had teeth under the APA and the agency's own rules. They were establishing an interpretive rule and announcing an "advisory opinion" from which FDA could not depart without proper procedure.

Contra Avadel (at 26), there was nothing tentative or "unclear" about those words. FDA was acknowledging a necessary condition for finding a major contribution to patient care: this "unusual" pathway applied "only when" a new drug was "comparable to the approved drug" in terms of safety and efficacy. 76 Fed. Reg. at 64871. The only confusion had to do with the evidentiary showing needed. Comments had expressed concern that FDA was imposing a new requirement by mandating that every major-contribution argument would require a head-to-head clinical trial, even though FDA had previously promised that such trials would not be required in all cases. *See* 57 Fed. Reg. 62076, 62079 (Dec. 29, 1992).

For the same reason, Avadel (at 3–4, 26) and FDA (at 23–24) are wrong to claim that FDA rejected the comparable-safety requirement in the 2013 final rule. The final preamble said no such thing; it simply explained that FDA had chosen to forgo changing the text of the regulation to avoid giving the misimpression that it was reneging on its promise. *See* 78 Fed. Reg. 35117, 35124 (June 12, 2013) (explaining that the agency "did not intend to propose a new standard" and "in particular … did not mean to suggest that direct proof of comparability … would be required"). Thus while FDA did not adopt a "new standard" neither did it repudiate the old one (the "longstanding policy") described in the 2011 preamble, which it had continued to apply while the proposed rule was pending. *See* Griffin Decl. Ex. 1 at 2 (rejecting a major contribution argument in 2012 based on a failure to establish comparable safety and effectiveness).

Avadel (at 26–27) and FDA (at 24) separately argue that the 2013 preamble statement that major contribution arguments will be "evaluated on a case-by-case basis" somehow means there is no comparable safety requirement. But those two requirements can easily coexist, and they did in agency practice. The comparable-safety requirement set a floor. Above that floor—after comparable safety was established—the agency considered on a case-by-case basis whether a drug's features otherwise constituted a major contribution. One of the memos in the administrative record reflects how that

worked. It states that an "[i]nherent" part of the major contribution is a theshold showing that the new drug will maintain comparable safety, after which each major contribution argument "is assessed individually." AR1494; AR1495 (same). In contrast, the approach that OOPD anounced below provides unfettered discretion to FDA to approve drugs under the "major contribution" pathway, contrary to the statute's design. As then-Judge Jackson recognized in *Depomed*, section 527(a) was intended to "remov[e] FDA discretion to approve" follow-on products during the exclusivity period. 66 F. Supp. 3d at 233. The approach that OOPD announced below grabs that discretion right back and places no meaningful limit on it.[9]

Pivoting, Avadel alternatively suggests (at 24, 26 & n.5) that the comparability requirement was supposed to be "disjunctive" such that comparable *efficacy* is sufficient, even if the new drug is significantly less *safe*. However, "or" can and often does mean "both." *See, e.g.*, *Holyoke Water Power Co. v. FERC*, 799 F.2d 755, 761 (D.C. Cir. 1986) (collecting cases); *United States v. Fahnbulleh*, 742 F. Supp. 2d 137, 147 (D.D.C. 2010) (rejecting the disjunctive reading of "or"). And FDA described its "longstanding policy" in a conjunctive sense, as in a drug must "provide safety *and* effectiveness comparable to the approved drug." 76 Fed. Reg. at 64876 (emphasis added). The agency applied it that way too. *See, e.g.*, AR1470 ("at least as safe *and* as effective") (emphasis added). FDA's longstanding policy clearly requires both comparable efficacy and comparable safety.

On precedent, FDA tries to shift the burden by forcing Jazz to show a specific example of FDA applying the agency's longstanding policy at the approval stage to block the approval of a follow-on product. *See* FDA Br. 24. That has it backwards. FDA acknowledged the comparable safety

---

[9] Avadel claims there is tension between "Jazz's … argument concerning *Depomed*" and FDA's comparable-safety argument, which (it says) would require an "extra-statutory showing of 'comparable safety'" under section 527(c). Avadel Br. 24 n.4. But FDA was interpreting its own regulation when it adopted the comparable-safety requirement—not section 527(c), which did not yet exist and does not provide authority to break exclusivity. *See* AR1348. In other words: the agency was elaborating its own rules, not rewriting the ones that Congress enacted.

requirement in the Federal Register. Public statements of policy are what matter here—not, as Avadel calls them, "confidential letters and memos." Avadel Br. 27. *See United States v. Lachman*, 387 F.3d 42, 54 (1st Cir. 2004) ("agency interpretations are only relevant if they are reflected in public documents."). Again, FDA's own binding regulations require FDA to faithfully follow its publicly announced advisory opinions unless and until they are publicly revoked. 21 C.F.R. § 10.85(d), (e). So OOPD's decisions can help to illustrate how a publicly stated, longstanding policy works in practice, but they cannot disprove its existence.

