# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAZZ PHARMACEUTICALS, INC.,

       *Plaintiff*,

    v.

XAVIER BECERRA, Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT CALIFF, Commissioner of Food and Drugs; U.S. FOOD AND DRUG ADMINISTRATION,

       *Defendants,*

AVADEL CNS PHARMACEUTICALS, LLC,

       *Intervenor-Defendant.*

Case No. 1:23-cv-1819-APM

Filed under seal

**Plaintiff's Combined Reply in Support of Plaintiff's Motion for Judicial Notice, Opposition to Defendants' Motions to Strike, and Memorandum in Support of Plaintiff's Protective Motion to Complete and Supplement the Record**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION AND SUMMARY.......................................................................................1

LEGAL STANDARD................................................................................................................3

ARGUMENT.............................................................................................................................4

I.  The motions to strike are grossly overbroad.................................................................4

    A.  FDA precedents and rules are legal authorities that may be freely cited......................4

    B.  Most of the exhibits were before FDA at the time of its decision.................................7

II. The Court should grant Jazz's motion for judicial notice. .........................................10

    A.  FDA's documents are subject to judicial notice.........................................................10

    B.  FDA's drug approvals are subject to judicial notice...................................................11

    C.  The administrative record rule is not a barrier to judicial notice.................................13

        1.  Taking judicial notice of the defendant agency's materials ensures
            effective APA review.....................................................................................14

        2.  The cases cited by FDA and Avadel are inapposite. .........................................17

    D.  FDA's remaining arguments are meritless. ................................................................18

        1.  Issue exhaustion does not apply. ....................................................................18

        2.  The exhibits are relevant. ...............................................................................22

        3.  The government has not been prejudiced.........................................................23

III. The Court should deny the motions to strike the scientific literature.........................24

IV. In the alternative, the standards for completing and supplementing the record are
    both met. ..................................................................................................................26

    A.  The court should order FDA to complete the administrative record. ..........................27

    B.  The court should order FDA to supplement the administrative record. .......................29

    C.  No forfeiture or waiver has occurred. ........................................................................32

CONCLUSION........................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Excursions LLC v. Yellen,*
   598 F. Supp. 3d 4 (D.D.C. 2022) ............................................................................................32

*Am. Wild Horse Pres. Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017) ..............................................................................................14

*Am. Wild Horse Pres. Campaign v. Salazar,*
   859 F. Supp. 2d 33 (D.D.C. 2012) .........................................................................................27

*Bayer HealthCare, LLC v. FDA,*
   942 F. Supp. 2d 17 (D.D.C. 2013) .........................................................................................21

*BB&L, Inc. v. NLRB,*
   52 F.3d 366 (D.C. Cir. 1995) ................................................................................................14

*Bennet v. Spear,*
   520 U.S. 154 (1997) ..............................................................................................................21

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.,*
   630 F. 3d 217 (D.C. Cir. 2011) ...............................................................................................3

* *City of Dania Beach v. FAA,*
   628 F.3d 581 (D.C. Cir. 2010) ........................................................................................ 29, 30

*Cobell v. Norton,*
   224 F.R.D. 1 (D.D.C. 2004) ..................................................................................................22

* *COMSAT v. FCC,*
   611 F.2d 883 (D.C. Cir. 1977) ........................................................................................ 13, 18

* *Cnty. of San Miguel v. Kempthorne,*
   587 F. Supp. 2d 64 (D.D.C. 2008) ................................................................................... 27, 28

* *Dent v. Holder,*
   627 F.3d 365 (9th Cir. 2010) ................................................................................................15

*Dist. Hosp. Partners, L.P. v. Sebelius,*
   971 F. Supp. 2d 15 (D.D.C. 2013) ................................................................................... 17, 34

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.,*
   2015 U.S. Dist. LEXIS 194281 (C.D. Cal. Oct. 1, 2015) ........................................................11

*Equalia, LLC v. Kushgo LLC*,
  2017 WL 277495 (D. Nev. Jan. 20, 2017) ..................................................21

\* *Ferring Pharms., Inc. v. Burwell*,
  169 F. Supp. 3d 199 (D.D.C. 2016) .............................................................4

\* *Ferring Pharms., Inc. v. Burwell*,
  2016 WL 4734333 (D.D.C. Sept. 9, 2016) ..................................................5

*Fund for Animals v. Williams*,
  391 F. Supp. 2d 191 (D.D.C. 2005) ...........................................................28

*Goodrich v. Teets*,
  510 F. Supp. 2d 130 (D.D.C. 2007) ...........................................................33

*Hi-Tech Pharmacal Co. v. FDA*,
  587 F. Supp. 2d 1 (D.D.C. 2008) ...............................................................21

*Hickey v. Scott*,
  738 F. Supp. 2d 55 (D.D.C. 2010) ...............................................................4

*Hispanic Affs. Project v. Acosta*,
  263 F. Supp. 3d 160 (D.D.C. 2017) ...........................................................18

*Hispanic Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ...................................................................18

\* *Hurd v. Dist. of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) ...................................................................10

*Jazz v. Avadel*,
  60 F.4th 1373 (Fed. Cir. 2023) ..................................................................24

*Jibril v. Mayorkas*,
  20 F.4th 804 (D.C. Cir. 2021) ...................................................................10

*Judicial Watch, Inc. v. Dep't of Com.*,
  224 F.R.D. 261 (D.D.C. 2004) ...................................................................22

*U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
  456 F. Supp. 2d 46 (D.D.C. 2006) ...............................................................3

\* *Kent Cnty., Del. Levy Ct. v. EPA*,
  963 F.2d 391 (D.C. Cir. 1992) ...................................................................29

*Kolbusz v. FBI*,
  2021 U.S. Dist. LEXIS 91212 (D.D.C. Feb. 17, 2021) ..............................32

*Level the Playing Field v. FEC,*
  381 F. Supp. 3d 78 (D.D.C. 2019) ........................................................................ 17, 24

* *Lotus Vaping Techs., LLC v. FDA,*
  73 F.4th 657 (9th Cir. 2023) ...................................................................................... 13

*Mass. Fair Share v. Law Enf't Assistance Admin.,*
  758 F.2d 708 (D.C. Cir. 1985) .................................................................................... 14

* *McCarthy v. Madigan,*
  503 U.S. 140 (1992) ............................................................................................. 21, 22

*Nebraska v. EPA,*
  331 F.3d 995 (D.C. Cir. 2003) .............................................................................. 13, 18

*Nicandro Sanchez-Patron v. Garland,*
  2022 U.S. App. LEXIS 15941 (9th Cir. June 9, 2022) ............................................... 15

*Nio v. DHS,*
  385 F. Supp. 3d 44 (D.D.C. 2019) ............................................................................... 4

* *Oceana, Inc. v. Ross,*
  290 F. Supp. 3d 73 (D.D.C. 2018) ........................................................................ 27, 29

* *Oceana, Inc. v. Ross,*
  454 F. Supp. 3d 62 (D.D.C. 2020) ........................................................................ 31, 32

* *PhRMA v. HHS,*
  43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................................... 14

*Riffin v. STB,*
  2016 WL 6915552 (D.C. Cir. Oct. 6, 2016) ........................................................... 17, 18

* *Sandoz, Inc. v. Becerra,*
  57 F.4th 272 (D.C. Cir. 2023) ................................................................................... 20

*Silver State Land, LLC v. Beaudreau,*
  59 F. Supp. 3d 158 (D.D.C. 2014) ............................................................................. 17

*Talley v. United States,*
  2023 U.S. Dist. LEXIS 64706 (E.D. La. Mar. 16, 2023) ........................................... 22

*United States v. Powers,*
  885 F.3d 728 (D.C. Cir. 2018) ................................................................................... 32

*United States v. SAIC,*
  555 F. Supp. 2d 40 (D.D.C. 2008) ............................................................................... 2

*United Student Aid Funds, Inc. v. Devos,*
   237 F. Supp. 3d 1 (D.D.C. 2017) ..................................................................30

\* *Univ. of Colo. Health at Mem'l Hosp. v. Burwell,*
   151 F. Supp. 3d 1 (D.D.C. 2015) ..................................................................27

\* *Univ. of Colo. Health v. Azar,*
   486 F. Supp. 3d 185 (D.D.C. 2020) ................................................................6

*Video Gaming Techs., Inc. v. Castle Hill Studios LLC,*
   2018 WL 284991 (N.D. Okla. Jan. 3, 2018) ...................................................11

*Wasserman v. Rodacker,*
   2007 WL 274748 (D.D.C. Jan. 29, 2007) .......................................................22

**Statutes and Regulations**

5 U.S.C. § 551(4) ...............................................................................................6

5 U.S.C. § 553(b)(A) ...........................................................................................6

5 U.S.C. § 704 ..................................................................................................21

21 U.S.C. § 355(*l*)(2) .........................................................................................11

21 U.S.C. § 371(h)(1)(B) .....................................................................................6

21 U.S.C. § 379k-1(a)(1) ......................................................................................7

21 U.S.C. § 387*l* .............................................................................................13

21 C.F.R. § 10.30 ..............................................................................................20

21 C.F.R. § 10.30(e)(2)(iv) ..................................................................................21

21 C.F.R. § 10.33 ..............................................................................................20

21 C.F.R. § 10.35 ..............................................................................................20

21 C.F.R. § 10.35(d) ..........................................................................................21

21 C.F.R. § 10.40 ..............................................................................................20

21 C.F.R. § 10.45(f) ...........................................................................................20

21 C.F.R. § 16.1(b) ............................................................................................20

21 C.F.R. § 16.1(b)(1)-(2) ...................................................................................20

21 C.F.R. § 16.80 ..............................................................................................20

57 Fed. Reg. 62076 (Dec. 29, 1992) ................................................................................. 19

76 Fed. Reg. 64868 (Oct. 19, 2011) ................................................................................. 15

86 Fed. Reg. 57156 (Oct. 14, 2021) ................................................................................... 8

**Rules**

Fed. R. Civ. P. 12(f) .................................................................................................... 3, 24

