PUBLIC VERSION

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., Plaintiff<br><br>v.<br><br>XAVIER BECERRA, *et al.*, Defendants<br><br>and<br><br>AVADEL CNS PHARMACEUTICALS, LLC,<br>Intervenor-Defendant. | Case No. 1:23-cv-01819-APM |

## Federal Defendants' Reply in Support of
## Their Cross-Motion for Summary Judgment

OF COUNSEL:

SAMUEL R. BAGENSTOS
General Counsel
U.S. Department of Health and Human
Services

MARK RAZA
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

LEAH A. EDELMAN
Associate Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD  20993-0002

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA L. LISKAMM
Director

JAMES W. HARLOW
Acting Assistant Director

NOAH T. KATZEN
ISAAC C. BELFER
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
(202) 305-2428 (Katzen)
(202) 305-7134 (Belfer)
(202) 514-8724 (fax)
Noah.T.Katzen@usdoj.gov
Isaac.C.Belfer@usdoj.gov

PUBLIC VERSION

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 3

   I.   FDA acted within its statutory authority ................................................. 3

      A.   The well-established regulatory meaning of "same drug" excludes a clinically superior drug .......................................................................... 4

      B.   FDA's interpretation is at least reasonable and entitled to deference ............ 13

   II.   FDA's reasoned decision-making should be upheld ................................. 15

      A.   FDA did not have a "comparable safety and effectiveness" policy from which it could have arbitrarily or capriciously departed ............................................ 15

      B.   FDA did not violate its internal dispute resolution procedures ...................... 18

      C.   The record supports FDA's decision regarding clinical superiority .............. 19

   III.   If the Court rules for Jazz on the merits, it should order supplemental briefing on the remedy ....................................................................................... 23

Conclusion .......................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*,
    508 F.3d 995, 1000 (11th Cir. 2007) ................................................................... 11

*Alaska v. United States*,
    545 U.S. 75, 115 (2005) .......................................................................................... 7

*Assa'ad v. Attorney General*,
    332 F.3d 1321, 1329 (11th Cir. 2003) ................................................................. 11

*\*Baker Norton Pharms., Inc. v. United States FDA*,
    132 F. Supp. 2d 30, 38 (D.D.C. 2001) ......................................................... passim

*Braintree Lab'ys, Inc. v. Nephro-Tech, Inc.*,
    No. 96-2459, 1997 WL 94237, at *8 (D. Kan. Feb. 26, 1997) ............................ 19

*Catalyst Pharmaceuticals, Inc. v. Becerra*,
    14 F.4th 1299 (11th Cir. 2021) .............................................................................. 8

*\*City of Arlington v. FCC*,
    569 U.S. 290, 306 (2013) ...................................................................................... 14

*Depomed, Inc. v. HHS*,
    66 F. Supp. 3d 217 (D.D.C. 2014) ............................................................... passim

*Eagle Pharmaceuticals, Inc. v. Azar (Eagle I)*,
    16-cv-790 (TJK), 2018 WL 3838265, at *2 (D.D.C. June 8, 2018) .................. 7, 10

*Eagle Pharmaceuticals, Inc. v. Azar (Eagle II)*,
    952 F.3d 323 (D.C. Cir. 2020) ......................................................................... 10, 15

*Environmental Defense v. Duke Energy Corp.*,
    549 U.S. 561 (2007) .............................................................................................. 11

*\*George v. McDonough*,
    142 S. Ct. 1953, 1959 (2022) ............................................................................... 10

*\*Hall v. Hall*,
    138 S. Ct. 1118, 1124-25 (2018) .......................................................................... 10

*Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*,
    972 F.3d 83, 115 (D.C. Cir. 2020) ....................................................................... 15

*Miller v. Clinton*,
    687 F.3d 1332, 1334 (D.C. Cir. 2012) ................................................................... 6

*Sims's Lessee v. Irvine*,
    3 U.S. (3 Dall.) 425 (1799) .................................................................................... 7

*Slack Techs., LLC v. Pirani,*
  598 U.S. 759, 766 (2023) ................................................................................................ 8

*Twitter, Inc. v. Taamneh,*
  598 U.S. 471, 484 (2023) .............................................................................................. 11

*United Therapeutics Corp v. HHS,*
  No. 17-cv-01577, 2020 WL 648619 (D.D.C. Sept. 2, 2020) ....................................... 10

*Yellen v. Confederated Tribes of Chehalis Rsrv.,*
  141 S. Ct. 2434, 2445 (2021) .......................................................................................... 9

## Statutes

21 U.S.C. §
  355(o)(4)(A)………………………………………………………………………………9
  360cc ............................................................................................................................ 7, 13
  360ccc-1(c)(2)(A) .......................................................................................................... 8, 9
  360ccc-2(a)(2)(B) ............................................................................................................. 9
  321(g)(1) ........................................................................................................................... 4
  355 .................................................................................................................................... 6
  355(d)(5) ......................................................................................................................... 22
  360cc(a) ............................................................................................................. 6, 11, 14, 15
  360cc(c) ........................................................................................................................... 12
  360ccc(a)(3)(A)(ii) ........................................................................................................... 8
  371(a) .............................................................................................................................. 14

Pub. L. No. 115-52, tit. VI, § 607(b), 131 Stat. 1005, 1050 ...................................... 13

## Regulations

21 C.F.R. §
  316.3(b)(14) .................................................................................................................. 1, 4
  516.3(b) ............................................................................................................................ 9
  516.115(c) ......................................................................................................................... 9