That said, the precedents clearly favor Jazz.[10] The parties have collectively identified nine relevant examples. Here they are in chronological order:

1. Avadel (but not FDA) tries to rely on FDA's 1997 memo regarding the drug Benefix® (coagulation factor IX), but that case did not involve a major-contribution finding. Instead, FDA found that Benefix was clinically superior based on greater safety. AR1433. The sponsor "[did] not claim … that Benefix … makes a major contribution to patient care," so FDA's memo did not address any issue relevant to this case. *See* AR1434.

2. The only precedent FDA affirmatively presents (at 26) is a 2002 decision related to the drug Rebif® (interferon beta-1a), which Avadel also invokes (at 28). Rebif also has nothing to do with

---

[10] Avadel, but not FDA, claims the agency is "'entitled to deference'" regarding its "'description of its historical practice.'" Avadel Br. 25 (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 8 (D.C. Cir. 2006)). But as *Alpharma* makes clear through its citation on this point to *Federal Power Commission v. Florida Power & Light Co.*, the "deference" described there goes only to "a purely factual question" and falls away when "it is without substantial basis in fact." 404 U.S. 453, 463 (1972). That limited deference was available in *Alpharma* because the plaintiff failed to cite "anything to contradict the agency's representation, and at oral argument plaintiff's counsel conceded that he did not know of any contrary examples." 460 F.3d at 9. Where, as here, the court is addressing the legal question of whether the agency changed its policy without acknowledgment or explanation—and especially because there is a real dispute with concrete examples identified—the question is for the court, with no deference owed to FDA. *See United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 6–7 (D.D.C. 2017) (Mehta, J.) ("Whether an agency's interpretative statement is a mere clarification of its existing position, as opposed to a change in position, is a question for the court to decide—not [the agency]—and the court owes the agency no deference on that issue.").

this case. OOPD found that the drug Rebif had established greater efficacy (through a head-to-head trial) even though Rebif presented a risk of injection-site necrosis that was not associated with the prior drug. *See* AR1440–41. That decision came nine years prior to the 2011 preamble and it did not involve a major-contribution. Any language in that memo that FDA and Avadel find favorable is both out-of-date and clearly dicta.

**3.**     The first actually relevant decision is OOPD's 2005 decision to reject a request for an orphan-drug designation for the drug Ravicti® (glycerol phenylbutyrate) based on a hypothesis of a major contribution to patient care. Jazz cited this example in its brief (at 4, 26). At the time, OOPD stated that to even "consider" a hypothesis of a major contribution, the sponsor would have to first "demonstrate with reasonable certainty that [the new drug] would be at least as safe and as effective as [the old drug]." AR1470. Avadel responds that Ravicti presented "unique circumstances" and cannot reflect any "broader policy." Avadel Br. 29. However, that lacks credibility given that similar circumstances and the same result recurred in 2012 for Orenitram®, as discussed below.

Avadel also suggests that Ravicti undermines Xywav's right to exclusivity because it allegedly shows that a reduction in sodium allegedly "does not provide 'greater safety.'" Avadel Br. 29. This is yet more psuedoscientifc sodium denial from Avadel. ████████████████████████████████ ████████████ It is also inaccurate. ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

For its part, FDA says the Ravicti decision and the Orenitram decision discussed below are irrelevant because they occurred at the designation stage, *see* FDA Br. 25, but that makes no sense. At the designation stage all that is required is a reasonable "hypothesis," *see* 21 C.F.R. §§ 316.20(a), 316.25(1)(3), whereas approval requires a "demonstration," *see* 21 U.S.C. § 360cc(c)(1); 21 C.F.R. § 316.34(c). The hypothesis requirement works like a gatekeeper by excluding the most obviously meritless claims. It makes sense that the comparable-safety requirement is more likely to be applied at the gate then at the subsequent approval stage. And just as a matter of logic, the standard of proof required at the approval stage is *more* stringent, not less. It follows that if there is a comparable safety requirement at the orphan-drug designation stage (as Ravicti and Orenitram demonstrate), then the same requirement must apply *a fortiori* at approval.