Fed. R. Civ. P. 401 ......................................................................................................... 22

Fed. R. Evid. 201(a) ....................................................................................................... 10

Fed. R. Evid. 201(b)(2) .............................................................................................. 10, 11

**Other Authorities**

FDA, Docket No. 2016-P-1163 ..................................................................................... 21

FDA, *Staff Manual Guides* (Aug. 24, 2021) ................................................................... 6

GAO, *Orphan Drugs: FDA Could Improve Designation Review Consistency*,
    GAO-19-83 (Nov. 2018) ........................................................................................... 16

Russell Rosenberg et al., *Implications of Oxybate Dosing Regimen for Sleep, Sleep
    Architecture, and Disrupted Nighttime Sleep in Patients with Narcolepsy: A Commentary*, 12
    Neurology and Therapy 1805 (Sept. 27, 2023) ......................................................... 31

## INTRODUCTION AND SUMMARY

In this APA case, Jazz argues that FDA acted unlawfully when it disregarded the unexpired orphan-drug exclusivity protecting one of Jazz's products and approved a competing, follow-on product marketed by Avadel. When it moved for summary judgment, Jazz asked the Court to judicially notice certain FDA precedents, rules, and statements. *See* Plaintiff's Mot. for Judicial Notice, ECF No. 37 (Sept. 15, 2023). Jazz also cited a number of medical journal articles to show that FDA failed to consider the relevant factors. As a courtesy, and to preserve them for future appellate review, Jazz filed copies of the above on the docket. *See* Declaration of Sean C. Griffin and Large Exhibits, ECF Nos. 35 and 36 (Sept. 15, 2023).

In response, FDA moved to strike the declaration and every exhibit. *See* Defendants' Mem. in Support of Mot. to Strike, ECF No. 48 (Oct. 20, 2023) ("FDA Mot."). FDA accuses Jazz of a "brazen" effort to "evad[e]" and "circumvent" the administrative record and a campaign to "malign the government generally" with "baseless accusations." *Id.* at 1, 4, 11. FDA also seeks an order requiring Jazz to redraft and resubmit its summary judgment brief. *See id.* at 2, 17-18.

Avadel also has moved to strike any citation to "extra-record" evidence. *See* Avadel's Mot. to Strike, ECF No. 42 (Oct. 20, 2023) ("Avadel Mot."); Avadel's Opp. to Jazz's Mot. For Judicial Notice, ECF No. 43 (Oct. 20, 2023) ("Avadel Opp."). Yet Avadel relies on "extra-record" materials throughout its own merits brief. Avadel cites prior FDA adjudications that are not in the record and have not been cited by any party. *See* Avadel's Cross-Motion for Summary Judgment, ECF No. 46, at 28 and 35 n.11 (Oct. 20, 2023) ("Avadel SJ Br."). Avadel also relies on an extra-record statement from a different agency, *id.* at 1-2; part of the administrative record from a different case, *id.* at 30; and a New York Times opinion piece, *id.* at 9-10. And Avadel asserts a number of extra-record facts without any citation at all. *See, e.g., id.* at 1 (claims about prescribing patterns for Lumryz); *id.* at 45 (similar); *id.* at 3 (claims about unidentified drugs "in FDA's pipeline"). The amicus brief supporting FDA and

Avadel – to which FDA and Avadel readily consented – likewise cites dozens of extra-record materials, including medical journal articles. *See* ECF No. 53 at *iv–v* (Oct. 26, 2023). Notably, FDA has not objected to either brief or sought to strike their extra-record citations or assertions.

The motions to strike should be denied. As an initial matter, they are grossly overbroad. A motion to strike must use "'a scalpel, not a butcher knife," *see, e.g.*, *United States v. SAIC*, 555 F. Supp. 2d 40, 47 (D.D.C. 2008) (citation omitted), and these motions are hacksaws. First, Jazz largely sought judicial notice of FDA's precedents and rules out of an abundance of caution, and to ensure that they are preserved for appeal. But such exhibits are offered as *legal authority*; they are not "evidence" or factual materials subject to the administrative record rule, and they cannot be subject to a motion to strike. Second, FDA is just wrong when it says that "none" of exhibits are in the record or were before the agency. A full copy of one exhibit was included in the record. Many others were discussed or cited in the record. Prior versions of at least three exhibits were discussed in the record. And many others were reviewed by the same people at FDA who participated in the decision below. FDA's request to strike these materials is facially unreasonable.

In contrast, the Court should grant Jazz's motion for judicial notice. The materials at issue include FDA adjudications and rules. *See, e.g.*, Griffin Declaration Exs. 1 and 10 (prior adjudications under the Orphan Drug Act); Exs. 26, 27, and 38 (prior adjudications of related requests by Jazz); Exs. 4 and 8 (FDA Staff Manual Guides); Exs. 12 and 14 (FDA Guidance Documents); *see also* Exs. 44 to 47 to the Second Declaration of Sean C. Griffin (Nov. 15, 2023) (additional adjudications under the Orphan Drug Act responsive to Avadel's summary judgment brief). These are all official FDA records whose authenticity cannot be questioned. The D.C. Circuit has in the past taken notice of similar government materials in cases where judicial review is based on an administrative record. Judicial notice of the defendant agency's own materials ensures meaningful APA review, and it is necessary to ensure fairness and avoid the potential for gamesmanship. None of the cases cited by

FDA or Avadel are apposite, and FDA's remaining objections (issue exhaustion, relevance, and prejudice) are meritless. Fundamentally, FDA must not be allowed to evade its obligation to explain why the decision below was consistent with its own precedents and rules.

The Court also should deny the motions to strike the scientific literature. Exhibits 15-25, 28-37, and 39 are all medical journal articles that are directly relevant to the issues that the Office of Orphan Product Development ("OOPD") purported to decide below. Indeed, OOPD represents that its decision is based on a "consultation of the literature," AR1381, which plainly opened the door to a rebuttal with the actual literature. In any event, the literature is always available to show that an agency failed to consider important aspects of the problem presented. Finally, neither FDA nor Avadel can contest the major premise of the articles, which is that treatment with twice-nightly oxybate *improves* the sleep and sleep architecture of patients with narcolepsy—it does not "disrupt" or "fragment" their sleep, as OOPD falsely claimed.

Finally, in the alternative, the standards for completing and supplementing the record are both met here. Jazz shows below, through concrete and non-speculative evidence, that most of these exhibits were in FDA's files and considered by the specific officials involved in the decision below. The record should be completed with all of those materials. Separately, the record also should be supplemented with (1) materials that FDA improperly excluded; (2) materials that help show that OOPD failed to comply with its procedural obligations; and (3) the medical journal articles that show OOPD failed to consider all of the relevant factors.

## LEGAL STANDARD

A court may strike "redundant, immaterial, impertinent, or scandalous matter" from a pleading or supporting document. Fed. R. Civ. P. 12(f); *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 51 & n.4 (D.D.C. 2006). But motions to strike are generally "disfavored," *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F. 3d 217, 226 (D.C. Cir. 2011) (cleaned up), and striking

an opponent's filing is "an exceptional remedy" whose proponent "must shoulder a formidable burden," *Hickey v. Scott*, 738 F. Supp. 2d 55, 63 (D.D.C. 2010) (citation omitted).

## ARGUMENT

## I.      The motions to strike are grossly overbroad.

The motions to strike are overbroad because FDA and Avadel have moved to strike citations to legal authority as well as exhibits that were in the record, were discussed in the record, and/or were otherwise before the agency at the time of its decision.

### A.      FDA precedents and rules are legal authorities that may be freely cited.

When it assembled the record, FDA included certain legal authorities cited by OOPD. This included agency precedents (*e.g.*, Index Nos. 36-40), Guidances (Index Nos. 88 and 90), OOPD's Standard Operating Procedures and Policies (Index No. 92), and FDA's Manual of Policies and Procedures (Index No. 91). FDA now argues that Jazz cannot cite any similar authorities because they are "extra-record" materials. *See, e.g.*, FDA Mot. at 15-16. FDA is mistaken.

FDA can no more prevent Jazz from citing FDA precedents or FDA rules by pointing to the administrative record than it could prevent citation to the Federal, Food, Drug, and Cosmetic Act ("FDCA") itself. "Of course, the Court is not limited to the administrative record in conducting its legal analysis." *Nio v. DHS*, 385 F. Supp. 3d 44, 59 (D.D.C. 2019). Legal analysis "must take into account relevant legal authority, including statutes, regulations, *and agency authority* such as [agency instructions and manuals]." *Id.* (emphasis added).