## Other Authorities

150 Cong. Rec. 6099 (July 20, 2004) ............................................................................... 9
56 Fed. Reg. 3338, 3341 (Jan. 29, 1991) ......................................................................... 4
57 Fed. Reg. 62083 (Dec. 29, 1992) .............................................................................. 19
70 Fed. Reg. 56394, 56397-98 (Sept. 27, 2005) .............................................................. 9
76 Fed. Reg. 64868 (Oct. 19, 2011) ................................................................................. 2
78 Fed. Reg. 35117, 35124 (June 12, 2013) ............................................................... 2, 16
A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 146 (2012) ........... 7
Concise Oxford Dictionary of Current English 1218 (1931) ........................................... 8

# INTRODUCTION[1]

Jazz's attack on FDA's determination that Lumryz is not the "same drug" as Xywav distorts the Orphan Drug Act, its implementing regulations, and the administrative record.

*First*, Jazz's revisionist interpretation of the Orphan Drug Act's phrase "same drug" remains unfounded. It claims FDA conceded that "drug" in the Orphan Drug Act means "active moiety." ECF No. 59-2 (Jazz Opp'n) 1, 10, 18. But FDA made no such concession, which would have been inconsistent with the plain language of its longstanding regulations. In defining "same drug," those regulations refer to a drug's active moiety as something "contain[ed]" in the "drug," rather than, in that context, the "drug" itself. 21 C.F.R. § 316.3(b)(14). Jazz then hypothesizes that Congress adopted the term "same drug" to resolve a non-existent "grammatical ambiguity" about the proper antecedent of the term it replaced ("such drug"). Jazz Opp'n 18. Even assuming the ambiguity existed (it did not), Jazz does not articulate any meaningful difference between "such" and "same," and so has no explanation of how this change in statutory wording could have resolved the alleged ambiguity.

Jazz tries to brush aside the old-soil principle of statutory interpretation, citing an Eleventh Circuit decision about FDA's interpretation of a term that Congress did *not* adopt. Jazz Opp'n 14-15. Here, though, Congress expressly adopted the identical phrase

---

[1] This brief utilizes the same abbreviations as Federal Defendants' opening brief. ECF No. 45-2 (FDA MSJ).

PUBLIC VERSION

"same drug" from FDA's long-standing regulatory definition. And that definition had and continues to have an exclusion for drugs that can be "shown to be clinically superior."

*Second*, Jazz has not demonstrated the existence of an FDA policy that comparable safety and effectiveness must be shown before a major contribution to patient care can be found. *See* Jazz Opp'n 24-34. Jazz points to a *proposed rule* for proof of the policy. Jazz Opp'n 25-27 (citing 76 Fed. Reg. 64868 (Oct. 19, 2011)). But as the *final rule* made clear, FDA had not intended to propose a "new standard" requiring a drug to have comparable safety and effectiveness. 78 Fed. Reg. 35117, 35124 (June 12, 2013). Moreover, neither Jazz nor FDA has been able to identify any instance in which FDA concluded a drug that otherwise made a major contribution to patient care was blocked from approval by another drug's exclusivity because the later drug had failed to demonstrate comparable safety and effectiveness. AR544-50 & n. 147.

*Third*, backing away from its original argument that the Office of Orphan Products Development (OOPD) was required to utilize formal dispute resolution procedures after receiving the Review Division's first consult memorandum, Jazz now concedes that OOPD could properly continue to discuss the matter with the Review Division. Jazz Opp'n 35. All that remains is Jazz's contention that OOPD violated internal procedures by consulting with board-certified sleep specialists in the Center for Devices and Radiological Health (CDRH). Jazz Opp'n 34-38. But FDA's procedures do not obstruct scientific analysis by forbidding one part of FDA from consulting with the best available experts in a relevant subject matter merely because they work for another part

2

PUBLIC VERSION

of FDA. Jazz's theory that such consultation could only have been part of a devious plan to undercut the Review Division's first consult memorandum has no basis in the administrative record.

*Finally*, Jazz's substantive attacks on FDA's major contribution to patient care determination, *see* Jazz Opp'n 38-42, have no merit. FDA adequately considered Lumryz's higher sodium content and explained why Lumryz's once-nightly dosing provides a major contribution to patient care over Xywav's (and Xyrem's) twice-nightly dosing. For the reasons in Federal Defendants' opening brief, ECF No. 45-2 (FDA MSJ), and in this Reply, the Court should grant their cross-motion for summary judgment.

## ARGUMENT

### I.   FDA acted within its statutory authority

All parties acknowledge that the term "same drug"—absent context—is ambiguous. *See* FDA MSJ 19; ECF No. 34-2 (Jazz MSJ) 20; Jazz Opp'n 16; ECF No. 41-2 (Avadel MSJ) 6. So the interpretive question is twofold: (1) does the term "same drug" have an established meaning in the context of determining the scope of orphan-drug exclusivity, and (2) if not, is FDA's resolution of the ambiguity reasonable? Under the old-soil principle, the term "same drug" in this context unambiguously excludes a clinically superior drug. FDA MSJ 14-15. Put another way, in adopting a term with a longstanding and clearly defined meaning in FDA's orphan drugs regulations, Congress effectively ratified FDA's longstanding definition of that term. *Id.* At the very least, FDA's interpretation is a reasonable one to which this Court must defer. FDA MSJ 15-16.