4.      As mentioned, OOPD's decision in 2012 related to Orenitram® (treprostinil) also rejected an orphan-drug designation request based on a failure to establish comparable safety. *See* Griffin Decl. Ex. 1 at 2 (clinical superiority "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug."). Avadel tries to deny (at 29–30) that this occurred, but the only plausible reading of the unredacted portions of the document is that the request was denied pursuant to FDA's longstanding policy.[11]

---

[11] FDA, of course, could clarify the issue by providing an unredacted copy.

5.      Citing extra-record documents, Avadel also tries to suggest (at 30) that FDA reversed its 2012 decision regarding Orenitram in a subsequent decision in 2016, but FDA's later decision was another rejection. Even there, FDA first stated that the adverse event profiles of the two drugs "appear to be similar" before rejecting the sponsor's major contribution arguments. *See* OOPD Ltr. at 2–3 (Mar. 23, 2016) (Second Griffin Decl. Ex. 46). That rejection also is consistent with the longstanding policy that FDA publicly recognized in 2011.

6.      Avadel (but not FDA) attempts to rely on OOPD's 2013 decision related to the drug Procysbi® (cysteamine bitartrate), but its presentation is misleading. Avadel claims (at 28) that FDA found Procysbi to be less safe than its predecessor due to a higher rate of gastrointestinal adverse events observed in its clinical trials. Avadel then asserts (at 28), that this "disproves Jazz's alleged per se policy." But as Avadel knows, one cannot mechanically compare adverse event frequency across studies because there are too many confounding factors.[12] Contrary to what Avadel says, FDA expressly found that Procysbi and its predecessor had comparable safety profiles before finding a major contribution to patient care. *See* AR1501 ("The reviewer's overall conclusions with the review of all the safety information submitted in support of the NDA were that *the safety profile for the delayed-release cysteamine product was similar to* [the older product] although a higher incidence of GI AEs were observed in the pivotal trial …..") (emphasis added). Which is to say, FDA once again acted consistently with its longstanding policy.[13]

---

[12] ███████████████████████████████████████████████████
███████████████████████████████████    FDA resoundingly rejected that argument. *See* AR480 ("[Avadel's] comparison is flawed for a number of readily-evident reasons.").

[13] The same point is also the answer to Avadel's hypothetical (at 24) about a new chemotherapy capsule. The hypothesized differences in GI adverse events would not necessarily prevent FDA from finding comparable safety, just as it did for Procysbi.

**7.**     OOPD's decision related to Signifor® LAR (pasireotide) in 2018 similarly followed the longstanding policy. Prior to finding that the drug made a major contribution to patient care, FDA verified that "[t]he overall safety and efficacy profiles of both pasireotide immediate release and pasireotide LAR are similar to and consistent with the safety and efficacy profiles of the SSA drug class." Griffin Decl. Ex. 10 at 3. FDA concedes (at 25) that this example is at least consistent with the longstanding policy described in the 2011 preamble. So does Avadel (at 29).

**8.**     Avadel (but not FDA) also purports to rely on the drug Valtoco® (diazepam nasal spray). Avadel claims that, in 2020, FDA found the drug to be less safe than its predecessor because "nasal administration caused new adverse reactions." Avadel 28; *see id.* at 30. To make that claim, Avadel infers a new safety problem based on its own interpretation of the drug's labeling (a notably "extra-record" source). *See id.* at 28. But the OOPD memo in the record raised no such safety concern and instead asserted a "favorable safety and tolerability profile." AR1525. Moreover, the OOPD memo references a separate citizen petition opposing orphan-drug exclusivity for Valtoco, *see* AR1524. When FDA denied that petition, the agency clearly wrote: "*The Agency did not identify any significant differences in the safety* or effectiveness of Valtoco in comparison to Diastat." FDA, Response to Citizen Petition at 13, Docket No. FDA-2019-P-5121 (Jan. 10, 2020), http://bit.ly/3QuqFEt (Second Griffin Decl. Ex. 47) (emphasis added). Once again, FDA was clearly following the comparable safety requirement with respect to this drug.

**9.**     Avadel attempts to distinguish OOPD's decision in 2020 with respect to Ultomiris® (ravulizumab-cwvz) on the ground that it allegedly "concerned 'greater safety' and 'greater effectivess,' not a [major contribution to patient care]." Avadel Br. 30. That is plainly false. FDA's website clearly states that Ultomiris earned a serial exclusivity by "provid[ing] a major contribution to patient care over Soliris." FDA, *Clinical Superiority Findings*, http://bit.ly/469XU5V. OOPD's memo says the same. AR1640 ("Ultomiris is clinically superior for the treatment of PNH within the meaning of the orphan

drug regulations and based on making a major contribution to patient care."). And before finding a major contribution, OOPD first "confirmed that the safety profile of Ultomiris was simlar to eculizumab." AR1639. Again, and despite what Avadel says, FDA was still following the comparable safety requirement.