*Ferring Pharmaceuticals* illustrates FDA's error. The dispositive issue there was whether "there were, in fact situations in which a drug was eligible for five-year exclusivity under the FDA's prevailing interpretation but failed to receive it because of the order in which it was approved." *Ferring Pharms., Inc. v. Burwell*, 169 F. Supp. 3d 199, 218 (D.D.C. 2016). The district court initially found that there was no such precedent. *See id.* at 218-19. The plaintiff sought reconsideration, identifying a number of

relevant examples—all but one of which were not mentioned in the administrative record. *See* Mem. in Support of Plaintiff's Mot. for Recons., ECF No. 39-1, at 1-3, in *Ferring Pharms., Inc. v. Burwell*, No. 1:15-cv-802 (RC) (D.D.C., filed Apr. 5, 2016). The plaintiff established the existence and content of those decisions by citing and relying on a search of Drugs@FDA, the *Orange Book*, the FDA's approval letters (also obtained from Drugs@FDA), and FDA's exclusivity memos (again obtained from Drugs@FDA). *See id.* Based on that presentation, the district court granted reconsideration and reversed the challenged agency action. *See Ferring Pharms., Inc. v. Burwell*, No. 1:15-cv-802 (RC), 2016 WL 4734333 (D.D.C. Sept. 9, 2016).

Jazz is entitled to make similar showings here. For example, OOPD took the position that its precedent "is devoid of" examples applying the comparable safety requirement. Jazz is entitled to rebut that claim by submitting **Exhibits 1 and 10**.[1] Likewise, OOPD asserted (1) that treatment with twice-nightly oxybate harms the sleep of patients with narcolepsy, and (2) that avoiding one awakening is a medically significant benefit. Jazz is entitled to cite **Exhibits 26, 27, and 38** to show that the Review Division previously rejected both positions.

Jazz also has the right to challenge FDA's legal interpretation of FDCA section 527(a). **Exhibit 9** is relevant to that challenge because it is a memo from an FDA official supporting Jazz's position that the word "drug" must mean "active moiety" in this context. In other words, Exhibit 9 is persuasive authority on how to interpret the governing statute. The administrative record rule cannot block such a citation.

Nor can FDA strike its own rules. **Exhibits 4 and 8** are FDA "Staff Manual Guides." On the website where they are posted, FDA describes them as "directives that document organizations and functions; delegations of authority; and administrative and program policies, responsibilities and

---

[1] Exhibits 44 to 47 to the Second Griffin Declaration are similarly situated and are directly responsive to arguments raised by Avadel in its summary judgment brief.

procedures." FDA, *Staff Manual Guides* (Aug. 24, 2021), http://bit.ly/40djLI4. In APA terms, they are "rules," *see* 5 U.S.C. § 551(4) (rules include any "agency statement … describing the organization, procedure, or practice requirements of an agency"), and, specifically, "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A). As rules of the agency, they can be cited as legal authority by anyone at any time. *See Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 218 (D.D.C. 2020) ("the Court remains free to take judicial notice of the 2020 rules as appropriate") ("*Colorado II*"). For proof, one need only look to FDA's briefs in other APA cases, which cite the Staff Manual Guides without regard to whether they were included in the administrative record.[2]

For similar reasons, FDA cannot dictate which of its Guidances Jazz may cite. Guidances are also rules of the agency, usually "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A). FDA must ensure that its employees "do not deviate from such guidances without appropriate justification and supervisory concurrence." 21 U.S.C. § 371(h)(1)(B). As legal authorities, Guidance documents like **Exhibits 12 and 14** can be cited regardless of whether FDA includes them in the record. Again, FDA's briefs in other APA cases prove the point.[3]

Finally, FDA cannot strike **Exhibit 2**, an article discussing the *Depomed* litigation. The article is persuasive authority discussing the relevant statute and case law, and it is relevant because two disinterested observers read *Depomed* in 2014 the same way that Jazz does now. FDA has denigrated

---

[2] *E.g.*, Federal Defendants' Mem. in Support of Cross-Mot. for Summary Judgment, ECF No. 36-1, at iv, 29, in *Wellness Pharmacy, Inc. v. Cochran*, No. 1:20-cv-03082-CRC (D.D.C., filed Mar. 3, 2021) (citing Staff Manual Guide section 2820.1) [hereinafter "FDA Wellness Pharmacy Br."]; Federal Defendants' Mem. in Support of Cross-Mot. for Summary Judgment, ECF No. 38, at vii, 8 in *Lannett Co. v. FDA*, No. 1:16-cv-01350-RBW (D.D.C., filed Feb. 7, 2017) (citing Staff Manual Guide sections 1410.1 and section 1410.10) [hereinafter "FDA Lannet Br."]; Federal Defendants' Mem. in Support of Mot. for Summary Judgment, ECF No. 55-1, at v, 9, in *Ranbaxy Lab'ys., Ltd. v. Burwell*, No. 1:14-cv-01923-BAH (D.D.C., filed Dec. 22, 2014) (citing Staff Manual Guide section 1262.4) [hereinafter "FDA Ranbaxy Br."].

[3] *E.g.*, FDA Wellness Pharmacy Br. at iv, 36 (citing FDA's compounding guidance); FDA Lannet Br. at vii, 36 (citing FDA's stability testing guidance).

the authors as "bloggers," *see* FDA Mot. at 10, but that only goes to the article's weight. And on that question, it is worth noting that FDA has previously cited the same "blog" in an APA case for the truth of the statistics reported. *See, e.g.*, FDA Ranbaxy Br. at 37 n.16.

**B.    Most of the exhibits were before FDA at the time of its decision.**

FDA incorrectly represents that *none* of the exhibits are in the administrative record. *See, e.g.*, FDA Mot. at 1, 2, 4; *see also* Avadel Mot. at 1. In truth, a majority of the exhibits were before FDA in one sense or another.

█   ███████  ████████  █████████████████████

**2.**    Many exhibits were discussed in the record, sometimes extensively. For example, **Exhibit 17** (Roth et al. 2013) and **Exhibit 34** (Roth et al. 2017) are medical journal articles discussing the effectiveness of twice-nightly sodium oxybate as a treatment for disrupted nighttime sleep in patients with narcolepsy. **Exhibit 24** (Xyrem Study Group 2002) is a medical journal article reporting the results of one of the pivotal trials supporting FDA's approval of Xyrem. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

**Exhibit 11** is a copy of FDA's website about sodium reduction, ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

**Exhibit 10** also was cited and discussed in the record. In its decision, OOPD identified an orphan-drug exclusivity decision related to Signifor LAR (pasireotide) as favorable precedent and twice cited a related memo from April 2019. *See* AR1368; AR1368 n.167, AR1379 n.250. FDA ensured that the April 2019 memo was included in the record. AR1518-21. However, the April 2019 memo describes a prior consult from the review division in August 2018 and it explains that it was the review division who had actually "opined" that the drug made a major contribution to patient care. *See* AR1520 & n.3. Exhibit 10 is the review division's consult. Setting aside the fact that Jazz cites this document as legal authority, *see supra* § I.A, FDA cannot reasonably contend that the review division's consult—which was described in the record as the original opinion on which OOPD now purports to rely—is an "extra-record" document.

The motions to strike also fail to account for the passage of time. ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ FDA subsequently finalized that Guidance in October 2021. *See* 86 Fed. Reg. 57,156 (Oct. 14, 2021). **Exhibit 14** is a copy of the final Guidance, while **Exhibit 3** and **Exhibit 13** are copies of FDA's announcements regarding the

availability of the final version. Citing the final Guidance and FDA's most recent announcements was not a "brazen end-run," FDA Mot. at 1, around anything. Indeed, had Jazz cited out-of-date versions of the documents, the government and Avadel would probably now be complaining about an alleged failure to cite current Guidance.

**3.** A different group of exhibits was "before FDA" because they were submitted to, and reviewed by, the same FDA officials who participated in the decision below ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████. Dr. Mani has more than 20 years of experience regulating oxybate and was the primary medical reviewer responsible for FDA's approval of Xyrem. In that capacity, Dr. Mani specifically reviewed each of **Exhibits 18, 19, 20, 21, 22, 24, and 25**. *See* Dr. Ranjit Mani, Efficacy Review of New Drug Application 21196, at 15, 17-18, 74-81 (June 15, 2001) (Second Griffin Declaration Exhibit 41).

As another example, Dr. Eric Bastings was the acting Director of the Review Division and signed the August 2021 memo rejecting Avadel's clinical superiority arguments. *See* AR0471-82. A few months earlier, Dr. Bastings had signed the Review Division's denial of Jazz's request to study Xywav as a treatment for disrupted nighttime sleep. *See* Griffin Decl. Ex. 38. As part of that request, Jazz submitted each of **Exhibits 17, 19, 21, 22, 25, 29, 30, 31, 33, 34, and 36** to the Review Division for its consideration and review. *See* Type C meeting Background/Briefing Materials, Xywav™ (calcium, magnesium, potassium, and sodium oxybates), Oral Solution, at 5-6, 14-15, 19, 21, 24 (Sept. 22, 2020) (Second Griffin Declaration Exhibit 42).

*     *     *

To sum up: many of the exhibits were cited as legal authority. A full copy of one was included in the record, others were discussed/cited in the record, prior versions of some were discussed, and

many were previously reviewed by the same FDA officials. All told, **33 of the 39 exhibits** fall into one or more of those categories (with substantial overlap between categories). ████████

## II.     The Court should grant Jazz's motion for judicial notice.

Jazz's motion for judicial notice seeks primarily to authenticate certain FDA documents so that they may be considered by the Court and secondarily to establish certain facts about FDA's approvals of drugs intended to treat sleep disorders. Both are appropriate in an APA case.