3

### A. The well-established regulatory meaning of "same drug" excludes a clinically superior drug

Jazz concedes (as it must) that, when the 2017 Amendments adopted the term "same drug" to determine the scope of orphan-drug exclusivity, FDA had long defined that specific term in that precise context to exclude a clinically superior drug. Jazz Opp'n 9. Jazz is still unable to explain why Congress would have harmonized the statutory language with FDA's regulatory term while silently abandoning the longstanding definition the regulatory term carried with it.

1. Throughout Jazz's response, it asserts that FDA has understood "drug" as used in the Orphan Drug Act to mean "active moiety." Jazz Opp'n 1, 10, 18. FDA's orphan-drug regulations do not define the term "drug" or provide any gloss on the FDCA's statutory definition of that term. *See* 21 U.S.C. § 321(g)(1). However, since 1992, the regulations have defined the term "same drug." 21 C.F.R. § 316.3(b)(14). That definition, in relevant part, does *not* refer to the "active moiety" itself as the "drug." Rather, it refers to the "active moiety" as something "contain[ed]" in the "drug." *Id.* ("Same drug means . . . a drug that *contains* the same active moiety . . .") (emphasis added); *see also* 56 Fed. Reg. 3338, 3341 (Jan. 29, 1991) (proposing "to adopt a policy that regards two drugs as different if they differ with respect to the chemical structure of their active moieties").

Notably, Jazz does not argue that "active moiety" is the plain meaning of "drug." Indeed, Jazz concedes that "drug" has no single meaning for all purposes under the FDCA. Jazz MSJ 20. Instead, in its effort to show how its "active moiety" argument flows from the statute, Jazz relies on one sentence in a 17-year-old internal

PUBLIC VERSION

memorandum from a staff attorney in FDA's Office of Chief Counsel. Jazz Opp'n 10

(citing Griffin Decl. Ex. 9 at 3). But that sentence itself is followed by a cite to the

regulatory definition of "same drug" that Jazz asks this Court to set aside. *See* FDA MSJ

18. Moreover, that sentence cannot be read in isolation, and the memorandum as a

whole makes clear that the definition of "same drug" is *not* simply "same active

moiety." *See* Griffin Decl. Ex. 9 at 6 n.3 (noting that a "drug" for which orphan drug

designation is sought may "not" be the "same drug" as another drug with the same

active moiety). There is no basis to treat Jazz's out-of-context reliance on a single

sentence in an internal legal memorandum as a more precise or more authoritative

interpretation of the statute than FDA's validly promulgated regulation.

Nor, contrary to Jazz's argument, do an FDA webpage and the decisional

memorandum in this case define "drug" to mean "active moiety." *See* Jazz Opp'n 10.

Instead, these documents simply note that orphan-drug designation "is generally

granted to" or "applies to" the active moiety.[2] FDA, Frequently Asked Questions About

Designating an Orphan Product (May 11, 2023);[3] AR1355 n.84. Jazz's efforts to tease a

---

[2] When read in context, it is evident that the documents Jazz cites do not define the
word "drug," let alone in the oversimplified manner that Jazz proposes; nor do they
undermine the regulatory definition of "same drug." *See* FDA, Frequently Asked
Questions About Designating an Orphan Product (May 11, 2023) (answering a question
about changes to product formulation by explaining that "designation is generally
granted to the active moiety *rather than the product formulation*"); AR1355 n.84
(explaining that orphan-drug designation generally "applies to the active moiety" *as
opposed to the generic drug name*).  In both places, FDA explained that the "same drug"
inquiry for small-molecule drugs begins with an examination of the active moiety *as
opposed to* product formulation or generic drug name—not that the inquiry is strictly
limited to whether two drugs contain the same active moiety.

[3] https://perma.cc/SA6B-NTP9

binding definition out of these sources—one at odds with the operative regulatory text—should be rejected.

2. Resisting the old-soil and effective-ratification principles, Jazz offers an implausible alternative explanation for why Congress amended the relevant language in 21 U.S.C. § 360cc(a) from "such drug" to "same drug." *See* Jazz Opp'n 4, 18. Jazz speculates that the previous statutory term "such drug" could have referred to either the "drug designated under [§ 360bb]" or the drug named in the "application filed pursuant to [§ 355]," which (according to Jazz) involve different meanings of the word "drug." Jazz Opp'n 18. By changing "such drug" to "same drug," Jazz contends, Congress made clear that the proper antecedent is the "drug designated," rather than the "finished product" that is the subject of the "application filed." *Id.* at 4, 18.

That theory ignores the grammatical structure of § 360cc(a), both pre- and post-amendment.

| Pre-2017 Amendments<br>21 U.S.C. § 360cc(a) (2012) | Post-2017 Amendments<br>21 U.S.C. § 360cc(a) (current) |
|---|---|
| "[I]f the Secretary . . . approves an **application filed pursuant to section 355 . . . for a drug designated under section 360bb** . . . the Secretary may not approve another application under section 355 . . . for **such drug** . . . ." | "[I]f the Secretary . . . approves an **application filed pursuant to section 355 . . . for a drug designated under section 360bb** . . . the Secretary may not approve another application, under section 355 . . . for the **same drug** . . . ." |

Syntactically, "such drug"—like "same drug"— had to refer to a "drug," and the only possible antecedent is the drug "designated under section 360bb." *See Miller v. Clinton*, 687 F.3d 1332, 1334 (D.C. Cir. 2012) ("[B]ecause there are no other 'individuals' mentioned in the section, there is no other antecedent to which the word 'such' [in 'such

PUBLIC VERSION

individuals'] could refer."); *see also* A. Scalia & B. Garner, Reading Law: The

Interpretation of Legal Texts 146 (2012) (explaining that the word "such" is a

"demonstrative adjective" referring to the last reasonable antecedent) (citing *Sims's*

*Lessee v. Irvine*, 3 U.S. (3 Dall.) 425 (1799) (per Ellsworth, C.J.)); *Alaska v. United States*,

545 U.S. 75, 115 (2005) (Scalia, J., concurring in part and dissenting in part) (identifying

the "only logical antecedent" for "such transfer" in a proviso as the "only mention of

'transfe[r] . . . that precedes the provision'").