In summary:

| Drug | Year | Significance |
|---|---|---|
| BENEFIX (coagulation factor IX), | 1997 | None — Not a "major contribution" decision |
| REBIF (interferon beta-1a), | 2002 | None — Not a "major contribution" decision |
| RAVICTI (glycerol phenylbutyrate) | 2005 | FDA rejected a major-contribution hypothesis based on a failure to show comparable safety |
| ORENITRAM (trespostinil) | 2012 | FDA rejected a major-contribution hypothesis based on a failure to show comparable safety and efficacy |
| ORENITRAM (trespostinil) | 2016 | FDA rejected a major-contribution hypothesis after finding comparable safety |
| PROCYSBI (cysteamine bitartrate) | 2013 | FDA found a major contribution after finding comparable safety |
| SIGNIFOR LAR (pasireotide) | 2018 | FDA found a major contribution after finding comparable safety |
| VALTOCO (diazepam nasal spray) | 2020 | FDA found a major contribution after finding comparable safety |
| ULTOMIRIS (ravulizumab-cwvz) | 2020 | FDA found a major contribution after finding comparable safety |

Which brings the conversation back to where it started—**never** before has FDA found a drug that is less safe than its predecessor can make a major contribution. Until this case, FDA *always* has acted consistently with the longstanding policy set out in the 2011 preamble. Pretending that the policy never existed was classically arbitrary and capricious.

## III.  OOPD acted arbitrarily and capriciously by departing from inter-agency dispute resolution procedures without explanation.

When the Review Division found that Lumryz was not clinically superior to Xywav, AR0480, OOPD had several options. According to its SOP, in the event of a disagreement, OOPD should consult with "the [OOPD Director], [Regulatory Counsel], Consulted Center, and/or sponsors as

needed." AR2192, AR2189. Instead, OOPD went to the Center for Devices and Radiological Health ("CDRH")—medical-device experts with no experience in regulating drugs, let alone orphan-drug-exclusivity. In other words: when the drug experts said no, OOPD decided to seek out others who would give it the answer it wanted. That decision flouted agency procedures and warrants vacatur. Jazz Br. 28–30. The procedural violation also explains why OOPD's ultimate decision conflicts with the science—the device reviewers whose opinion carried the day lacked the experience with narcolepsy and oxybate to know better. *See infra* § IV.

It does not matter that OOPD's standard operating procedures "govern [the agency's] internal affairs." FDA Br. 28; *see also* Avadel Br. 31–32. The Orphan Drug Act confers a statutory right to exclusivity, and that right is at stake when FDA administers this scheme. Because FDA has adopted procedures "by which the interests of [exclusivity-holders] are to be regulated," it "must adhere firmly" to those procedures, *Massachusetts Fair Share v. L. Enf't Assistance Admin.*, 758 F.2d 708, 711 & n.34 (D.C. Cir. 1985), and courts "have a clear role to play" in scrutinizing their "practical implementation," *Robbins v. Reagan*, 780 F.2d 37, 46 (D.C. Cir. 1985).

The simple truth is that OOPD was required by its own SOP to work with the review division responsible for oxybate. OOPD did as required, but it received an answer it did not like. *See* AR0482. At that point, OOPD had the option to continue discussions with the Review Division, to appeal to its own supervisors, to appeal to the Review Division's supervisors, to seek input from the Orphan Drug Products Policy Council, or some combination of the above. But the SOP did not contemplate what OOPD chose to do: seek a second opinion from a different center that has no regulatory jurisdiction over drugs at all. That choice was unprecedented (there is no public record of CDRH ever being involved in a decision under the Orphan Drug Act prior to this case), and it was not authorized by OOPD's own SOP or either of the applicable SMGs. Further, that choice easily distinguishes this case from *Logic Technology Development LLC v. FDA*, 84 F.4th 537 (3d Cir. 2023), where the agency's

deliberations all occurred within the Center for Tobacco Products, which indisputably is the decider for tobacco product applications.