### A.     FDA's documents are subject to judicial notice.

It is important to be clear about what Jazz is—and is not—seeking through judicial notice of FDA's documents (Griffin Decl. Exs. 1, 3-14, 26-27 and 38). Avadel claims that Jazz is trying to use judicial notice to dispositively establish the truth of innumerable facts contained in the documents. *See* Avadel Opp. at 3 (erroneously claiming that Jazz is seeking notice of "hundreds of pages of 'documents' as a whole"). That is not accurate. Jazz seeks to establish only that the FDA documents are what they purport to be—a routine and permissible use of judicial notice akin to authentication. *See, e.g.*, *Hurd v. Dist. of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (it is proper to take "judicial notice of court records from other cases … as a record of what was said" but not "for the truth of the matter asserted"). Jazz seeks notice of the "adjudicative fact[s]" that FDA issued the decisions, established the rules, and made the statements reflected in the exhibits, Fed. R. Evid. 201(a), which "can be accurately and readily determined" from the documents, Fed. R. Evid. 201(b)(2). After that, FDA's decisions, rules, and other documents speak for themselves.[4]

---

[4] That distinguishes Jazz's request from *Jibril v. Mayorkas*, 20 F.4th 804 (D.C. Cir. 2021), cited by Avadel. In that case, the government sought to base a motion to dismiss on declarations from government officials. The D.C. Circuit rightly concluded that the government's request for judicial notice was seeking to dispositively establish the truth of the matters asserted, which is particularly inappropriate at the pleading stage. *See id.* at 815 (citing *Hurd*, 864 F.3d at 686).

**B.**     **FDA's drug approvals are subject to judicial notice.**

Jazz also asks the Court to take notice of FDA's approval of a number of drugs indicated to treat sleep disorders. *See* Griffin Decl. ¶¶ 22-23. The details surrounding those approvals are "adjudicative facts" within the meaning of Federal Rule of Evidence 201(a). That a drug was approved by the Review Division is likewise an adjudicative fact. Those facts "can be accurately and readily determined," Fed. R. Evid. 201(b)(2), from the online Drugs@FDA database. Because that database exists to fulfill one of FDA's statutory mandates, *see* 21 U.S.C. § 355(*l*)(2)(A)-(D), it is a prime example of a source "whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2). Taking judicial notice of a chart derived from Drugs@FDA is, therefore, entirely appropriate. *See, e.g.*, *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. CV 14-02496-BRO (Ex), 2015 U.S. Dist. LEXIS 194281, at *26-27 (C.D. Cal. Oct. 1, 2015) ("Government documents and public records available from government websites are capable of judicial notice, *as are results of record searches conducted on government websites.*") (emphasis added).[5]

Avadel nevertheless asserts that the Review Division's involvement can only be determined through "extrinsic sources beyond the cited 'Drugs@FDA,'" Avadel Opp. at 6, such as "extrinsic FDA drug approval letters," *id.* at 6 n.6. Avadel's description of the database is incorrect. Congress mandated that Drugs@FDA contain any FDA-generated documents "related to the review of the application," including approval letters, reviews, and a list "by name of each officer or employee" who participated. *See* 21 U.S.C. § 355(*l*)(2)(C)(i)-(vi). Congress specifically intended for Drugs@FDA to include such documents and to identify the approving officials.

---

[5] FDA's citation to *Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, No. 17-CV-454-GKF-JFJ, 2018 WL 284991 (N.D. Okla. Jan. 3, 2018), is off base. In that case, the court refused to take notice of spreadsheets that reflected counsel's summaries of USPTO filings because counsel was offering interpretations that were "not a matter of public record." *Id.* at *3 n.3. In contrast, every data point in the chart submitted by Jazz is drawn directly from Drugs@FDA.

Nor is there any inaccuracy. FDA did not even try to identify an error. Avadel merely asserts that the Review Division's involvement in approving the drug Sinequan cannot be determined from contemporaneous records. *See* Avadel Opp. at 6 n.6. However, a simple search of Drugs@FDA leads to records *from 1974* showing that Sinequan was approved by the Division of Neuropharmacological Drug Products. *See* Second Griffin Decl., ¶¶ 3-11 (Nov. 15, 2023).

The approval information also is relevant. In an apparent attempt to justify its decision to ask medical device reviewers to decide whether Lumryz makes a major contribution to patient care,[6] OOPD repeatedly refers to them as FDA's "sleep experts," *see, e.g.*, AR0525, and the device reviewers refer to themselves as FDA's "sleep team," *see, e.g.*, AR0516. Those titles appear to have been invented for the purpose of this dispute,[7] and they create the misleading impression that CDRH staff has special expertise in "sleep" that the Review Division lacked. The chart of approvals rebuts that misimpression by showing that the putative "sleep team" has played no role in determining that **any drug** is a safe or effective treatment for **any** sleep disorder, while the Review Division makes such assessments all the time. That, in turn, underscores that OOPD irrationally departed from agency procedure when it sought a second opinion from the "sleep team."

---

[6] Avadel's assertion that "OOPD had sole responsibility" for the decision below, Avadel Opp. at 6, is plainly false. OOPD's Standard Operating Procedure ("SOP") makes clear that responsibility for clinical superiority decisions is **shared** between OOPD and the review division with jurisdiction to approve the drugs at issue. *See* AR2186-94. Furthermore, the issue is whether the SOP authorized OOPD to ask medical **device** reviewers in CDRH to decide whether a **drug** makes a major contribution to patient care, which they clearly did not. And because the Review Division had already answered that question in the negative, *see* AR0471-082; AR0483-85, OOPD's forum shopping also was inconsistent with FDA's Staff Manual Guide. *See* Griffin Decl. Exs. 4 and 8.

[7] As of this writing, a Google search of the website www.fda.gov for "sleep team" returns only documents pertaining to this dispute. The public name of the FDA unit where the medical device reviewers work is the *Division of ENT, Sleep Disordered Breathing, Respiratory and Anesthesia Devices* ("DSRA"); which is within the *Office of Health Technology 1 – Opthalmic, Anesthesia, Respiratory, ENT, and Dental Devices* ("OHT1"); which in turn is part of the *Office of Product Evaluation and Quality* ("OPEQ") within CDRH. *See* AR0504.

### C.    The administrative record rule is not a barrier to judicial notice.

FDA's main theme is that any request for judicial notice in an APA case must always be construed as a motion to either complete or supplement the record and judged in accordance with those standards *See* FDA Mot. at 1; 4, 6-8, 14-17; *see also* Avadel Mot. at 1-2; Avadel Opp. at 1-2. The argument is without merit.

The D.C. Circuit has taken judicial notice in administrative cases without reference to the record rule. In *Nebraska v. EPA*, the D.C. Circuit judicially noticed that "a number of water utilities sell substantial volumes of drinking water across state lines" to reject a challenge brought against the EPA's arsenic regulations. 331 F.3d 995, 998 (D.C. Cir. 2003). The court allowed that "the administrative record does not contain these facts" but it nevertheless took "judicial notice of the information on the EPA's [website]." *Id.* at 998 n.3. The D.C. Circuit also judicially noticed extra-record facts about AT&T's debt-to-equity ratio in a challenge to rates established by FCC. *See COMSAT v. FCC*, 611 F.2d 883, 901 n.31 (D.C. Cir. 1977).

*Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023), provides a more recent example. *Lotus Vaping* was an appeal under a direct review provision that incorporates the APA standard of review, including the administrative record rule. 21 U.S.C. § 387*l*(a)-(b). The Ninth Circuit first rejected a request to supplement the record. *See Lotus Vaping*, 73 F. 4th at 675-76. But the Ninth Circuit granted the petitioner's three separate requests for judicial notice of (1) an FDA press release; (2) two internal FDA memos; and (3) two FDA deficiency letters related to other products. *See id.* at 677 ("These are published materials representing the considered views of the FDA, and the FDA does not contest their accuracy here.").[8]

---

[8] FDA's position in *Lotus Vaping* was very different from its position here—there, FDA agreed that the court could judicially notice the agency's materials. *See* Dkt. Entries 72, 80, 85, *Lotus Vaping*, No. 21-71328 (9th Cir., filed Feb. 21, Oct. 31, Dec. 20, 2022).

*PhRMA v. HHS*, 43 F. Supp. 3d 28 (D.D.C. 2014), also is a helpful example. PhRMA challenged a final HHS rule related to orphan drugs. An amicus supporting the government sought to introduce extra-record materials, including declarations and survey results. *See id.* at 34 n.6. The court indicated that it would have stricken (but for mootness) those materials because the standard for supplementing the record was not met. *See id.* Nevertheless, the court granted PhRMA's request to take judicial notice of a website maintained by FDA. *See id.* at 33 ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."). Notably, PhRMA was citing a (now-archived) OOPD webpage that had explained that "**drug**" means "**active moiety**" in the Orphan Drug Act (as Jazz argues here). *See* Reply in Support of Plaintiff's Application for Preliminary Injunction, ECF No. 37 at *iv*, 2, 10, in *PhRMA v. HHS*, No. 1:13-cv-1501-RC (D.D.C., filed Jan. 10, 2014) (citing FDA, *Designating an Orphan Product: Drug and Biological Products, Frequently Asked Questions*, archived at http://bit.ly/3u9Qlil).

These cases show that taking judicial notice and completing/supplementing the record are distinct functions and are not governed by the same standard.

### 1. Taking judicial notice of the defendant agency's materials ensures effective APA review.

Taking judicial notice of the defendant agency's materials is required to effectively apply the APA standard of review. In APA cases, the agency's precedents, policies, procedures, and statements can all provide cause to vacate the challenged action as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *See, e.g.*, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017) (agency's position rejected as inconsistent with "repeated official agency statements"); *BB&L, Inc. v. NLRB*, 52 F.3d 366, 370 (D.C. Cir. 1995) (similar); *Mass. Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711-12 (D.C. Cir. 1985) (reversing where the agency failed to follow its own procedures). Judicial notice helps to ensure that an APA plaintiff can cite, and the Court can consider, the full range of the materials that bear on such arguments.