   Jazz argues that "such drug" was nonetheless ambiguous because the antecedent

"drug" to which it refers was (according to Jazz) simultaneously a "finished drug

product" (with respect to the phrase "application filed … for a drug") and an "active

moiety" (with respect to the phrase "drug designated").[4] Jazz Opp'n 4, 18. The latter

part of this theory relies entirely on Jazz's erroneous contention that FDA has

interpreted "drug" to mean only "active moiety." But in any event, the ambiguity Jazz

hypothesizes could not have been cured by changing "such drug" to "same drug." If (as

Jazz's interpretation of § 360cc requires) "such" and "same" bear their ordinary

meanings, they are synonyms. "Such" means "of the *same* class, type, or sort." "Such,"

Merriam-Webster.com, https://perma.cc/E66J-NV2E. It "usually refers to something

that has already been 'described' or that is 'implied or intelligible from the context or

---

[4] Jazz suggests (Opp'n 18) that FDA and courts themselves have suggested this ambiguity in "such drug." Not so. The ambiguity in "such drug" was about whether "two 'drugs' are the same or different," *Eagle Pharmaceuticals, Inc. v. Azar (Eagle I),* 16-cv-790 (TJK), 2018 WL 3838265, at *2 (D.D.C. June 8, 2018); 57 Fed. Reg. 62,076, 62078 (Dec. 29, 1992) (similar), not about the proper antecedent.

circumstances.'" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (quoting Concise Oxford Dictionary of Current English 1218 (1931)). "Same" means "being the one under discussion or already referred to." "Same," Merriam-Webster.com, https://perma.cc/M2DR-LKSR. Therefore, if "such drug" could have referred to "the finished product identified in . . . the 'application filed,'" then "same drug" would be open to the same interpretation. So Jazz's theory does not credibly explain why Congress adopted the term "same drug."

3. Contrary to Jazz's assertion, this case is *not* "on all fours with" *Catalyst Pharmaceuticals, Inc. v. Becerra*, 14 F.4th 1299 (11th Cir. 2021). Jazz Opp'n 11. There, the Eleventh Circuit held that a different statutory phrase from the 2017 Amendments—"same disease or condition"—could not be interpreted to mean "same use or indication." *Id.* at 1306. But unlike "same drug," the phrase "same disease or condition" was not a defined term in FDA's orphan-drug regulations when the 2017 Amendments were adopted. That "Congress did not borrow FDA's words" with respect to the statutory phrase at issue in *Catalyst*, Jazz Opp'n 15, is precisely what makes that case inapposite here.[5]

4. Jazz's citation to other uses of "same drug" in the FDCA, *see* Jazz Opp'n Reply 15-16, adds further support to FDA's position. As an initial matter, three of the four examples of "same drug" that Jazz cites—21 U.S.C. § 360ccc(a)(3)(A)(ii), § 360ccc-

---

[5] Jazz argues that FDA does not claim that "same disease or condition" is a term of art, suggesting FDA has conceded that it is not. Jazz Opp'n 1-2, 15. FDA did not address the meaning of that phrase because it is not at issue in this case, so no such concession can be inferred.

1(c)(2)(A), and § 360ccc-2(a)(2)(B)—are from the Minor Use and Minor Species (MUMS) Act of 2004.[6] Similar to the Orphan Drug Act, the MUMS Act authorizes FDA to "designate" certain new animal drugs as potentially eligible for a seven-year period of exclusivity if, among other things, the "same drug" is not already approved or designated.[7] *Id.* § 360ccc-2(a)(2)(B); *see also* 150 Cong. Rec. 6099 (July 20, 2004) (Statement of Rep. Pickering) ("[The MUMS Act] creates a program very similar to the successful Human Orphan Drug Program . . . ."). FDA's implementing regulations for the MUMS Act interpret "same drug" to exclude a "functionally superior" drug, much as its orphan-drug regulations have long defined "same drug" to exclude a "clinically superior" drug. 21 C.F.R. §§ 516.3(b), 516.115(c) (cross-referencing the definition of "same drug" in 21 C.F.R. § 516.3(b)); *see also* 70 Fed. Reg. 56394, 56397-98 (Sept. 27, 2005) (explaining that this definition "is consistent with the human orphan drug regulations"). Jazz is therefore incorrect in arguing that these uses of "same drug" "could not possibly bear the term-of-art meaning that FDA proposes here." Jazz Opp'n 3.

In any event, FDA's argument does not depend on "same drug" having a broad term-of-art meaning "*wherever* it appears" in the FDCA. Jazz Opp'n 16 (quoting *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2445 (2021) (emphasis added).

---

[6] The fourth example that Jazz cites, 21 U.S.C. § 355(o)(4)(A), relates to drug safety provisions of the FDCA, a dissimilar context from the use of the term at issue here.