Nor does *American Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47 (D.D.C. 2020), require Jazz to "prove that the alleged procedural deviation" prejudiced its "'right to participate' in the proceeding." Avadel Br. 32 (quoting *Am. Waterways*, 507 F. Supp. 3d at 72). This language addressed the specific argument that the *American Waterways* petitioner made under the actual standard—"a showing of substantial prejudice." 507 F. Supp. 3d at 72 (quoting *Assoc. Press v. FCC*, 448 F.2d 1095, 1104 (D.C. Cir. 1971)). It claimed the agency's departure from procedure had prejudiced the regulated community by making it more difficult to access the "information necessary to meaningfully participate." *Id.* This Court denied that challenge on the fact-specific ground that the plaintiff *was* able to participate meaningfully. *Id.* at 56. It did not purport to depart from controlling decisions like *Massachusetts Fair Share.*

FDA also says OOPD's SOP "applies only to the process of determining eligibility for exclusivity, not whether one drug's exclusivity blocks the approval of another," FDA Br. 27, which begs the question why the government chose to include an allegedly inapplicable SOP in the administrative record in the first place. In any event, FDA's claim is pure revisionism—OOPD's decision obviously and expressly did determine "eligibility for exclusivity." Specifically, OOPD determined that it could break Xywav's exclusivity *because* "Lumryz is eligible for its own term of [exclusivity] because it is clinically superior to both Xywav and Xyrem." AR1344. And by its terms, the SOP applies to all complex cases, including determinations of clinical superiority or the "sameness" of the drugs. *See* AR2187, AR2188, AR2190.

For its part, Avadel suggests (at 32–34) that no procedural violation occurred because OOPD and the Review Division never "formally reach[ed] an impasse." Whatever that means, it has no bearing on when the standard operating procedures apply. *See* AR2190. And Avadel's narrative is

misleading. Avadel asserts that when the Review Division rejected Avadel's clinical superiority claim in August 2021, *see* AR0482, the Review Division supposedly "overlooked" its "own prior finding." Avadel Br. 34 n.10. ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ While designation requires only a "plausible hypothesis" of clinical superiority, *see* 21 C.F.R. § 316.20(a), (b)(5), exclusivity requires an actual demonstration by competent evidence, *see* 21 U.S.C. § 360cc(c)(1); 21 C.F.R. § 316.34(c). Here, there is no inconsistency between the Review Division's determination in 2017 that Avadel's hypothesis was plausible and its judgment in 2021 that Avadel's evidence was lacking. *See* AR0482 ("In this Division's opinion, no evidence has been provided by the applicant that Lumryz™ is clinically superior."). Further, Avadel's suggestion that the Review Division "would have quickly aligned with OOPD," Avadel Br. 34 n.10, is both speculation and belied by the available facts. While the record does not include a full accounting of OOPD's communications with the Review Division (or with CDRH for that matter), the record as it exists shows that this cross-center dispute remained ongoing through at least July 2022 (nearly a full year after the Review Division rejected Avadel's claim). AR0483-85.

FDA nevertheless protests that its "sleep experts in CDRH" were actually "well positioned to answer questions about the benefits of once-nightly dosing." FDA Br. 28; *see also* Avadel Br. 34. FDA does not explain why that is so. Again, as far as Jazz can tell, this is the first time OOPD has ever asked CDRH—the *device* center—to decide whether a drug makes a major contribution to patient care. Indeed, it appears to be the first time CDRH has ever evaluated a *drug* treatment for any sleep disorders. The medical device reviewers at CDRH are no doubt skilled at their jobs, but they work in the *Division of ENT, Sleep Disordered Breathing, Respiratory and Anesthesia Devices* ("DSRA"); which is within the *Office of Health Technology 1 – Opthalmic, Anesthesia, Respiratory, ENT, and Dental Devices*

("OHT1"); which in turn is part of the *Office of Product Evaluation and Quality* ("OPEQ"), which is a unit of CDRH. *See* AR0504. As the title implies, their focus is on "Sleep Disordered Breathing," which is a common condition that is generally treated with a CPAP device. Expertise in mechanical treatments for obstructive sleep apnea does not equate to expertise in a rare sleep disorder like narcolepsy or the pharmaceuticals used to treat it. ***That*** expertise exists in the Review Division. Avadel's assertion that OOPD consulted CDRH just because "so much work on sleep science occurs there," Avadel Br. 33, is after-the-fact lawyering.