For example, in *Dent v. Holder*, 627 F.3d 365 (9th Cir. 2010), the agency had not included in the record two naturalization petitions, which the appellant provided to the court as attachments to a motion for judicial notice. *Id.* at 370-71. The government opposed the motion, invoking (as FDA does here) the administrative record rule. *Id.* at 371. The court refused to "interpret this rule absurdly, so that injustice may be done if the government successfully shields its documents from a person who ought to have access to them." *Id.* The administrative record rule "does not prevent [a court] from taking judicial notice of the agency's own records." *Id.* (citing *Lising v. INS*, 124 F.3d 996 (9th Cir. 1997)). That is, an "agency's own records are subject to judicial notice regardless of whether they are in the administrative record." *Nicandro Sanchez-Patron v. Garland*, No. 21-70950, 2022 U.S. App. LEXIS 15941, at *2 (9th Cir. June 9, 2022).

This case presents concerns similar to those that motivated the *Dent* court. To Jazz's knowledge, never before in the 40-year history of the Orphan Drug Act has FDA found that a **less safe** drug makes "a major contribution to patient care." Before this case, FDA used to require a showing that a drug will achieve comparable safety with existing products before being willing to consider whether it makes a major contribution. *See* 76 Fed. Reg. 64,868, 64,871 (Oct. 19, 2011) (the major contribution pathway "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug"); *id.* at 64,876 (explaining that the comparable safety requirement was FDA's "longstanding policy").

Below, OOPD conceded that it was "aware of certain language in agency documents that could be interpreted as suggesting FDA has such a policy." AR1365 n.147. OOPD nevertheless denied the existence of a comparable safety requirement by claiming that "agency precedent is **devoid of** instances in which we refused to find a [major contribution] for a drug based on a failure to show comparable safety or efficacy." AR1365 (emphasis added). FDA is trying to force Jazz and the Court to accept that sweeping representation on faith. OOPD has made literally thousands of orphan-drug

15

designation and exclusivity decisions.[9] The administrative record does not include a representative sample of those decisions, let alone the full universe. As a result, the record assembled by FDA does not enable Jazz, the Court, or anyone else to verify the accuracy of OOPD's assertion that FDA precedent "is devoid of" relevant examples.

But with judicial notice, Jazz can show that OOPD's claim is false. **Exhibit 1** is an OOPD decision from March 2012 rejecting a request for orphan-drug designation because the applicant had "not provided an adequate hypothesis that oral treprostinil is clinically superior by claim of a major contribution to patient care." Although Jazz's copy is redacted, the unredacted portions of the decision indicate that OOPD denied the designation because the applicant had not met the comparable safety requirement. Thus, the decision stressed that the major contribution pathway "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug." In other words, Exhibit 1 is an example of the agency doing exactly what Jazz says should have happened here—and which OOPD denies it has done before.[10] FDA can try to distinguish Exhibit 1 and the other precedents cited by Jazz. But FDA must not be allowed to both claim that its precedent "is devoid of" relevant examples and then block their consideration.

---

[9] In 2019, the Government Accountability Office ("GAO") reported that between 2008 and 2017 FDA received 3,690 requests for orphan drug designation, and had granted 2,615 of them, and denied another 195, with the remainder unanswered. GAO, *Orphan Drugs: FDA Could Improve Designation Review Consistency*, GAO-19-83, at 16, Table 3 (Nov. 2018), http://bit.ly/49vZ4LS.

[10] Exhibit 10 also is relevant. It shows that, before determining that Signifor LAR provides a major contribution to patient care, the responsible review division followed FDA's longstanding policy by determining that the "overall safety and efficacy profiles" of the new and old versions were similar. FDA questions why Jazz needs to cite Exhibit 10 when a related document is in the record. *See* FDA Mot. at 11 (citing AR1518-21). The answer is simple—the document that FDA chose to include omitted the discussion of comparable safety. But the question is more important—the question is a concession that FDA did not include full documentation in the record even for the few precedents that OOPD chose to discuss.

## 2.    The cases cited by FDA and Avadel are inapposite.

Most of FDA's and Avadel's cited cases simply discuss the standards for supplementing or completing the record (and some discuss seeking discovery), without discussing judicial notice. Only a few addressed the use of judicial notice in APA cases, and they generally address third-party materials, not the agency's own records. Thus, none of the materials in *Level the Playing Field v. FEC*, 381 F. Supp. 3d 78 (D.D.C. 2019), were prepared by the FEC. *See id.* at 90-93. Likewise, the document in *Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158 (D.D.C. 2014), was a state court order in a suit between the plaintiff and a third party, in which the agency was not involved, and which the court deemed irrelevant. *Id.* at 161–62, 170.

*District Hospital Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15 (D.D.C. 2013), also is off base, but for a different reason. In that case, the plaintiffs filed a motion to compel the agency to supplement or complete the record with testimony given by an agency official before a Senate subcommittee. The *agency* attempted to avoid that outcome by *conceding* that the plaintiffs could cite to the testimony "because it is a public document subject to judicial notice." *Id.* at 32 n.14. The court did the agency one better and excluded the testimony altogether because (1) the official had been speaking in a personal capacity, and (2) he had been discussing a different rulemaking. *See id.* at *31 (finding "personal testimony regarding an earlier rulemaking" to be irrelevant). Any commentary about the agency's offer to proceed through judicial notice was purely dicta.

FDA cites *Riffin v. STB*, No. 16-1147, 2016 WL 6915552 (D.C. Cir. Oct. 6, 2016) (per curiam), which is neither precedential nor apposite. When the Board moved for summary affirmance, it attached various documents, which led the petitioner to move to strike, which the court denied on the ground that "[j]udicial notice may be taken of the [agency's exhibits]." *Id.* at *1. The petitioner also moved for judicial notice of two deeds, and then separately moved to supplement the record with various documents. That the court's unpublished order denied both of the petitioner's motions in a

17

single paragraph, *id.*, does not mean that every motion for judicial notice in an APA case is governed by the standards for completing or supplementing the record.

The closest citation is probably Avadel's reliance on *Hispanic Affairs Project v. Acosta*, 263 F. Supp. 3d 160 (D.D.C. 2017), *aff'd in part, rev'd in part*, 901 F.3d 378 (D.C. Cir. 2018), which did refuse to take judicial notice of applications available on the agency's website. *Id.* at 176. However, the substantive decision in favor of the government was reversed. When the D.C. Circuit reinstated the plaintiff's claims, it stated that "[o]n remand, the district court is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue.'" *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (citation omitted).

And none of these cases addressed the D.C. Circuit's use of judicial notice in prior administrative disputes. *See, e.g., Nebraska v. EPA*, 331 F.3d at 998 n.3; *COMSAT v. FCC*, 611 F.2d at 901 n.31. Nor did they consider the persuasive line of Ninth Circuit cases like *Dent* and *Lotus Vaping*. As those cases teach, effective judicial review requires that courts be able to take judicial notice of the defendant agency's own records. This is especially true in cases, like this one, where the agency has been less than diligent or forthcoming in preparing the record.

### D.     FDA's remaining arguments are meritless.

FDA, but not Avadel, raises various additional objections to Jazz's motion, including issue exhaustion, relevance, and prejudice. All are meritless.

#### 1.     Issue exhaustion does not apply.

Invoking issue exhaustion, *see* FDA Mot. at 12, FDA argues that "Jazz should have given FDA an opportunity to consider the extra-record documents before presenting [them] in court," *id.* at 8 n.3; *see* Defendants' Cross-Motion for Summary Judgment, at 31 (Oct. 20, 2023) ("FDA SJ Br.") (asserting that Jazz "never asked the agency to consider" studies showing "that twice-nightly dosing reduces sleep"). This argument fails for several reasons.

███████████████████████████████████████████████████████

████████████████████████████████████████████████ Moreover, Jazz *did* ask the

agency to consider studies about disrupted nighttime sleep—when it originally sought approval for

Xyrem, as evidenced by Dr. Mani's review, *see* Second Griffin Decl. Ex. 41 at 15, 17-18, 74-81, and

again when it sought permission to study Xywav as a treatment for disrupted nighttime sleep in 2020.

*See* Second Griffin Declaration Ex. 42 at 5-6, 14-15, 19, 21, 24.

Second, issue exhaustion does not apply given the way FDA has implemented the Orphan

Drug Act. FDA repeatedly rejected calls to establish a transparent process to resolve orphan-drug

disputes. *See* 57 Fed. Reg. 62,076, 62,083 (Dec. 29, 1992). The result is a system in which sponsors

who have concerns about an exclusivity decision normally are limited to sending unsolicited letters

(which will not generate a response), or requesting meetings with the agency's lawyers (where FDA

will remain in "listening mode"). And they must take these steps without knowing what their adversary

might be saying or what FDA might be considering. Indeed, they generally do not learn FDA's

thinking until it has taken final action.

That is what occurred here. Jazz learned from Avadel's public statements that Avadel was

developing a follow-on version of its high-sodium oxybate product (Xyrem) and that Avadel was

pursuing orphan-drug exclusivity. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████. But it was little more than shadowboxing. Jazz had no notice of the

agency's thinking and did not learn OOPD's position until it received the decision letter. Lumryz was

approved just a few hours later. In turn, Jazz had no opportunity to raise concerns about the scope of

the materials that OOPD considered.