[7] The MUMS Act also authorized FDA to "index" certain new animal drugs for minor species, thereby providing an easier path to legal marketing status, if, among other things, the "same drug" was not already approved or conditionally approved. 21 U.S.C. § 360ccc-1(c)(2)(A).

Rather, the agency's argument is narrowly tied to the phrase's meaning in the *specific* context of determining the scope of orphan-drug exclusivity. And the principle indeed may apply with such precision. In *Hall v. Hall*, for example, the Supreme Court invoked the old-soil principle to give "consolidate" a particular meaning when applied to the consolidation of civil cases, notwithstanding the word's different meanings in other contexts. 138 S. Ct. 1118, 1124-25 (2018); *see also George v. McDonough*, 142 S. Ct. 1953, 1959 (2022) (applying the old-soil principle to a statutory term "that had a long regulatory history *in this very context*") (emphasis added). The same is true here: whatever "same drug" might mean in other statutory contexts, by 2017, its meaning for the scope of orphan-drug exclusivity was firmly established by a decades-old regulation.

5. Relatedly, Jazz's suggestion that FDA's "same drug" definition is too new or too disputed to qualify for the old-soil principle is meritless. Jazz Opp'n 17. Jazz cites no case establishing a minimum age requirement for the principle's application. FDA's "same drug" definition also was not "vacated," Jazz Opp'n 17, in *Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217 (D.D.C. 2014), *Eagle I*, *Eagle Pharmaceuticals, Inc. v. Azar (Eagle II)*, 952 F.3d 323 (D.C. Cir. 2020), or *United Therapeutics Corp v. HHS*, No. 17-cv-01577, 2020 WL 648619 (D.D.C. Sept. 2, 2020). Rather, it was *upheld* in *Baker Norton Pharms., Inc. v. United States FDA*, 132 F. Supp. 2d 30, 38 (D.D.C. 2001). And to the extent the other cases said anything relevant, they reinforced *Baker Norton*. *See Eagle I*, 2018 WL 3838265, at *2 (noting that "the statute itself does not explain when two drugs are the same or different" and turning to FDA regulations) (citing *Baker Norton*, 132 F. Supp. 2d at 34-

10

36); *Depomed*, 66 F. Supp. 3d at 232 (declining to call into question "the 'such drug' ambiguity identified in *Baker Norton*").

6. Unable to show that Congress sought to deviate from the established meaning of "same drug," Jazz tries to shift the burden, arguing that "[t]here is no evidence that Congress modeled the amended [§ 360cc(a)] on FDA's 1992 regulation." Jazz Opp'n 14. However, when Congress uses a term with an established meaning, no further evidence of congressional intent is necessary for the old-soil principle to kick in; rather, there is a "presum[ption]" in favor of the established use. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484 (2023). "Stated differently, '[w]hen Congress uses language with a well-known legal meaning,' we generally presume 'the statute to incorporate that understood meaning.'" *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1000 (11th Cir. 2007) (quoting *Assa'ad v. Attorney General*, 332 F.3d 1321, 1329 (11th Cir. 2003)).

*Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007), is not to the contrary. There, the Supreme Court held that the EPA was not required to interpret the same statutory term uniformly across two different but related statutes. *Id.* at 576. Here, by contrast, the question is whether "same drug" in a statutory provision bears the meaning the agency has long given to that term in a regulation implementing the same statutory provision. Moreover, by recognizing that Congress's use of the same term in different but related statutes did not require uniform agency interpretation, *Environmental Defense* supports the proposition that Congress did not "eliminat[e] the customary agency discretion to resolve questions about a statutory definition," *id.* at 563, that FDA possessed before the 2017 Amendments.

11

7. FDA's interpretation of "same drug" finds further support in 21 U.S.C. § 360cc(c) and the uncodified provision that preserved FDA's pre-2017 determinations. Jazz does not persuasively answer these points.

As FDA explained, if Congress intended to make clinical superiority irrelevant to whether two drugs are the same, Congress would not have described some "clinically superior" drugs as "otherwise the same" as previously approved drugs. FDA MSJ 15 (citing 21 U.S.C. § 360cc(c)). To say that two drugs are "otherwise the same" is to say that they are not the same in the identified respect. So if "otherwise" is interpreted to mean "in other respects," Jazz Opp'n 19, that does Jazz no good. If a "clinically superior" drug may be the "the same in other respects" as a previously approved drug, then clinical superiority is a "respect" in which the drugs are not "the same."

Nor, contrary to Jazz's argument, does Congress's express incorporation of a clinical-superiority requirement in § 360cc(c) show otherwise. Jazz Opp'n 3, 16-17. Jazz ignores the most salient point, *i.e.*, that subsection (c) reversed *Depomed's* holding that FDA lacked authority to deny orphan-drug exclusivity to a designated orphan drug that FDA had approved absent a demonstration of clinical superiority. Congress did not need to specify that FDA could consider clinical superiority to determine the scope of exclusivity because *Baker Norton* had already upheld that practice. Similarly, Congress had no need to specifically authorize the continuation of existing regulations implementing subsection (a) because *Depomed* had not called those regulations into question.