The point is not that "one part of FDA" cannot "consult[] with colleagues in another part" or to object to "reasoned disagreement among civil servants." FDA Br. 28 (cleaned up). Rather, the point is that FDA adopted procedures that specify ***who*** should address orphan-drug topics and ***how*** disagreements should be addressed when they arise, to ensure they are resolved in a sound and reasoned way. OOPD departed from those rules without even acknowledging that it was doing so. "*Ad hoc* departures from those rules … cannot be sanctioned," *Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986), in part because they frequently undermine sound decisionmaking. As Jazz showed in its opening brief and shows again in Part IV below, OOPD's decision was far from sound.[14]

## IV. OOPD's determination was inconsistent with prior FDA determinations and the scientific literature.

While this Court defers to FDA's scientific expertise, it must ensure that FDA adequately considered all "the relevant data"—including evidence that cuts against its conclusion. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). FDA failed to do that here. Instead of engaging in reasoned decisionmaking, the agency ignored critical safety information about sodium,

---

[14] As a last point, FDA cites (at 28) to 21 U.S.C. § 393(b)(4), which allows the agency to consult with *external* experts. That neither occurred here nor justifies OOPD's decision to seek a second opinion from CDRH when doing so is not contemplated by its SOP or the agency's SMGs.

overstated the benefits of once-nightly dosing, and exaggerated the risks of twice-nightly dosing. That was arbitrary and capricious.

A.   **FDA failed to grapple with the clinical significance of Lumryz's sodium burden.**

"[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). But that's exactly what FDA did here. As Jazz has shown (at 31–34) the agency arbitrarily and capriciously (i) failed to grapple with the clinical significance of Lumryz's sodium burden and (ii) claimed that patients could reduce their sodium intake through other means. *See Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 88 (D.D.C. 2020) (Mehta, J.) (vacating FDA rule because agency relied on "general 'health risks'" and "assum[ptions]" instead of analyzing whether warning labels were "in fact" necessary).

FDA insists (at 29) that its order passes muster because it "considered" Lumryz's sodium burden and concluded that it "still provided a major contribution to patient care." But "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice." *AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001). FDA may have "quoted entire paragraphs" about Xywav and mentioned "'cardiovascular morbidity' eight times," Avadel Br. 42, but it failed to "articulate a satisfactory explanation" for finding that the benefits of once-nightly dosing outweighed the acknowledged safety concerns of Lumryz's sodium burden. *State Farm*, 463 U.S. at 43. This is not merely a question of policy, FDA Br. 29, or scientific judgment, Avadel Br. 35. Things could be different if FDA had drawn upon its expertise to rationally explain the specific risks of hypertension, cardiovascular disease, and cardiovascular morbidities and why those specific risks are overcome by a more convenient dosing schedule. "The problem in this case is that [FDA] did not do that work." *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1199–2000 (D.C. Cir. 2021)

(order was arbitrary and capricious because agency offered "breezy analysis" and failed to reconcile its order with previous statements).

Turning to sodium reduction, FDA observes that Jazz "does not actually claim that it is *impossible* for patients to reduce sodium in their diets." FDA Br. 29 (emphasis added). But FDA's own data and analysis do show that doing so is "difficult," Griffin Decl. Ex. 11—and sodium consumption may be more inelastic still if drugs "represent a significant portion of an individual's total daily intake," Griffin Decl. Ex. 12 at 2. Far from taking this evidence "out of context," FDA Br. 29, Jazz is merely citing what *FDA itself* has repeatedly said. It was arbitrary and capricious to ignore these realities when suggesting that narcolepsy patients could simply compensate for Lumryz's 1,500 mg increase in sodium burden compared to Xywav through unspecified "other means." AR1374 n.210. *See New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d 61, 74 (D.D.C. 2009) ("An agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision.").

Avadel suggests (at 44) that FDA was just "treat[ing] like cases alike" because Lumryz contains the same amount of sodium as Xyrem, which FDA has found safe. But OOPD was engaged in a different analysis here. It was considering not whether Lumryz was sufficiently safe to be approved, but whether it provided "a significant therapeutic advantage *over and above* that provided by an approved drug," by way of the "major-contribution" pathway. 21 C.F.R. § 316.3(b)(3) (emphasis added). And in all events, Avadel misses the point. The question is not whether Jazz "presented … evidence" linking sodium to "adverse event[s]" but instead whether OOPD adequately addressed "evidence that undercut[] its judgment." *Genuine Parts*, 890 F.3d at 312. It did not.

### B. The record does not support FDA's assertions that twice-nightly dosing harms patients and that once-nightly dosing can normalize sleep.