Third, the D.C. Circuit recently resolved the question in *Sandoz, Inc. v. Becerra*, 57 F.4th 272 (D.C. Cir. 2023). That case involved the award of 5-year exclusivity to the drug teriflunomide. When Sandoz argued that the drug was not entitled to exclusivity, FDA asserted that Sandoz "failed to exhaust its statutory challenge." *Id.* at 277. The D.C. Circuit agreed that, as a factual matter, "Sandoz did not raise this argument before the agency," *id.*, but concluded that exhaustion was not required. FDA's process for resolving exclusivity disputes is "far from adversarial": While the parties "submitted letters to the FDA" laying out their positions, they "were simply considered under the FDA's internal review procedures," which "involved no adjudicator." *Id.* at 278-79. Because that "informal process" could not "be analogized to normal adversarial litigation," the court "decline[d] to impose an exhaustion requirement." *Id.* at 279 (cleaned up).

Rather than mention *Sandoz*, FDA asserts that exhaustion was required by 21 C.F.R. § 10.45(f), but its brief quoted only the second sentence of the regulation. *See* FDA Mot. at 12. The full text of the regulation is in the margin,[11] and it shows that the rule applies only where there is a record (1) "specified in" certain enumerated regulations, or (2) arising from a proceeding listed in 21 C.F.R. § 16.1(b). The enumerated regulations pertain to citizen petitions (§ 10.30), petitions for reconsideration (§ 10.33), petitions to stay (§ 10.35), notice-and-comment rulemaking (§ 10.40), and regulatory hearings (§ 16.80). The specified proceedings all involve formal hearings. *See* 21 C.F.R. § 16.1(b)(1)-(2). Thus, by its terms, 21 C.F.R. § 10.45(f) is irrelevant.

---

[11] "The Commissioner shall take the position in an action for judicial review under 5 U.S.C. 701 et seq., whether or not it includes a request for a declaratory judgment under 28 U.S.C. 2201, or in any other case in which the validity of administrative action is properly challenged, that the validity of the action must be determined solely *on the basis of the administrative record specified in §§ 10.30(i), 10.33(k), 10.35(h), 10.40(g), and 16.80(a) or the administrative record applicable to any decision or action under the regulations referenced in § 16.1(b)*, and that additional information or views may not be considered. An interested person who wishes to rely upon information or views not included in the administrative record shall submit them to the Commissioner with a new petition to modify the action under § 10.25(a)." 21 C.F.R. § 10.45(f) (emphasis added).

FDA also asserts that Jazz should have responded to OOPD's decision by filing a citizen petition, *see* FDA Mot. at 12, but it has no authority to make that demand. Breaking Xywav's exclusivity by approving Lumryz was indisputably "final agency action." *See, e.g.*, *Bennet v. Spear*, 520 U.S. 154 (1997). Where FDA has taken final action, it can require further exhaustion only if it "provides that the action meanwhile is inoperative." 5 U.S.C. § 704. No filing that Jazz could make at FDA would have that effect. *See* 21 C.F.R. § 10.35(d).

In any event, non-statutory exhaustion requirements are subject to exceptions. *Cf.* FDA Mot. at 12 (citing *McCarthy v. Madigan*, 503 U.S. 140 (1992)). At least three of the *McCarthy* exceptions would apply here. First, exhaustion must yield when the agency's response is governed by "an unreasonable or indefinite time frame." *Id.* at 147. FDA is not required to provide any response to a citizen petition at all for six months, at which point it usually chooses to indefinitely defer a substantive answer. *See* 21 C.F.R. § 10.30(e)(2)(iv). Had Jazz filed a citizen petition, FDA could have withheld a substantive response until after Xywav's exclusivity expired in 2027, leaving Lumryz on the market the whole time.[12] Second, irreparable harm also excuses exhaustion. *McCarthy*, 503 U.S. at 147. Jazz earned orphan drug exclusivity through its innovation in the narcolepsy space, and FDA has violated that right to exclusivity and subjected Jazz to unlawful competition. Those are both irreparable harms,[13] which grow with each passing day. Finally, exhaustion is excused where further engagement with the

---

[12] For example, in April 2016, a company petitioned FDA to confirm that its drug was entitled to exclusivity. FDA did not provide a substantive response until May 26, 2021. *See* FDA, Docket No. 2016-P-1163, https://www.regulations.gov/docket/FDA-2016-P-1163 (last accessed Nov. 10, 2023).

[13] *See, e.g.*, *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) ("a clear statutory entitlement is not 'merely economic' harm, and its loss may be sufficiently irreparable to justify emergency injunctive relief because '[o]nce the statutory entitlement has been lost, it cannot be recaptured.'" (internal citations omitted)); *Equalia, LLC v. Kushgo LLC*, No. 2:16-CV-02851-RFB-CWH, 2017 WL 277495, at *4 (D. Nev. Jan. 20, 2017) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("price erosion and diminished market share can constitute irreparable harm").

agency would be futile. *Id.* at 148-49. One need only glance at OOPD's letter to know that its position would not be altered by another filing.

> ### 2.   The exhibits are relevant.

Citing Federal Rules of Evidence 401 and 402, FDA repeatedly asserts that the exhibits are "irrelevant." *See* FDA Mot. at 5-6, 9-10. That is clearly incorrect.

Relevance is a low bar. "Evidence is relevant if … it has *any tendency* to make a fact more or less probable than it would be without the evidence … [and] the fact is of consequence in determining the action." Fed. R. Civ. P. 401 (emphasis added). The relevance requirement protects a jury from being misled and is less important where, as here, there is no jury. *See, e.g.*, *Talley v. United States*, No. 21-1509, 2023 U.S. Dist. LEXIS 64706, at *2-4 (E.D. La. Mar. 16, 2023).

The cases cited by FDA do not actually suggest that a relevance objection is sufficient to justify the extraordinary remedy of striking an opponent's filing. In *Judicial Watch, Inc. v. Department of Commerce*, 224 F.R.D. 261 (D.D.C. 2004), "the formidable burden of prevailing on a motion to strike" had been met because the plaintiff's declaration sought "to impugn the character" of the defendant's employee through baseless claims of "'outrageous,' 'atrocious,' 'improper,' 'unethical,' and 'dishonest' conduct," *id.* at 264. In *Wasserman v. Rodacker*, No. 06-1005 (RWR), 2007 WL 274748 (D.D.C. Jan. 29, 2007), the court struck documents the defendants submitted related to "later occurring events" that were "wholly unrelated to [their] defenses" to "unfairly cast aspersions upon [plaintiff's] character," *id.* at *2. These cases reflect the rule that a filing that "fairly presents a question of law or fact which the court ought to hear … may not be stricken as impertinent." *Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C. 2004) (citation omitted). And a filing is not immaterial "unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation," or "it can be shown that no evidence in support of the allegation would be admissible." *Id.* at 2-3 (citation omitted).

FDA cannot clear that bar. Each exhibit was cited in Jazz's first summary judgment brief, and a number of the exhibits also are cited in Jazz's second summary judgment brief (filed today). Those briefs establish the relevance of the exhibits by incorporating them into Jazz's claims against FDA. The relevance of certain exhibits is also discussed above in this brief. *See supra* at §§ I.A, I.B. The exhibits are undeniably relevant in the usual sense.

### 3.    The government has not been prejudiced.

FDA's final objection is to claim "prejudice" stemming from the Griffin Declaration and its exhibits. *See* FDA Mot. at 11. The claim is baseless.

The Griffin Declaration first recounts Jazz's efforts to obtain undisclosed communications related to OOPD's decision through FOIA. *See* Griffin Decl. ¶¶ 3-14; *see also* AR0483, AR0516 (discussing some of the missing communications between OOPD and the Review Division). The declaration then recounts the parties' efforts to meet and confer about FDA's refusal to include the missing communications in the record. *See* Griffin Decl. ¶¶ 15-21.

FDA's response is overwrought. Although it purports to be "set[ting] the public record straight," FDA Mot. at 11 n.5, it cannot identify any inaccuracy in the declaration. All FDA can do is quibble about whether it had *one* or *two* subjective reasons to "not include certain internal FDA communications in the administrative record." *Id.* But that disagreement was addressed in the declaration. *See* Griffin Decl. ¶ 20. To further guard against the risk of even an inadvertent misstatement, the declaration attached every piece of correspondence, including the only letter that FDA sent on this topic. *See* Griffin Decl. at 57. Indeed, FDA quotes from the copy of its letter that *attached to the declaration* while purporting to complain about the declaration's completeness. *See* FDA Mot. at 11 n.5 (quoting Griffin Decl. at 57).

Nor does the declaration "malign the government generally" through "baseless accusations." FDA Mot. at 11. FDA has not identified a single "accusation" in the declaration, much less explained

why it thinks the accusation is "baseless" or how it has been "malign[ed]." FDA's own case demonstrates that such hyperbole cannot justify a motion to strike. *See Level the Playing Field*, 381 F. Supp. 3d at 95 (denying the government's motion to strike plaintiff's counsel's declaration where the agency referred generally to the contents of the declaration without "providing an example of the objectionable argument").