PUBLIC VERSION

Nor does Jazz seriously grapple with the clear language in the uncodified provision preserving FDA's existing "determination" that "same drug" does not include a clinically superior drug. *See* Pub. L. No. 115-52, tit. VI, § 607(b), 131 Stat. 1005, 1050; FDA MSJ 21. That provision was not limited to "past adjudications," as Jazz states. Jazz Opp'n 4. Facially, it includes "any" previous "determination under [§§ 360bb and 360cc]," whether adjudicatory or not. Also lacking in textual support is Jazz's assumption that Congress included that provision to *change* the law. To the contrary, the main purpose for the 2017 Amendments was to *preserve* FDA's regulatory framework in the wake of *Depomed*.

### B.  FDA's interpretation is at least reasonable and entitled to deference

At worst, the meaning of "same drug" is ambiguous and FDA's interpretation should be upheld as reasonable, just as FDA's prior interpretation of "such drug" was upheld in *Baker Norton*. 132 F. Supp. 2d at 37-38. There, the court concluded that: (1) the phrase "such drug" was ambiguous because it did not specify what aspects of the drug to look to, *id.* at 36; (2) Congress left it to FDA to resolve that ambiguity, *id.*; and (3) FDA reasonably looked to whether two drugs have the same active moiety unless the later drug is clinically superior, *id.* at 37-38.

The only relevant change since *Baker Norton* is that in 2017 Congress adopted the term "same drug." That change makes FDA's interpretation *more* reasonable, not less so. While *Baker Norton* had to find that "such drug" meant "same drug" and then define "same drug" to exclude clinically superior drugs, the 2017 Amendments eliminated the need for the first step.

13

PUBLIC VERSION

Relegating *Baker Norton* to a footnote, Jazz inaccurately asserts that "[t]he concept of clinical superiority simply was not at issue" in *Baker Norton*. Jazz Opp'n 24 n.7.  In rejecting the argument that "such drug" meant drug product, the court explained that "the regulation's manner of determining 'sameness' appears to promote the obvious legislative intent behind the Orphan Drug Act—to promote the development of orphan drugs" by balancing two competing concerns. *Baker Norton*, 132 F. Supp. 2d at 38. On the one hand, "[t]he financial incentive for companies to develop" orphan drugs "would be undermined if other companies could develop drugs with the same active moiety but minor differences in active ingredients." *Id.* On the other hand, "[t]he interests of patients who need such drugs are served by the approval of drugs which have the same active moiety but are clinically superior." *Id.* Thus, *Baker Norton* held that FDA reasonably focused *generally* on the active moiety, while *also* considering clinical superiority.

To avoid *Chevron*, Jazz denies that Congress gave FDA interpretative authority with respect to § 360cc(a). But "a general conferral of rulemaking or adjudicative authority" is always sufficient "to support Chevron deference for an exercise of that authority within the agency's substantive field." *City of Arlington v. FCC*, 569 U.S. 290, 306 (2013). Jazz does not (and cannot) deny that Congress generally conferred rulemaking authority on FDA to implement the FDCA, *see* 21 U.S.C. § 371(a); that the Orphan Drug Act is part of the FDCA; and that determining whether orphan-drug exclusivity blocks approval of a drug is within FDA's "substantive field." That resolves the matter.

14

Ignoring *City of Arlington*, Jazz contends that *Depomed* and *Eagle II* found FDA lacks interpretive authority with respect to § 360cc(a). Both cases, however, concerned a different interpretative question: whether FDA could require a designated and approved orphan drug to demonstrate clinical superiority to be eligible for orphan-drug exclusivity. The "plain text" of 21 U.S.C. § 360cc(a) precluded FDA's interpretation only as to that specific issue. *Eagle II*, 952 F.3d at 334 n.14. Indeed, both cases *support* FDA's interpretative authority at issue here. *Id.* at 326 (observing that the Orphan Drug Act "does not define 'such drug'" and describing, without criticism, how FDA interpreted that term through its "same drug" regulation); *Depomed*, 66 F. Supp. 3d at 232 (distinguishing *Baker Norton*).

## II.   FDA's reasoned decision-making should be upheld

### A.   FDA did not have a "comparable safety and effectiveness" policy from which it could have arbitrarily or capriciously departed

As FDA explained in its decisional memorandum and opening brief, the agency does not have a policy requiring a showing of comparable safety and effectiveness to support a finding of major contribution to patient care. AR544-50; FDA MSJ 23-26. The decisional memorandum acknowledged that some language in regulatory documents could be construed as saying such a policy exists, but it also explained that, after a careful review of its practice, FDA determined that no such policy exists. AR546 n.147. The agency's reasonable explanation is all that the APA requires. *Brotherhood of Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020).

15

PUBLIC VERSION

Jazz's primary counterevidence is language in a preamble to a proposed rule. Jazz Opp'n 25. But the final rule explained that FDA did not adopt a comparable safety and effectiveness requirement because the agency did not intend to adopt any "new standard," which that requirement would have been. 78 Fed. Reg. at 35124. Moreover, if there had, in fact, been a policy of requiring comparable safety and effectiveness, one would expect to see that policy reflected in practice. But what FDA said in its opening brief remains true: "Jazz has not identified any instance where FDA did what Jazz wants it to do now: determine that a drug that otherwise demonstrated a major contribution to patient care[] was blocked by another orphan drug's exclusivity because the later drug failed to show comparable safety and effectiveness." FDA MSJ 24. Nor did FDA's internal review uncover an instance. AR544-50. And the four examples (Ravicti, Orenitram, Signifor LAR, and Ultomiris) Jazz has cited, Jazz Opp'n 28-23, remain inapposite, FDA MSJ 24-26.