In approving Lumryz, OOPD claimed that twice-nightly dosing creates "increased risk for accidents and death," AR1374, whereas once-nightly dosing "provides an opportunity for narcolepsy patients to achieve normal sleep architecture," AR1371. As Jazz has explained (at 34–44), the record

supports neither assertion. Twice-nightly dosing is safe and effective, and FDA has not approved any drug to improve—let alone normalize—nighttime sleep in narcolepsy patients. Indeed, OOPD itself conceded that there "is no evidence suggesting that the efficacy of Lumryz is different from that of … Xywav." AR1369. OOPD's decision thus "rests upon a factual premise that is unsupported by substantial evidence," making it arbitrary and capricious. *See Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

Neither FDA nor Avadel seriously defends the agency's claim that twice-nightly dosing harms patients. To the contrary, Avadel now concedes that "twice-nightly oxybate improves sleep relative to no treatment at all." Avadel Br. 38. But that gives away the game. It cannot be true that Xywav (i) improves sleep, but also that it (ii) "fragments sleep and disrupts sleep architecture," making it "antithetical to the goal of improving sleep." AR1381, AR1370. Avadel tries to mitigate this concession by calling it a comparative claim and arguing that FDA's statements "speak to the second question of whether *once-nightly oxybate* is better for sleep than twice-nightly oxybate." Avadel Br. 39. But the agency's order does not speak in comparative terms, and this Court "may not accept appellate counsel's post hoc rationalizations." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

In all events, there is no evidence that Lumryz is better for sleep than Xywav—and what evidence there is suggests that the drugs are roughly equivalent. *See* Jazz Br. 42–43. Meanwhile, only one study has actually evaluated Lumryz against a placebo, and, FDA did not address that claim or consider the study. *See Burlington*, 371 U.S. at 168–69 (Agency action must "be upheld, if at all, on the same basis articulated in the order by the agency itself.") At bottom, the record does not show that Lumryz can normalize sleep—so it was arbitrary and capricious to approve Lumryz on that basis.

As for the benefits of once-nightly dosing, FDA and Avadel chiefly claim that a "forced awakening" is clinically different from (and worse than) the brief arousals and full awakenings that all

41

narcolepsy patients experience. FDA Br. 30; Avadel Br. 37. There are two problems with that theory. *First*, it's still more after-the-fact lawyering, found nowhere in FDA's order. And *second*, it's unsupported by any study in the administrative record. To be sure: the literature recognizes a difference between arousals and awakenings—but it does not recognize a third, more-serious category of "forced awakenings." *See Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020) ("[A]n agency's ipse dixit cannot substitute" for the "substantial evidence [required] to support a decision." (citation and quotation marks omitted)). Far from inviting this Court to "step into the FDA's shoes" Avadel Br. 36, Jazz is merely invoking textbook principles of administrative law: Courts "do not defer to an agency's conclusory or unsupported suppositions." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (citation omitted).

Avadel also suggests (at 35) that any errors were harmless because "unchallenged grounds" for FDA's decision "provide an independent reason for this Court to affirm." But when an agency has offered "multiple rationales (and has not done so in the alternative)," and "one of the rationales is deficient," this Court will "ordinarily vacate the order unless [it is] certain" that the agency "would have adopted it even absent the flawed rationale." *Nat'l Fuel Gas Supply Co. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006). Here, FDA did not identify the "unchallenged grounds" as independent bases for its decision, and it is far from certain that it would have approved Lumryz "absent the flawed rationale." *Id.*; *see also Prohibition Juice Co. v. FDA*, 45 F.4th 8, 24 (D.C. Cir. 2022) (courts apply the "harmless error rule consistent with [*Chenery*]" and thus generally will not "affirm an agency decision on a ground other than that relied upon by the agency"). Anyway, FDA doesn't argue harmless error, so Avadel may not do so. *See Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*, 41 F.3d 721, 729 (D.C. Cir. 1994) ("Intervenors may only argue issues that have been raised by the principal parties ….").

## V.      Approval for Lumryz must be vacated.

Jazz's opening brief explained (at 44) that vacatur is the proper remedy for FDA's APA violations, consistent with the general rule that "[a] plaintiff who prevails on its APA claim is entitled to relief under that statute, which normally will be a vacatur." *Cigar Ass'n of Am. v. FDA*, No. 16-cv-1460 (APM), 2023 WL 5094869, at *3 (D.D.C. Aug. 9, 2023) (cleaned up) (citing *Am. Bioscience Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001)). That is especially true when an agency exceeds its statutory authority, *NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007), and when it fails to address "empirical data … inconsistent with its conclusion," *Cigar Ass'n*, 2023 WL 5094869, at *4 (citations omitted).