That said, certain filings in this case do reflect an effort to malign Jazz. Right out of the gate, Avadel alleges that "Jazz has been engaged for years in unlawful conduct." Avadel SJ Br. at 1. To make that claim, Avadel twice misrepresents the Federal Circuit's holding in the patent certification litigation by suggesting that the court found Jazz's patent listing had violated federal law. *See id.* at 1, 9. In truth, the Federal Circuit expressly did not "consider whether the patent holder violated the law by listing the patent in the first instance." *Jazz v. Avadel*, 60 F.4th 1373, 1382 (Fed. Cir. 2023). Avadel also offers a biased New York Times article for the truth of the matters asserted therein, Avadel SJ Br. at 9-10. Those are the sort of unfounded and prejudicial allegations that actually meet the standard for striking "immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).[14]

## III.   The Court should deny the motions to strike the scientific literature.

The Court also should deny FDA's effort to prevent Jazz from citing the medical literature to show that OOPD's decision was arbitrary and capricious. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

---

[14] Indeed, if the Court agrees with FDA's or Avadel's motions to strike, Jazz respectfully requests that the Court also strike all extraneous materials cited in Avadel's brief and the amicus brief.

A separate problem with FDA's motion to strike is that *FDA is the party* purporting to rely on "the literature." In its decision, OOPD made a number of factual assertions implying that Xywav's twice-nightly dosing schedule affirmatively harms the sleep of narcolepsy patients and exposes them to higher risks of accidents and death:

- "[W]aking up to take a second dose of Xyrem or Xywav is antithetical to the goal of improving sleep," AR1370;

- "[H]aving to wake up to take a second dose is antithetical to oxybate's goal of improving sleep," AR1374 (appears twice);

- "Awakening to take a second dose of Xyrem or Xywav fragments sleep and disrupts sleep architecture," AR1381; and

- Treatment with twice-nightly oxybate "contributes to chronic sleep loss, which is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health" AR1374 (appears twice).

OOPD also made factual claims that Lumryz provides additional "medical benefits" for patients with narcolepsy by eliminating "the need to awaken in the middle of sleep to take a second dose." AR1371. OOPD also asserted that Lumryz "provides an opportunity for narcolepsy patients to achieve normal sleep architecture." *Id.*

OOPD asserted that all these claims were "based on its scientific expertise and consultation of the literature." AR1381. OOPD also asserted that its claims reflect the "general knowledge base" about oxybate and are accepted as part of the "scientific knowledge of sleep hygiene and the importance of consolidating sleep to treat narcolepsy." AR1382. That justification invites rebuttal based on the actual literature.

Moreover, FDA and Avadel have conceded that Jazz was right on at least one critical issue. As just discussed, one of OOPD's main themes below was that twice-nightly dosing harms the sleep of narcolepsy patients. To provide a concrete example, OOPD asserts that waking up to take a second dose of oxybate "will increase" a narcolepsy patient's "WASO" (a sleep architecture measure that

refers to the amount time spent awake during the night). AR1371. That claim is false. The literature proves that patients with narcolepsy start from a baseline characterized by severely disrupted sleep, including elevated WASO. *See, e.g.*, Griffin Decl. Ex. 17 (Roth et al. 2013). The literature further proves that treatment with twice-nightly oxybate consolidates their sleep and reduces WASO. *See, e.g.*, Griffin Decl. Ex. 30 at 599 (Black et al. 2010).

It is difficult to imagine a more direct contradiction and, in response, FDA has retreated from OOPD's position. FDA now concedes that twice-nightly oxybate is effective at improving the sleep of patients with narcolepsy. *See* FDA SJ. Br. at 31 ("Jazz further argues that twice-nightly dosing reduces disrupted sleep. … FDA does not dispute oxybate therapy, even when dosed twice nightly, can have that effect."). Avadel makes a similar concession. *See* Avadel SJ. Br. at 38 ("Twice-nightly oxybate improves sleep relative to no treatment at all."). In other words, the movants may not want the Court to consider the medical journal articles, but they neither can nor do contest the primary conclusion that Jazz drew from them.

In any event, as discussed next, if the administrative record rule were actually a barrier to considering any of the medical journal articles, completing and supplementing the record with them would be proper.

## IV.    In the alternative, the standards for completing and supplementing the record are both met.

For the reasons above, Jazz's motion for judicial notice should be granted, the motions to strike filed by FDA and Avadel should be denied, and the case should proceed to the merits.

But in the alternative, if the Court concludes that completing or supplementing the record is necessary to consider some or all of the exhibits, Jazz submits that the standards for completing and supplementing the record are both met.

### A.     The court should order FDA to complete the administrative record.

Completing the administrative record refers to expanding the record to include "evidence that should have been properly a part of the administrative record but was excluded by the agency." *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018) ("*Oceana I*") (citation omitted). This requires two simple showings. First, the plaintiff must show that the materials in question actually exist by identifying them "'with sufficient specificity.'" *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015) ("*Colorado I*"). Second, the plaintiff must provide "reasonable, non-speculative grounds" based on "concrete evidence" indicating "that the documents were considered by the agency." *Oceana I*, 290 F. Supp. 3d at 78-79 (citation omitted). "'[C]onsidered' means "considered 'either directly *or* indirectly.'" *Colorado I*, 151 F. Supp. 3d at 23 (emphasis added). A document that was before the relevant agency officials was "considered" even if they did not ultimately rely on it. *See, e.g., Am. Wild Horse Pres. Campaign v. Salazar*, 859 F. Supp. 2d 33, 41 (D.D.C. 2012) (agency cannot "exclude information on the grounds that it did not 'rely' on the excluded information in its final decision") (citation omitted). What matters is whether the document "might have influenced the agency's decision." *Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 71 (D.D.C. 2008) (citation omitted). Both prongs are met here.

**<u>Exhibit 1</u>** was before the agency because OOPD alluded to it in its decision letter. *See id.* at 75 (question is whether the decision makers "knew about" the document "during [their] decision-making process"). OOPD conceded that it was "aware of certain language in agency documents that could be interpreted as suggesting FDA has" a comparable safety policy. AR1365 n.147. Although OOPD did not identify those documents, Exhibit 1 is clearly one of them. *See* Griffin Decl. Ex. 1 at 2 (the major contribution pathway "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug").

**Exhibit 10** was before the agency because it is a consult that supported one of OOPD's prior exclusivity decisions. Indeed, OOPD's decision letter relied on a different memo arising from the same exclusivity determination as Exhibit 10, that memo is in the record, and it purports to summarize Exhibit 10. *See* AR1520. Similarly, **Exhibits 26, 27, and 38** were all before FDA because they are prior decisions made by the same Review Division that participated in the decision below, and they address one of the key topics in OOPD's decision letter (the relationship between oxybate and disrupted nighttime sleep). **Exhibits 44 to 47** to the Second Griffin Declaration were similarly before FDA as prior relevant decisions. In addition, **Exhibits 4, 8, 12 and 14** were all before FDA as rules of the agency. *See, e.g.*, *Cnty. of San Miguel*, 587 F. Supp. 2d at 76 ("it is axiomatic that documents created by an agency itself or otherwise located in its files were before it"); *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 198 (D.D.C. 2005) (agency "knew of each of the documents" because they "were created by the agency itself").



Other exhibits were previously submitted by Jazz to the Review Division in connection with Jazz's requests to market or study twice-nightly oxybate as a treatment for disrupted nighttime sleep.

Thus, **Exhibits 18, 19, 20, 21, 22, 24, and 25** were all before FDA because they were submitted as part of the NDA for Xyrem—and they were each specifically reviewed by Dr. Mani. *See* Second Griffin Decl. Ex. 41 at 15, 17-18, 74-81. **Exhibits 17, 19, 21, 22, 25, 29, 30, 31, 33, 34, and 36** were all before FDA because they were discussed and attached to Jazz's 2020 submission to the Review Division. *See* Second Griffin Decl. Ex. 42 at 5-6, 14-15, 19, 21, 24. FDA cannot legitimately exclude from the administrative record scientific studies that are in its own files and were submitted to the same officials in connection with closely related topics. *See, e.g.*, *Kent Cnty., Del. Levy Ct. v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992) ("Had the EPA simply checked the files at the Region III office, it would have found the documents that discuss what appears to be a well-aired debate …. The documents relate to the position of the agency's own experts on the question central to this case. To deny their relevance would be inconsistent with rational decisionmaking ….").

## B. The court should order FDA to supplement the administrative record.

Supplementing the record refers to expanding the administrative record to include materials that were not before the agency in the first instance, but which "the plaintiff 'believes should nonetheless be included in the administrative record.'" *Oceana I*, 290 F. Supp. 3d at 77 (quoting *Univ of Colo.*, 151 F. Supp. 3d at 13). Unlike a request to complete the record, a request to supplement requires a showing of "unusual circumstances." *Id.* (quoting *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010)). At least three "unusual circumstances" exist here.

First, it is well settled that unusual circumstances exist where the agency has "deliberately or negligently excluded documents that may have been adverse to its decision." *City of Dania Beach*, 628 F.3d at 590 (citation omitted). That description applies here to FDA's decision to delete or exclude the references that were attached to or discussed in Avadel's and Jazz's submissions. *See supra* § I.B.2 (discussing **Exhibits 3, 11, 13, 14, 17, 24 and 34**). At least some of those exhibits appear to have been *deliberately* excluded, and they are all adverse to FDA's decision because they undercut OOPD's

assertions that a 1,500 mg reduction in daily sodium can be easily achieved, that twice-nightly oxybate therapy harms the sleep of patients with narcolepsy, and that avoiding a single nighttime awakening is a medically relevant benefit.

FDA improperly excluded **Exhibits 1 and 10**, as well as **Exhibits 44 to 47**, which are OOPD precedents that help rebut OOPD's claim its precedent is "devoid" of examples of the agency imposing or following a comparable safety requirement. FDA similarly should not have excluded **Exhibits 26, 27, and 38**, where the Review Division rejected closely related requests from Jazz. Those decisions also undercut OOPD's assertion that twice-nightly oxybate therapy harms sleep and its claim that avoiding a single awakening is a medically relevant benefit.

Second, this Court previously surveyed the case law and concluded that unusual circumstances exist "where the district court cannot determine from the administrative record whether the agency complied with its procedural obligations," in which case "the district court may consider extra-record evidence." *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 4 (D.D.C. 2017) (Mehta, J.). That allows the Court to consider **Exhibits 4 to 8**, which go to whether OOPD's decision to invite CDRH to answer the ultimate question violated FDA's procedures (especially when the Review Division had already said "No"). It also provides another reason to consider **Exhibits 1, 10, and 44-47**, which go to whether OOPD irrationally disavowed the existence of a dispositive policy. *See* 237 F. Supp. 3d at 6-7 ("Whether an agency's interpretative statement is a mere clarification of its existing position, as opposed to a change in position, is a question for the court to decide — not [the agency] — and the court owes the agency no deference on that issue.").

Third, unusual circumstances exist where "background information was needed 'to determine whether the agency considered all the relevant factors.'" *City of Dania Beach*, 628 F.3d at 590 (citation omitted). "The 'relevant factors' ground for supplementation comes into play where a party seeks to demonstrate that an agency decision was arbitrary because the agency did not consider some important

aspect of the regulatory problem before it." *Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 69 (D.D.C. 2020) ("*Oceana II*") (quoting 33 Wright & Miller, Federal Practice & Procedure § 8391 (2d ed. 1987)). To qualify, the proffered evidence should "point out an 'entirely new' general subject matter that the defendant agency failed to consider." *Id.* at 70 (quoting *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013)).

Here, the medical journal articles point out at least two "general subject matters" that OOPD failed to consider. First, the articles include an overwhelming body of literature—going back at least four decades—showing that twice-nightly oxybate therapy improves virtually every measure of sleep architecture and consolidates sleep in patients with narcolepsy. OOPD repeatedly asserted the exact opposite, showing that it entirely failed to consider that literature.

Second, **Exhibit 37** (Roth et al. 2022) reports an analysis sponsored by Avadel quantifying the impact that Lumryz has on disrupted nighttime sleep. That analysis, when compared to prior studies of Xyrem and Xywav, suggests *equivalence* (not superiority) between once- and twice-nightly dosing when it comes to the sleep of patients with narcolepsy. Another publication (which came out after Jazz's last filing) underscores that exact point. *See* Russell Rosenberg et al., *Implications of Oxybate Dosing Regimen for Sleep, Sleep Architecture, and Disrupted Nighttime Sleep in Patients with Narcolepsy: A Commentary*, 12 Neurology & Therapy 1805, 1805 (Sept. 27, 2023) ("We conclude that while once-nightly and twice-nightly oxybate dosing regimens differ in their pharmacokinetic profiles, both improve [disrupted nighttime sleep] in patients with narcolepsy to a similar degree.") (Second Griffin Decl. Ex. 43). OOPD's clinical superiority relies in part on a comparison of the impacts that Xywav and Lumryz have on sleep. *See* FDA SJ Br. at 30 (characterizing OOPD's decision as a "finding that twice-nightly dosing disrupts sleep more than once-nightly dosing"); Avadel SJ Br. at 39 (asserting that the central issue is "whether once-nightly oxybate is better for sleep than twice-nightly oxybate") (emphasis omitted). Yet OOPD entirely failed to consider the literature that can inform such a comparison.

These are both valid reasons to supplement the record, particularly given OOPD's claim that its position is based on a "consultation of the literature." *See Oceana II*, 454 F. Supp. 3d at 70 ("In a complicated, scientific analysis, … consideration of the intermediary evidentiary factors which lead to the ultimate conclusion are the very means by which the agency renders its decision and, generally speaking, any of them can be a 'relevant factor' justifying supplementation of the administrative record if ignored.") (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1, 8 (D.D.C. 2001)). Thus, the record should be supplemented to include all of the medical journal articles.

### C.      No forfeiture or waiver has occurred.

Avadel claims that Jazz forfeited the right to respond by asking the Court to order FDA to complete or supplement the record. *See* Avadel Mot. at 1, 2. That is wrong.

To begin, Jazz retains the right to file a reply in support of its motion for judicial notice. *See* Local Rule 7.1(d) and (e); *see also* Order Granting Motion for Scheduling Order, ECF No. 33 (August 14, 2023) ("Scheduling Order"). Avadel is the party asserting, in its opposition, that Jazz's motion should be governed by the legal standards for completing or supplementing the record. Explaining that those standards are met is not a "new" argument. Indeed, it is common for an opponent to declare that the movant has the law wrong, and for the movant to reply that its motion should be granted under the legal standard urged by the opposition. That is, reply arguments are fair game "if they fall within issues raised by the opposing party in its opposition brief." *Air Excursions LLC v. Yellen*, 598 F. Supp. 3d 4, 18 n.13 (D.D.C. 2022), *rev'd on other grounds*, 66 F. 4th 272 (D.C. Cir. 2023); *see Kolbusz v. FBI*, No. 1:17-cv-00319 (EGS/GMH), 2021 U.S. Dist. LEXIS 91212, at *25 n.18 (D.D.C. Feb. 17, 2021) ("Plaintiff argues that Defendants waived or forfeited this argument … because it was raised for the first time in their reply brief. … Plaintiff is incorrect. Defendants' reply … was not a new argument, but rather a reply to … [the] opposition brief."); *see also United States v. Powers*, 885 F.3d 728, 732 (D.C. Cir. 2018) (finding no waiver because a reply brief may "respond to arguments raised for

the first time" in the opposition brief; moving party "could wait to see" if the opposition raised the issue and then "contest [it] in his reply brief").

Avadel is also the party who filed a "disfavored" and "exceptional" motion to strike. It is nonsensical for Avadel to assert that Jazz forfeited the right to oppose Avadel's motion before that motion was even filed. To make such a claim, Avadel pretends that Jazz conceded that "the existing 'record of the materials that were before the agency' in the 'administrative record' is 'more than sufficient' to resolve its APA claims." Avadel Mot. at 2 (claiming to quote ECF No. 38 at 15 n.6). That is a blatant misrepresentation. What Jazz actually said was: FDA had "refused to include the [missing communications] in the <u>administrative record</u>," but that "in the interest of reaching a timely resolution of this matter, Jazz has moved for summary judgment without access to a complete <u>record</u> <u>of the materials that were before the agency</u>," because "Jazz believes the available records are <u>more</u> <u>than sufficient</u> to show that the agency's decision to break Xywav's exclusivity was [unlawful]." *See* ECF No. 58 at 15 n.6. (underscored portions quoted in Avadel's telling). A quick glance shows that Avadel cherry picked and reordered three different portions of Jazz's statement to create a fake concession.[15] When Jazz stated *in its summary judgment brief* stated that "*the available records* are more than sufficient to show" unlawful agency action, *id.* (emphasis added), Jazz was referring inclusively to all of the records cited in that brief. In any event, circumstances change, and nothing in that statement forfeited Jazz's right to oppose motions to strike that had not yet been filed.

Moreover, Avadel and FDA both have another brief on these topics. ECF No. 33. Because they will doubtlessly do their level best to respond to this submission, there would be no waiver or prejudice even if Jazz had introduced a wholly new topic. *See, e.g., Goodrich v. Teets*, 510 F. Supp. 2d

---

[15] FDA similarly mispresented Jazz's statement. *See* FDA Mot. at 3 (falsely claiming that Jazz stated that "the administrative record compiled by FDA" was "'more than sufficient'"); *id.* at 8 (falsely claiming that Jazz "'believe[d]' the existing record was 'more than sufficient'").

130, 143 (D.D.C. 2007) (considering argument raised for the first time in reply brief because opposing party had the opportunity to respond in its own reply).

That said, the forfeiture assertions necessitate protective action. To that end, Jazz has filed a Protective Motion to Complete and Supplement the Record. The briefing on that motion will give Avadel an additional opportunity to respond. And that motion is timely—no rule requires filing a motion to complete or supplement the record with or before the opening summary judgment brief. *See Dist. Hosp. Partners, LP*, 971 F. Supp. 2d at 21 (rejecting the agency's argument that a motion to supplement the record was "untimely because the plaintiffs waited until mid-way through summary judgment briefing to file their motion").

## CONCLUSION

The Court should grant Jazz's motion for judicial notice (ECF No. 37) and deny FDA's and Avadel's motions to strike (ECF Nos. 48 and 42). In the alternative, the Court should deny both motions to strike and complete and supplement the record as discussed above.

November 15, 2023

Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Peter A. Bruland (D.C. Bar No. 1600717)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
tlosseaton@sidley.com
pbruland@sidley.com

*Counsel for Plaintiff Jazz Pharmaceuticals Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 15, 2023, I electronically filed this motion using the Court's CM/ECF system. Consistent with the August 7, 2023 Protective Order entered in this case, all participants will be served with the Notice of Electronic Filing and the foregoing motion via email.

Date: November 15, 2023

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah

**APPENDIX**

to

**Plaintiff's Combined Reply in Support of Plaintiff's Motion for Judicial Notice, Opposition to Defendants' Motions to Strike, and Memorandum in Support of Plaintiff's Protective Motion to Complete and Supplement the Record**