Jazz now contends that "if there is a comparable safety requirement at the orphan-drug designation stage . . . then the same requirement must apply a fortiori at approval." Jazz Opp'n 31. The premise is incorrect because there is no "comparable safety requirement at the orphan-drug designation stage."  FDA sometimes requests more information from the sponsor to facilitate the agency's evaluation of a designation request, depending on the hypothesis and purported benefit put forth by the sponsor. In some cases, FDA may ask the sponsor to show comparable safety or effectiveness at the designation stage to support the sponsor's specific hypothesis—for example where

16

PUBLIC VERSION

it is not clear to the agency that the purported benefit would outweigh a new safety risk. *See* AR547-48.

The reason for that concerns the nature of assessing a hypothesis of a major contribution to patient care. A major contribution to patient care determination, as FDA explained, involves consideration of a number of factors, including those that touch on safety and effectiveness. FDA MSJ 24; AR547. But FDA generally has less information about safety and effectiveness when assessing whether a sponsor has a "plausible hypothesis" of a major contribution to patient care at the designation stage than it does at the approval stage. AR547-48. For that reason, FDA generally makes an assumption about safety and effectiveness at the designation stage. FDA MSJ 25; AR548. Normally, it assumes that the drug's safety and effectiveness is comparable to that of the previously approved drug. AR548. But if "a safety or efficacy concern is readily apparent to the agency," *id.*, it may ask the sponsor to provide information supporting comparable safety or effectiveness in order to evaluate the sponsor's specific hypothesis. FDA MSJ 25; AR548 & n. 158. It does not follow that FDA must demand a showing of comparable safety and effectiveness at the approval stage, when it has more specific information about safety and effectiveness and can make an informed "global assessment" of a major contribution to patient care without the need to make any assumptions. *See* FDA MSJ 25-26; AR548.

Ultimately, Jazz has no real evidence of the existence of the policy it asks this Court to attribute to FDA. The Court should reject Jazz's argument.

### B.  FDA did not violate its internal dispute resolution procedures

Jazz's response does not salvage its meritless contention that FDA violated its internal dispute resolution procedures.[8] Initially, Jazz argued that OOPD had no choice but to utilize dispute resolution procedures once the Review Division's initial consult response opined that once-nightly dosing is not a major contribution to patient care. Jazz MSJ 17-18. However, Jazz now admits that "OOPD had the option to continue discussions with the Review Division." Jazz Opp'n 35. That is exactly what OOPD did. *See* AR569 (explaining that Review Division's "reconsideration" was based in part on further discussions with OOPD); AR483 ("OOPD subsequently identified additional information for [the Review Division's] further consideration, and [the Review Division's] consideration of that information remains ongoing.").

Jazz is left to speculate that OOPD turned to CDRH to somehow undermine or contradict the Review Division. Jazz Opp'n 35 ("when the drug experts said no, OOPD decided to seek out others who would give it the answer it wanted"). Actually, OOPD turned to the CDRH sleep experts because they are "board certified sleep specialists,"

---

[8] As FDA explained in its opening brief, the Standard Operating Procedures (SOP) are inapplicable to FDA's decision that Xywav's orphan-drug exclusivity does not block approval of Lumryz. FDA MSJ 27. Jazz does not dispute this. Rather, it seizes on the fact that the SOP does apply to FDA's determination that Lumryz is entitled to its own period of exclusivity. Jazz Opp'n 36. But Jazz does not challenge *that* determination. Nor would it have standing to do so, since Lumryz's exclusivity has not blocked any drug sponsored by Jazz. Jazz complains that FDA included the SOP in the administrative record, Jazz Opp'n 36, but FDA included all the references in its decisional memorandum in the administrative record, regardless of whether they relate to the Xywav scope-of-exclusivity determination or the Lumryz eligibility determination. The SOP's inclusion in the record does not alter the fact that it applies to a decision Jazz does not challenge.

PUBLIC VERSION

AR587, a fact that contradicts Jazz's unfounded claim that they "lacked the experience with narcolepsy and oxybate to know better," Jazz Opp'n 35. Jazz points to nothing in the administrative record suggesting any other motive. Nor can it identify any prohibition in the Staff Manual Guides or the SOP against OOPD involving other FDA components in its discussion with the Review Division.

Finally, even if FDA had violated its internal procedures (which it did not), there would be no basis to reward Jazz by blocking approval of a drug that is outside the scope of Jazz's orphan exclusivity. The purpose of those procedures is to govern FDA's internal affairs. *See* FDA MSJ 28-29. And contrary to Jazz's assertions, *see* Jazz Opp'n 7, 35, orphan-drug exclusivity does not confer any rights or privileges on the sponsor, but instead merely prohibits *the agency* from approving certain drugs during the exclusivity period. *See Braintree Lab'ys, Inc. v. Nephro-Tech, Inc.*, No. 96-2459, 1997 WL 94237, at *8 (D. Kan. Feb. 26, 1997) ("The FDCA does not speak of 'exclusive rights'; it merely provides that if the FDA approves a drug and designates it an 'orphan drug,' it may not approve another such drug for seven years."); 57 Fed. Reg. 62083 (1992) (explaining FDA's view that "[t]here is no property right to exclusive approval under the Orphan Drug Act").

### C.  The record supports FDA's decision regarding clinical superiority

As to the substance of FDA's finding that Lumryz is clinically superior because it makes a major contribution to patient care, Jazz focuses on two issues: (1) Lumryz's higher sodium content and (2) the benefits of once-nightly dosing over twice-nightly

dosing. Jazz Opp'n 38-42. On neither issue does it establish that FDA's decision was arbitrary and capricious.

1. Far from giving short shrift to the sodium issue, FDA discussed it for nearly three pages in its decisional memorandum. AR553-56. The agency acknowledged that "the sodium content of Lumryz raises the same safety concern that was present for Xyrem and that is not present with Xywav." AR554. It described the difference as "clinically meaningful," AR554, and laid out the concern at length, AR553-54.

FDA then explained why, nevertheless, "the benefit of Lumryz's once-nightly dosing outweighs the safety concern raised by increased sodium content for a substantial number of narcolepsy patients." AR554. For patients who are not sensitive to sodium, the benefit of once-nightly dosing outweighed the risk of increased sodium intake because (1) "having to wake up to take a second dose is antithetical to oxybate's goal of improving sleep"; (2) "disrupting sleep contributes to chronic sleep loss, which is well known to cause reduced performance, increased risk of accidents and death, and detrimental effects on both psychological and physical health"; and (3) "there are other ways such patients may reduce their sodium." AR555.

For patients sensitive to sodium, FDA observed that Lumryz's labeling contains a warning directed at such patients, AR554, and Lumryz may not be the best option for some of them, AR555. For other sodium-sensitive patients though, FDA concluded that the benefit of Lumryz's once nightly dosing would outweigh the risk of increased sodium intake for the same reasons as for non-sodium-sensitive patients, including the possibility of reducing sodium intake in different ways. AR555. Ultimately, FDA

PUBLIC VERSION

concluded, "healthcare practitioners would need to weigh the benefits of once-nightly dosing against the severity of the patient's sodium sensitivity and the nature of their comorbidities to determine whether, in the practitioners' judgment, use of Lumryz or Xywav was appropriate." AR555.

Jazz faults FDA for not specifying in detail how patients could reduce sodium intake. Jazz Opp'n 39. Quite obviously, however, that is an issue for patients to discuss with their healthcare practitioners in evaluating whether Lumryz is the right option for a particular patient. Ways of reducing sodium (like eating less salty foods) are common knowledge, and healthcare practitioners are better positioned than FDA to recommend particular methods for particular patients. AR555. For some patients, the risk of increased sodium intake may make Xywav the better choice. That does not render unreasonable, however, FDA's determination that Lumryz makes a major contribution to patient care for patients who *can* reduce their sodium intake or for whom sodium intake is not a concern.

2. Also meritless is Jazz's contention that no evidence supports the benefits of once-nightly dosing over twice-nightly dosing. Jazz Opp'n 40-42. For patients suffering from a disorder that can disrupt nighttime sleep, there is an obvious advantage to a drug that does not require those patients to interrupt sleep by waking up in the middle of the night to take a dose. Not only is that common sense, but it also was explained, at length and in detail, by board-certified sleep specialists. AR587-96.

Jazz treats FDA's statement that Xywav is "effective" at treating narcolepsy as if it were somehow a material concession. *Of course* Xywav, like Lumryz, is "effective" for

PUBLIC VERSION

its intended use. Otherwise, FDA would not have approved it for that use. 21 U.S.C. § 355(d)(5). But effectiveness is different from the major contribution to patient care inquiry. FDA MSJ 31-32. FDA's determination that waking up to take a second dose is "antithetical" to one of the goals of treatment, AR555, does not conflict with the agency's earlier finding that Xywav "ha[s] the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested" in its labeling, 21 U.S.C. § 355(d)(5). It just means, under the governing regulatory standard, Lumryz's once-nightly dosing constitutes a major contribution to patient care over Xywav's (and Xyrem's) twice-nightly dosing.

Jazz is likewise incorrect in arguing that FDA's finding that a "forced awakening" is "clinically different from (and worse than) the brief arousals and full awakenings that all narcolepsy patients experience" by virtue of their condition is "after-the-fact lawyering, found nowhere in FDA's order." Jazz Opp'n 41-42. In fact, OOPD's decision, which relies on the CDRH consult, describes the difference between forced awakenings and the brief arousals or intermittent awakenings that narcoleptics experience as a result of their disease. And in describing those differences, CDRH's board-certified sleep specialists relied on scientific literature that is included in the administrative record. *See, e.g.*, AR588 ("A nocturnal arousal from sleep to take a second dose of [Xywav or Xyrem] will fragment sleep and disrupt sleep architecture.") (citing AR1742-55, 1847-73).

22

PUBLIC VERSION

**III.  If the Court rules for Jazz on the merits, it should order supplemental briefing on the remedy**

Because FDA's approval of Lumryz was neither unlawful nor arbitrary and capricious, Jazz is not entitled to any relief. If, however, the Court determines that Jazz is entitled to some relief, the nature of that relief may depend on the basis of any finding of deficiency in FDA's decision-making. Accordingly, if the Court grants Jazz's Motion for Summary Judgment, it should order supplemental briefing on the appropriate remedy.

**CONCLUSION**

For the reasons set forth above and in Federal Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, the Court should grant FDA summary judgment.

December 22, 2023                              Respectfully submitted,

<u>/s/ Noah T. Katzen</u>
NOAH T. KATZEN
ISAAC C. BELFER
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
(202) 305-2428 (Katzen)
(202) 305-7134 (Belfer)
(202) 514-8742 (fax)
Noah.T.Katzen@usdoj.gov
Isaac.C.Belfer@usdoj.gov

23