To be sure, "remand without vacatur is an available remedy," but "it is generally reserved for 'exceptional' circumstances." *Id.* And the settled rule is that "[t]he burden to demonstrate such extraordinary circumstances lies with the government." *Id.* (citing *CBOE Futures Exch., LLC v. SEC*, 77 F.4th 971 (D.C. Cir. 2023); *Friends of the Earth v. Haaland*, 583 F. Supp. 113, 156 n.29 (D.D.C. 2022)).

Here, FDA made no attempt to carry that burden—its brief does not mention vacatur or in any way deny that vacatur is warranted if its approval violated the APA. And so FDA has waived any argument for a remedy other than vacatur. *See Lewis v. District of Columbia*, No. 10-5275, 2011 WL 321711, at *2 (D.C. Cir. Feb. 2, 2011) (per curiam) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

Avadel's brief (at 45) does mention vacatur and the alternative of remand without vacatur, but it makes no meaningful effort to carry the burden that the government declined to pick up. Avadel fails to even mention the "exceptional circumstances" standard, let alone acknowledge that the burden to demonstrate "exceptional circumstances" lies with the federal defendants. And while Avadel alludes to facts within its knowledge that supposedly would demonstrate that vacatur would have "severe[]"

and "highly disruptive consequences,"[15] Avadel did not disclose them, preferring to keep whatever cards it may have in its sleeve for "separate briefing on remedies." Avadel Br. 45.

The Court should not countenance this strategy, in no small part because Avadel already waived its opportunity to request separate remedy briefing. At the outset of this litigation, the parties jointly negotiated and then moved this Court to adopt a proposed briefing schedule. ECF No. 31. In that submission, the parties, including Avadel (*see id.* 1 n.1) jointly proposed that this case would be "most efficiently resolved by cross-motions for summary judgment" on a schedule that did *not* include separate remedy briefing. *Id.*

The Court also should not overlook that any delay for additional remedy briefing favors Avadel by allowing it to continue to market Lumryz despite a ruling that would, in Avadel's words, "dissolve FDA's approval of Lumryz." Avadel Br. 45. By exactly the same token, the delay would harm Jazz, which earned seven years of exclusivity by developing an innovative safer product and would continue to face unlawful competition. That harm to Jazz's statutory rights further favors vacatur: The Orphan Drug Act "remov[es] FDA discretion to approve" competing drugs during the exclusivity period. *Depomed*, 66 F. Supp. 3d at 233. The question here is whether FDA has properly steered around that prohibition. If the Court finds that it has not—that FDA either lacks or has failed to justify its exercise of its supposedly residual discretion—then it should not allow the approval order to stand.[16]

---

[15] *But see Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) (explaining that potential disruption "is weighty only insofar as the agency may be able to rehabilitate its rationale for [its decision]").

[16] A vacatur need not take effect the moment the Court issues its decision. For example, in *CBOE Futures Exchange, LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023), the D.C. Circuit addressed the possibility of disruption from vacatur by withholding its mandate for a brief period to allow certain transactions to be unwound. If the Court deemed an analogous transitional period warranted here, it could structure its vacatur similarly.

Importantly, granting the ordinary remedy of vacatur would not deprive Avadel of all recourse. It could move for a stay of vacatur pending any appeal it might wish to pursue. *See* Fed. R. App. P. 8. That procedure would allow the courts to consider in the balance, along with the usual stay factors, any interim remedies necessary to protect Jazz during the period of any stay, such as "a bond or other security provided" by Avadel. *See* Fed. R. App. P. 8(a)(1)(B), (a)(2)(E). That approach would far better serve the equities of this case, where the stakes are not a nationwide regulatory rule (a frequent reason to consider the "extraordinary" remedy of remand without vacatur), but instead the agency's adjudication of Avadel's drug application and its decision to vitiate the statutory right that Jazz earned by inventing Xywav.

## CONCLUSION

The Court should grant Jazz summary judgment and vacate FDA's approval of Lumryz.

November 15, 2023

Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Peter A. Bruland (D.C. Bar No. 1600717)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
tlosseaton@sidley.com
pbruland@sidley.com

*Counsel for Plaintiff Jazz Pharmaceuticals Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 15, 2023, I electronically filed this motion using the Court's CM/ECF system. Consistent with the August 7, 2023 Protective Order entered in this case, all participants will be served with the Notice of Electronic Filing and the foregoing motion via email.

Date: November 15, 2023

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah