**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC.,<br><br>              *Plaintiff*,<br><br>   v.<br><br>XAVIER BECERRA, Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT CALIFF, Commissioner of Food and Drugs; U.S. FOOD AND DRUG ADMINISTRATION,<br><br>           *Defendants,*<br><br>AVADEL CNS PHARMACEUTICALS, LLC,<br><br>           *Intervenor-Defendant.* | Case No. 1:23-cv-1819-APM |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jazz Pharmaceuticals, Inc. hereby moves for entry of summary judgment against the Defendants.

First, FDA lacked statutory authority to approve Lumryz. Because FDA recognized orphan-drug exclusivity for Xywav, it could not approve "the same drug for the same disease" until Xywav's exclusivity period ended. *See* 21 U.S.C. § 360cc(a). Xyrem and Lumryz are the "same drug" for exclusivity purposes because they share the same active moiety, and Congress did not grant FDA authority to use the concept of clinical superiority as a workaround. FDA's approval order was unlawful and should be vacated. *See* 5 U.S.C. § 706(2)(C).

Second, FDA acted arbitrarily and capriciously in approving Lumryz because it did not adequately explain its departure from longstanding agency policy. FDA has long required a new drug

to be as safe and effective as an existing drug before determining that the new drug makes a "major contribution to patient care." The agency failed to do so here, so its approval order should be vacated. *See* 5 U.S.C. § 706(2)(A).

Third, FDA acted arbitrarily and capriciously in finding that Lumryz is clinically superior to Xywav. To begin with, FDA failed to follow binding procedures for resolving intra-agency disputes about clinical superiority. Separately, FDA did not square its clinical-superiority determination here with prior FDA determinations, with the record before it, or with the scientific literature. Both errors warrant vacatur. *See* 5 U.S.C. § 706(2)(A).

The grounds for Jazz's motion are set forth more fully in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated:  September 15, 2023

Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499536)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Peter A. Bruland (D.C. Bar No. 1600717)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
tlosseaton@sidley.com
pbruland@sidley.com

*Counsel for Plaintiff*
*Jazz Pharmaceuticals, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAZZ PHARMACEUTICALS, INC.,

    *Plaintiff*,

  v.

XAVIER BECERRA, Secretary of Health
and Human Services; U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
ROBERT CALIFF, Commissioner of Food
and Drugs; U.S. FOOD AND DRUG
ADMINISTRATION,

    *Defendants*,

AVADEL CNS PHARMACEUTICALS,
LLC,

    *Intervenor-Defendant*.

Case No. 1:23-cv-1819-APM

## MEMORANDUM OF POINTS AND AUTHORITY IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Peter A. Bruland (D.C. Bar No. 1600717)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
tlosseaton@sidley.com
pbruland@sidley.com

*Counsel for Plaintiff Jazz Pharmaceuticals Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................iii

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................7

I.     Regulatory Background ...............................................................................................7

        A.     Orphan-Drug Exclusivity ...............................................................................7

        B.     The 1992 Regulations ...................................................................................8

        C.     *Depomed*, *Eagle*, and *United Therapeutics* ..............................................9

        D.     2017 Amendments to the Orphan Drug Act ...............................................11

II.     Factual Background ...................................................................................................12

        A.     Narcolepsy .................................................................................................12

        B.     Jazz developed and earned orphan-drug exclusivity for Xywav, the only safer, low-sodium oxybate treatment for patients with narcolepsy based on the Act's promise of seven years of exclusivity.................................................12

        C.     FDA violated ordinary procedures to break Xywav's exclusivity and approve Avadel's high-sodium oxybate product, Lumryz .............................15

ARGUMENT ........................................................................................................................19

I.     FDA lacked statutory authority to break Xywav's orphan-drug exclusivity because Xywav and Lumryz are the same drug................................................................19

        A.     "Drug" means "active moiety" in FDCA section 527(a)...............................20

        B.     "Same drug" means "same active moiety" in FDCA section 527(a) ............21

        C.     FDA lacks authority to read the concept of clinical superiority into the phrase "the same drug" in Section 527(a) .................................................21

II.     OOPD's "major contribution to patient care" finding departs from longstanding FDA policy without acknowledgment or adequate explanation .........................................24

III.     OOPD's clinical-superiority determination was arbitrary and capricious................28

        A.     OOPD acted arbitrarily and capriciously by departing from agency procedures without explanation ...................................................................28

B.    OOPD's determination was inconsistent with prior FDA determinations and the scientific literature ........................................................................................30

    1.    OOPD irrationally minimized the importance of sodium reduction for all narcolepsy patients .............................................................................31

    2.    Claims that twice-nightly dosing disrupts sleep or harms patients are demonstrably false ......................................................................................34

        a.    Patients with narcolepsy generally experience disrupted nighttime sleep, but even healthy individuals experience multiple nighttime awakenings and arousals .........................................35

        b.    Twice-nightly oxybate reduces disrupted nighttime sleep among patients with narcolepsy by consolidating sleep, improving sleep quality, and improving sleep architecture ................37

    3.    The record contains no support for OOPD's claim that once-nightly oxybate provides additional "medical benefits" ................................................41

IV.    Approval for Lumryz must be vacated. ........................................................................44

CONCLUSION ......................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrus v. Glover Constr. Co.,*
446 U.S. 608 (1980)......................................................................................................23

*Baker-Norton Pharms. v. FDA,*
132 F. Supp. 2d 30 (D.D.C. 2001)..............................................................................20

*BedRoc Ltd., LLC v. United States,*
541 U.S. 176 (2004)......................................................................................................19

*Belmont Mun. Light Dep't v. FERC,*
38 F.4th 173 (D.C. Cir. 2022)....................................................................................30

\* *Catalyst Pharms., Inc. v. Becerra,*
14 F.4th 1299 (11th Cir. 2021)............................................................................21, 24

*Cigar Ass'n of Am. v. FDA,*
436 F. Supp. 3d 70 (D.D.C. 2020)..............................................................................31

\* *Cigar Ass'n of Am. v. FDA,*
2023 WL 5094869 (D.D.C. Aug. 9, 2023) ................................................................44

*City of Kansas City v. HUD,*
923 F.2d 188 (D.C. Cir. 1991) ....................................................................................23

\* *Depomed, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
66 F. Supp. 3d 217 (D.D.C. 2014) ...........................................2, 7, 8, 9, 10, 11, 20, 23

\* *Eagle Pharms., Inc. v. Azar,*
952 F.3d 323 (D.C. Cir. 2020) ..........................................................................2, 10, 23

\* *Eagle Pharms., Inc. v. Azar,*
2018 WL 3838265 (D.D.C. June 8, 2018) ...........................................................2, 10

*In re England,*
375 F.3d 1169 (D.C. Cir. 2004) ..................................................................................23

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)..................................................................................................5, 25

*Genus Med. Techs. LLC v. FDA,*
994 F.3d 631 (D.C. Cir. 2021) ....................................................................................17

\* Authorities chiefly relied upon are marked with asterisks

*Getty v. Fed. Savs. & Loan Ins. Corp.,*
　　805 F.2d 1050 (D.C. Cir. 1986) ................................................................................30

*Guedes v. ATF,*
　　920 F.3d 1 (D.C. Cir. 2019) ....................................................................................24

*Hunter v. Town of Mocksville,*
　　897 F.3d 538 (4th Cir. 2018) ..................................................................................21

*INS v. Yang,*
　　519 U.S. 26 (1996) ..................................................................................................29

\* *Mass. Fair Share v. Law Enf't Assistance Admin.,*
　　758 F.2d 708 (D.C. Cir. 1985) ................................................................................29

*Mazaleski v. Treusdell,*
　　562 F.2d 701 (D.C. Cir. 1977) ................................................................................28

\* *Morton v. Ruiz,*
　　415 U.S. 199 (1974) ................................................................................................28

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
　　583 U.S. 109 (2018) ................................................................................................22

*Nat'l Pharm. All. v. Henney,*
　　47 F. Supp. 2d 37 (D.D.C. 1999) ...........................................................................20

*NFIB v. Sebelius,*
　　567 U.S. 519 (2012) ................................................................................................23

*NRDC v. Regan,*
　　67 F.4th 397 (D.C. Cir. 2023) ................................................................................30

*Prestol Espinal v. Att'y Gen.,*
　　653 F.3d 213 (3d Cir. 2011) ...................................................................................23

*Reuters Ltd. v. FCC,*
　　781 F.2d 946 (D.C. Cir. 1986) .........................................................................29, 30

*Shays v. FEC,*
　　528 F.3d 914 (D.C. Cir. 2008) ................................................................................23

*Sierra Club v. EPA,*
　　294 F.3d 155 (D.C. Cir. 2002) ................................................................................19

*Smith v. United States,*
　　508 U.S. 223 (1993) ................................................................................................20

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) .................................................................................28

*United States v. Generix Drug Corp.*,
    460 U.S. 453 (1983).................................................................................................20

*United States v. Johnson*,
    529 U.S. 53 (2000)...................................................................................................22

*United States v. Lachman*,
    387 F.3d 42 (1st Cir. 2004) .....................................................................................28

* *United Therapeutics Corp. v. HHS*,
    2020 WL 6498619 (D.D.C. Sept. 2, 2020).........................................................2, 10

*UPMC Mercy v. Sebelius*,
    793 F. Supp. 2d 62 (D.D.C. 2011) ...........................................................................19

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014).................................................................................................19

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp. 2d 32 (D.D.C. 1998) .............................................................................28

**Statutes and Regulations**

Pub. L. No. 115-52, 131 Stat. 1005 (2017) ......................................................................11

5 U.S.C. § 552(a)(1)(D), (2)(B) .......................................................................................28

5 U.S.C. § 706(2) .......................................................................................................19, 44

21 U.S.C. § 331(d) ..............................................................................................................7

21 U.S.C. § 355(a) ..............................................................................................................7

21 U.S.C. § 355(c)(1)(A) ....................................................................................................7

21 U.S.C. § 355(j)(4)...........................................................................................................7

21 U.S.C. § 360cc(a) ..........................................................................................7, 19, 21, 22

21 U.S.C. § 360cc(a) (2016) ...............................................................................................7

21 U.S.C. § 360cc(b) .....................................................................................................8, 22

21 U.S.C. § 360cc(c) .......................................................................................................3, 11

21 U.S.C. § 360cc(d) ................................................................................3, 12, 23, 24, 25, 26

21 C.F.R. § 316.3(b)(3) ....................................................................................................4, 24

21 C.F.R. § 316.3(b)(14) ........................................................................................................ 4

21 C.F.R. § 316.31(a) ............................................................................................................. 8

21 C.F.R. § 316.31(b)(3) ........................................................................................................ 9

56 Fed. Reg. 3338 (Jan. 29, 1991) ......................................................................................... 8

57 Fed. Reg. 62076 (Dec. 29, 1992) ..............................................................................8, 9, 11

61 Fed. Reg. 17798 (Apr. 22, 1996) ..................................................................................... 33

69 Fed. Reg. 13765 (Mar. 24, 2004) ..................................................................................... 33

76 Fed. Reg. 64868 (Oct. 19, 2011) ...........................................................................4, 9, 24, 26

78 Fed. Reg. 35117 (June 12, 2013) ...................................................................................... 26

79 Fed. Reg. 76888 (Dec. 23, 2014) ...................................................................................... 10

**Legislative Materials**

Orphan Drug Amendments of 1990, H.R. 4638, 101st Cong. (1990) ....................................... 8

**Other Authorities**

David C. Babaian, *Adopting Pharmacogenomics and Parenting Repurposed Molecules Under the Orphan Drug Act: A Cost Dilemma?*, 13 J. Marshall Rev. Intel. Prop. L. 668 (2014) ......................... 26

Jed Black & Christian Guilleminault, *Medications for the Treatment of Narcolepsy*, 6(2) Expert Opin. Emerging Drugs 239 (2001) ............................................................................ 38

Jed Black et al., *The nightly Administration of Sodium Oxybate Results in Significant Reduction in the Nocturnal Sleep Disruption of Patients with Narcolepsy*, 10(8) Sleep Med. 829 (2009) ....................................................................................................................................... 39

Jed Black et al., *The Nightly Use of Sodium Oxybate Is Associated with a Reduction in Nocturnal Sleep Disruption: A Double-Blind, Placebo-Controlled Study in Patients with Narcolepsy*, 10(8) Sleep Med. 829 (2009) ......................................................................... 39

Roger Broughton & Mortimer Mamelak, *Effects of Nocturnal Gamma-Hydroxybutyrate on Sleep / Waking Patterns in Narcolepsy-Cataplexy*, 7(1) Can. J. Neurol. Sci. 23 (1980) ...................... 37

Michelle L. Butler & Kurt R. Karst, *Court Upends FDA's Clinical Superiority Requirement for Granting Orphan Drug Exclusivity; Decision Leaves a Lot of Questions to Be Answered*, The FDA Law Blog (Sept. 11, 2014) ................................................................................ 11

Yves Dauvilliers et al., *Effect of Sodium Oxybate, Modafinil, and Their Combination on Disrupted Nighttime Sleep in Narcolepsy*, 40 Sleep Med. 53 (2017). ........................................................40

FDA, *CDER Offices and Divisions* (Aug. 7, 2023) ........................................................17

FDA, *Center for Drug Evaluation and Research | CDER* (Aug. 14, 2023) ........................................17

FDA, *Constituent Update: FDA Issues Sodium Reduction Final Guidance* (Oct. 13, 2021) ...........................13

FDA Division of Metabolism and Endocrinology Products, *Orphan Drug Exclusivity for Pasireotide LAR* (Aug. 30, 2018) ........................................................27

FDA, *Draft Guidance for Industry: Quantitative Labeling of Sodium, Potassium, and Phosphorus for Human Over-the-Counter and Prescription Drug Products* (Sept. 2022) ........................33

FDA, *Guidance for Industry: Voluntary Sodium Reduction Goals: Target Mean and Upper Bound Concentrations for Sodium in Commercially Processed, Packaged, and Prepared Foods* (Oct. 2021) ........................................................33

FDA, *Organization and Leadership Chart* (Sept. 2023) ........................................................17

FDA, *Sodium Reduction: The Public Health Need* (Mar. 24, 2023) ........................................ 32, 33

FDA, *Staff Manual Guide 2010.19: FDA Orphan Drug Products Policy Council* (Sept. 17, 2020) ........................................................17

FDA, *Staff Manual Guide 9010.2: Cross-Center Dispute Resolution at the FDA* (June 21, 2019) ........................................................ 16, 17

FDA Statement, *To Improve Nutrition and Reduce the Burden of Disease, FDA Issues Food Industry Guidance for Voluntarily Reducing Sodium in Processed and Packaged Foods* (Oct. 13, 2021) ........................................................33

Marco Filardi et al., *In-Field Assessment of Sodium Oxybate Effect in Pediatric Type 1 Narcolepsy: An Actigraphic Study*, 41(6) Sleep (2018) ........................................................40

Clete Kushida et al., *Response to: Once-Nightly Sodium Oxybate (FT218) in the Treatment of Narcolepsy: A Letter to the Editor Commenting on the Recent Publication by C. Kushida et al.*, 45(6) Sleep (2022) ........................................................35

G. J. Lammers et al., *Gammahydroxybutyrate and Narcolepsy: a Double Blind Placebo Controlled Study*, 16(3) Sleep 216 (1993) ........................................................38

Michel Lecendreux et al., *Tolerance and Efficacy of Sodium Oxybate in Childhood Narcolepsy with Cataplexy: a Retrospective Study*, 35(5) Sleep 709 (2012) ........................................................40

Mortimer Mamelak et al., *A Pilot Study on the Effects of Sodium Oxybate on Sleep Architecture and Daytime Alertness in Narcolepsy*, 27 Sleep 1327 (2004) ........................................................38

Giuseppe Plazzi et al., *Impact of Acute Administration of Sodium Oxybate on Nocturnal Sleep Polysomnography and on Multiple Sleep Latency Test in Narcolepsy with Cataplexy*, 15(9) Sleep Med. 1046 (2014). ........................................................................................................40

Thomas Roth et al., *Disrupted Nighttime Sleep in Narcolepsy*, 9(9) J. Clin. Sleep Med. 955 (2013) .............................................................................................................................. 36, 40

Thomas Roth et al., *Effect of FT218, a Once-Nightly Sodium Oxybate Formulation, on Disrupted Nighttime Sleep in Patients with Narcolepsy: Results from the Randomized Phase III REST-ON Trial*, 36(4) CNS Drugs 377 (2022) ..................................................................42

Thomas Roth et al., *Effect of Sodium Oxybate on Disrupted Nighttime Sleep in Patients with Narcolepsy*, 26(4) J. Sleep Rsch. 407 (2017) ..........................................................................40

Martin B. Scharf et al., *The Effects and Effectiveness of Gamma-Hydroxybutyrate in Patients with Narcolepsy*, 46 J. Clin. Psych. 222 (1985) ...................................................................38

Lawrence Scrima et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479 (1990) ........................................................................38

Lawrence Scrima et al., *Efficacy of Gamma-Hydroxybutyrate Versus Placebo in Treating Narcolepsy-Cataplexy: Double-Blind Subjective Measures*, 26 Biol. Psych. 331 (1989) ..............................38

Aletta Shutte & Bruce Neal, *The Sodium Hidden in Medication: A Tough Pill to Swallow*, 43 Eur. Heart J. 1756 (2022).........................................................................................................34

Michael J. Thorpy, *Recently Approved and Upcoming Treatments for Narcolepsy*, 34(1) CNS Drugs 9 (2020)................................................................................................................................43

U.S. Xyrem Multicenter Study Group, *A Randomized, Double Blind, Placebo-Controlled Multicenter Trial Comparing the Effects of Three Doses of Orally Administered Sodium Oxybate with Placebo for the Treatment of Narcolepsy*, 25(1) Sleep 42 (2002) ...........................................38

Terri E. Weaver, et al. *A Randomized Trial Evaluating the Effectiveness of Sodium Oxybate Therapy on Quality of Life in Narcolepsy*, 29(9) Sleep 1189 (2006) ........................................................39

## INTRODUCTION

Plaintiff Jazz Pharmaceuticals, Inc. ("Jazz") is the sponsor of Xywav® (calcium, magnesium, potassium & sodium oxybates), a prescription drug that treats excessive daytime sleepiness ("EDS") and cataplexy in patients with narcolepsy. Because narcolepsy is a rare disease, the Orphan Drug Act provides special incentives to develop treatments for it. The key incentive is orphan-drug exclusivity, which grants the sponsor of the rare-disease treatment a clear market, free of new entrants, for a period of seven years after approval. The exclusivity operates by restricting FDA's ordinary authority to approve new drugs. That is, once exclusivity attaches, FDA "may not approve another application … for the same drug for the same disease or condition for a person who is not the holder of such approved application … until the expiration of seven years from the date of the approval of the approved application," *see* 21 U.S.C. § 360cc(a), unless one of two express exceptions applies. *See id.* § 360cc(b) (authorizing approvals "[d]uring the 7-year period described in subsection (a)" when drug shortages exist or the holder of the exclusivity consents).

In 2020, FDA approved Jazz's application for Xywav and later recognized that Xywav was entitled to orphan-drug exclusivity because it is safer than prior versions of oxybate. FDA's finding of greater safety was based on Xywav's "greatly reduced sodium burden." Specifically, FDA found that "[t]he differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated." Xywav thus earned the seven years of marketing exclusivity promised by the Orphan Drug Act—and FDA was concomitantly barred from approving new oxybate products to treat the symptoms of narcolepsy that Xywav treats until 2027.

In the final agency action challenged here, FDA did exactly what the Orphan Drug Act prohibits. On May 1, 2023, FDA approved Lumryz™ (sodium oxybate), developed by Avadel CNS Pharmaceuticals, LLC ("Avadel"), even though Lumryz and Xywav are the same drug within the

meaning of the Act (they both contain the same "active moiety," *i.e.*, the portion of the drug substance responsible for pharmacological activity) and they are marketed for the same disease (they are both indicated to treat EDS and cataplexy in patients with narcolepsy).

In approving Lumryz, FDA did not invoke either of the Act's express exceptions to exclusivity, nor could it have done so. No shortages exist, and Jazz did not consent.

As explained in a letter prepared by FDA's Office of Orphan Products Development ("OOPD") and sent to Jazz the same day as Lumryz's approval, FDA instead relied on a regulatory carve-out of its own making. The regulation in question has no plausible basis in the text of the statute, and Congress specifically declined to give FDA authority to issue rules to implement the exclusivity provision of the Orphan Drug Act. The regulation also has been rejected by other judges of this Court and by the D.C. Circuit, albeit in other applications. *See Eagle Pharms., Inc. v. Azar*, 952 F.3d 323 (D.C. Cir. 2020) (*Eagle II*); *United Therapeutics Corp. v. HHS*, No. 17-01577 (ESH), 2020 WL 6498619 (D.D.C. Sept. 2, 2020); *Eagle Pharms., Inc. v. Azar*, No. 16-790 (TJK), 2018 WL 3838265 (D.D.C. June 8, 2018) ("*Eagle I*"); *Depomed, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 66 F. Supp. 3d 217 (D.D.C. 2014). And, as newly reinterpreted by FDA here, the regulation is so broad that it turns the Orphan Drug Act inside out, giving FDA discretion to approve any drug that meets the usual standards of safety and efficacy, *see, e.g.*, AR1351, AR1374, in direct contravention of Congress's command that FDA "may not approve another application under section 355" (the provision setting out those safety and efficacy standards) during the 7-year exclusivity period.

As the OOPD letter recites, the regulation purports to decree that "a drug that contains the same active moiety as a previously approved drug" nonetheless "will not be considered to be the same drug" if "the subsequent drug can be shown to be clinically superior to the first drug." AR1348 (quoting 21 C.F.R. 316.3(b)(14)). Based solely on that regulation, OOPD declared that a "clinical

superiority" finding could "overcome" Xywav's unexpired orphan-drug exclusivity, AR1360, because it would mean that Lumryz and Xywav are not the "same drug."

OOPD cannot reconcile that regulatory carve-out with the statute's text or structure. The statute specifically addresses the role of "clinical superiority" within the Orphan Drug Act, and confines it to a different subsection. *See* 21 U.S.C. § 360cc(c). OOPD concedes that this provision, subsection (c), "only concerns" whether a second or subsequent entrant is entitled to exclusivity where another version of the same active moiety was previously approved to treat the same disease. AR1348. In that circumstance (often called a "serial" exclusivity), the statute uses "clinical superiority" as a dividing line, granting exclusivity only where the follow-on drug is "clinically superior" to its predecessors. But as OOPD concedes, subsection (c) "does not address" FDA's limited authority to disregard an unexpired exclusivity. AR1348. Moreover, the statute also denies FDA authority to even issue regulations with respect to subsections (a) or (b). *See* 21 U.S.C. § 360cc(d). Eschewing any "clinical superiority" consideration, subsection (a) is plain and unambiguous—it simply asks whether the "drug" for which approval is sought is the "same" as a drug that has unexpired exclusivity. In this context, all appear to agree that the word "drug" means "active moiety." And so, because Xywav and Lumryz have the same active moiety, they are the "same drug."

One thing that can be said for OOPD's view that clinical superiority can "overcome" an unexpired exclusivity, AR1360, is that it at least reflects FDA's longstanding position. That is not true, however, of how OOPD reached the conclusion that Lumryz is "clinically superior" to Xywav. OOPD conceded both that Lumryz is less safe than Xywav (because Lumryz has the same high sodium load as pre-Xywav oxybate products), *see* AR1373, and that there is "no evidence" that Lumryz is more effective than Xywav, AR1369. This is the first time in the history of the Orphan Drug Act that FDA has concluded that a drug that is less safe but no more effective than its predecessor is

clinically superior. The reason there is no such precedent is obvious: A drug that is less safe but no more effective than its predecessor is **_inferior_**, not superior.

Until now, FDA's regulatory approach adhered to that obvious truth. Generally, "clinical[] superior[ity]" is demonstrated by showing "[g]reater effectiveness than an approved drug" or "[g]reater safety in a substantial portion of the target populations[.]" 21 C.F.R. § 316.3(b)(3)(i), (ii). As noted, Lumryz could show neither. AR1369. OOPD instead sought to pitch Lumryz's dosing schedule change—it is administered once-nightly instead of twice-nightly—as a "major contribution to patient care," a regulatory concept that FDA says can be used in "unusual cases" to show clinical superiority when neither greater safety nor greater efficacy has been demonstrated. 21 C.F.R. § 316.3(b)(3)(iii). But FDA's longstanding policy says that a drug that is less safe than its predecessor cannot be a major contribution. Rather, the major-contribution pathway is available "only when the subsequent drug provides safety or effectiveness **_comparable to the approved drug_**." 76 Fed. Reg. 64868, 64871 (Oct. 19, 2011) (emphasis added); *accord* AR1470 (to show a major contribution, the sponsor must first show that the new drug "would be at least as safe and as effective" as existing products); AR1471 ("for us to consider your request to designate GT4P on the basis of a major contribution to patient care, you should first demonstrate with reasonable certainty that GT4P … would offer at least comparable safety and effectiveness"); Ltr. from OOPD to United Therapeutics Corp. re: Designation request #11-3621 at 2 (Mar. 9, 2012) (the major contribution path "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug") (attached as Exhibit 1 to the Declaration of Sean C. Griffin). Under that test, Lumryz does not make a major contribution because, as FDA determined, it is less safe than Xywav.

The finding that Lumryz is less safe than Xywav should have been the end of the matter. But OOPD instead sought to deny that FDA ever adopted a comparable-safety requirement. It asserted that a drug can make a "major-contribution" if it merely "provide[s] adequate safety to meet the

approval standard." AR1374. This was an unlawful and arbitrary change of policy. Unlawful because it sharpens the conflict between the statute's command and FDA's "clinical superiority" construct— it reworks the law to grant FDA discretion to approve drugs on the basis that they are safe and effective enough to be approved, the very standard that the Orphan Drug Act says FDA "**may not**" apply within the 7-year exclusivity window. Unlawful because the change of policy conflicts with FDA's rules concerning advisory opinions—the agency must continue to follow them unless and until they are revoked through a subsequent Federal Register publication. And arbitrary in the classic sense that the agency flouted its duty to forthrightly acknowledge and explain a departure from past policy and to address the "serious reliance interests" affected when FDA narrows the scope of orphan drug exclusivity. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). OOPD did none of that here. OOPD just pretended that the comparable-safety requirement never existed, even though (1) OOPD conceded that the comparable safety requirement is reflected in "certain language in agency documents," AR1365 n.147; and (2) *contra* OOPD, the comparable safety requirement has been applied by FDA in other adjudications.

OOPD's determination was also arbitrary and capricious, and an abuse of discretion, with respect to its treatment of the available evidence. Part of the problem appears to stem from the fact that OOPD failed to follow its own operating procedures (and also ignored FDA's agency-wide rules) for resolving disagreements about clinical superiority when the experts in FDA's Division of Neurology 1 (together with its predecessors, "the Review Division") concluded that Avadel had failed to establish clinical superiority. *See* AR471-82. In attempting to end-run the experts in the Review Division, OOPD also badly botched the science. OOPD's clinical superiority determination reduces to a claim that once-nightly dosing outweighs "the risk of increased sodium intake." AR1374. But OOPD failed to seriously engage with the key facts on either side of the scale.

Regarding sodium, OOPD offered only vague generalities and never squared up to the evidence in the record quantifying the serious cardiovascular risks posed by ingesting the amounts of sodium contained in Lumryz. OOPD also attempted to discount that risk by breezily asserting that patients with narcolepsy who take Lumryz can achieve similar sodium reductions through other means. OOPD offered no explanation for that assertion, which is not supported by any evidence in the record, and it is belied by repeated prior FDA pronouncements about the structural barriers to reducing sodium intake through individual choice. *See infra* at § III.B.1.b (collecting authorities).

Regarding dosing schedule, OOPD made several assertions that present twice-nightly dosing in a false and dangerous light. Even though Jazz's twice-nightly oxybate products have been used extensively and successfully in the treatment of narcolepsy since at least 2002, OOPD claimed that their twice-nightly dosing schedule is antithetical to improving sleep, fragments sleep, disrupts sleep architecture, leads to chronic sleep loss, and increases the risk of harm or even death for patients with narcolepsy. *See, e.g.*, AR1374; AR1381. None of that is true or has any support in the record. Indeed, OOPD ignored a mountain of evidence showing **_the exact opposite_**: Multiple large clinical trials have proven that twice-nightly oxybate enhances sleep efficiency, consolidates sleep, improves sleep architecture, increases daytime functioning, and improves overall quality of life for patients with narcolepsy. *See infra* at § III.B.2.b (collecting authorities).

OOPD also irrationally inflated the supposed upsides of once-nightly dosing. Specifically, OOPD speculated that once-nightly dosing provides additional "medical benefits" by allowing patients with narcolepsy to achieve "normal" sleep architecture. AR1371. That claim also is contradicted by the record. It bears repeating: Avadel has never argued that Lumryz is more effective than Jazz's products, and OOPD itself conceded that there is "no evidence suggesting that the efficacy of Lumryz is different from that of Xyrem or Xywav." AR1369. More broadly, it is not possible for any pharmaceutical product, on any schedule, to "normalize" the sleep of patients with narcolepsy.

Pharmacotherapy can improve their sleep, but no currently existing medicine can cure narcolepsy or return patients to a "normal" status. Nor is there any evidence that Lumryz is any more effective at improving sleep than Xywav. Again, that was OOPD's **own** conclusion, reflected in the **same** decision letter. AR1369. OOPD never reconciled its evidence-based finding of comparable efficacy with its musings about the supposed "medical benefits" of Lumryz's dosing schedule, which were neither based on the record nor grounded in science.

For all these reasons, FDA's approval of Lumryz is unlawful and should be vacated.

## BACKGROUND

### I.     Regulatory Background

#### A.     Orphan-Drug Exclusivity

Virtually all prescription drugs must be approved by FDA before they can be marketed in the United States. *See* 21 U.S.C. §§ 331(d), 355(a). Typically, the manufacturer of a prescription drug obtains FDA approval by submitting an application to FDA under section 505 of the FDCA. As a general rule, FDA **must** approve any application that meets the relevant approval standard. *See id.* §§ 355(c)(1)(A), 355(j)(4).

The Orphan Drug Act of 1983 partially clawed back that obligation. As originally enacted, the Orphan Drug Act provided that, when a drug that is designated to treat a rare disease earns approval, FDA "may not approve another application" submitted by anyone else "for such drug for such disease or condition" for seven years. *Id.* § 360cc(a) (2016). That seven-year period is known as "orphan-drug exclusivity" (or "ODE"), and it "operates by **removing** FDA discretion to approve" competing drugs. *Depomed*, 66 F. Supp. 3d at 233.

The statute allows FDA to break ODE only in two situations. The prohibition on approving a competing drug during the exclusivity period applies "[e]xcept as provided in subsection (b)." 21 U.S.C. § 360cc(a). Subsection (b) provides that FDA "may approve" a competing drug "[d]uring

7

the 7-year period" only if the holder of the exclusivity (1) "cannot ensure the availability of sufficient quantities of the drug," or (2) gives its written consent. *Id.* § 360cc(b)(1)-(2). Absent a shortage or consent, the statute provides an absolute right to seven years of exclusivity.

### B.     The 1992 Regulations

In October 1990, Congress passed revisions to section 527(b) that would have created two new exceptions to orphan-drug exclusivity, including an exception that would have allowed FDA to break exclusivity when two competing drugs were simultaneously developed by different companies. *See* Orphan Drug Amendments of 1990, H.R. 4638, 101st Cong. (1990). Those amendments did not become law due to the President's pocket veto in November 1990. In the wake of that veto, FDA proposed regulations to implement orphan-drug exclusivity in January 1991. *See* 56 Fed. Reg. 3338 (Jan. 29, 1991). Those regulations—the first ever promulgated regarding the Orphan Drug Act—were finalized in 1992. *See* 57 Fed. Reg. 62076 (Dec. 29, 1992).

The 1992 regulations, which are nominally still on the books today, imposed a regulatory scheme that intentionally narrows the scope of orphan-drug exclusivity. The regulations first restated the prohibition in section 527(a), but replaced the statutory phrase ("such drug for such disease or condition") with the regulatory phrase "the same drug for the same use or indication." *See* 21 C.F.R. § 316.31(a). They then defined "same drug" to exclude products that FDA considers clinically superior. *See id.* § 316.3(b)(14)(i). The regulations thus injected the concept of clinical superiority into the statute in a way that "effectively limit[ed] the scope of exclusivity protection." *Depomed*, 66 F. Supp. 3d at 222. Under the regulations, if a subsequent drug is thought to be clinically superior, "then the drugs are not considered to be the 'same,' and the FDA may approve the [subsequent] drug notwithstanding the exclusivity period." *Id.*

The regulations also explained that clinical superiority can be shown three different ways: by demonstrating "greater efficacy," "greater safety," or that "the drug otherwise makes a major

contribution to patient care." 21 C.F.R. § 316.3(b)(3)(i)-(iii). Greater efficacy is the most stringent standard and must be shown through adequate and well-controlled clinical trials, *i.e.*, "the same kind of evidence needed to support a comparative effectiveness claim for two different drugs." *Id.* § 316.3(b)(3)(i). Greater safety requires proof of a benefit for "a substantial portion of the target population[]," for example, through "the elimination of an ingredient or contaminant that is associated with relatively frequent adverse effects." *Id.* § 316.3(b)(3)(ii). The "major contribution to patient care" pathway is reserved for "unusual cases," *id.* § 316.3(b)(3)(iii), and applies "only when the subsequent drug provides safety … comparable to the approved drug." 76 Fed. Reg. at 64871.

Notably, FDA acknowledged that the 1992 final rule granted FDA new power "to approve a clinically superior subsequent drug otherwise identical to a pioneer" during an unexpired exclusivity even though such a product "might not have been approvable prior to the promulgation of this rule." 57 Fed. Reg. at 62076. In other words, the 1992 regulations were intended from the outset to rewrite the Orphan Drug Act by narrowing the scope of orphan-drug exclusivity and increasing FDA's authority to approve competing versions of the same drug.

### C. *Depomed*, *Eagle*, and *United Therapeutics*

In prior cases, the D.C. Circuit and this Court have both rejected FDA's arguments that the orphan-drug exclusivity provision of the Orphan Drug Act is ambiguous and leaves gaps to be filled by FDA's clinical superiority concept.

In 2014, then-Judge Jackson held that 21 U.S.C. § 360cc(a) unambiguously functioned as a limitation on FDA's approval authority, while subsection (b) "established the only two situations in which the FDA can carry on regardless." *Depomed*, 66 F. Supp. 3d at 230, 231. Judge Jackson explained that FDA lacked authority to read additional exceptions into the statute and that Congress had left "FDA with a merely ministerial role in the exclusivity process." *Id.* at 233. FDA notably abandoned

its appeal in favor of non-acquiescence. *See* 79 Fed. Reg. 76888, 76888 (Dec. 23, 2014) ("FDA intends to continue to apply its existing regulations.").

Four years later, Judge Kelly found that 21 U.S.C. § 360cc(a) is unambiguous and "delivers unmistakable commands." *Eagle I*, 2018 WL 3838265, at \*6 (cleaned up). Judge Kelly agreed "with the conclusion in *Depomed*" and held that subsection (a) "leaves no room for the FDA's imposition of its clinical-superiority requirement." *Id.* This time, FDA saw its appeal through, and the D.C. Circuit affirmed Judge Kelly's decision. *See generally Eagle II*, 952 F.3d 323. The Circuit Court also rejected the agency's request for rehearing en banc. *See* Order, *Eagle Pharms., Inc. v. Azar*, No. 18-5207 (D.C. Cir. Aug. 17, 2020).

Following the D.C. Circuit's denial of rehearing in *Eagle II*, Judge Huvelle granted summary judgment to the plaintiff in a third case where FDA also had attempted to require clinical superiority as a condition for a serial exclusivity. *See United Therapeutics*, 2020 WL 6498619.

To be fair, the *Depomed*, *Eagle*, and *United Therapuetics* decisions focused on a different application of clinical superiority than this dispute. As the courts recognized, FDA had used the clinical superiority concept in the 1992 regulations **both** as a way to break unexpired exclusivity **and** as an additional requirement for sponsors seeking new exclusivity when the same drug was already approved to treat the rare disease in question (so called "serial" exclusivities). *See, e.g., Eagle II*, 952 F.3d at 326 ("FDA applies this scheme not only when determining whether it can approve another drug for marketing during an orphan drug's seven-year exclusivity period but also in deciding whether to grant a subsequent drug its own period of exclusive approval ...."). However, their reasoning applies to any use of clinical superiority, including FDA's claimed power to break exclusivity on that ground. As noted, Judge Jackson explicitly drew the connection. *See Depomed*, 66 F. Supp. 3d at 222-23.[1]

---

[1] The trade press also drew the connection, explaining that *Depomed* "put in jeopardy FDA's 'same drug' regulations, which permit FDA to ignore a previously approved drug's exclusivity in order to

### D.    2017 Amendments to the Orphan Drug Act

Congress responded to *Depomed* by amending 21 U.S.C. § 360cc in three ways, all of which are relevant here. Congress first amended subsection (a) to replace the original phrase "**such** drug for **such** disease or condition" with the current language, "the **same** drug for the **same** disease or condition." Pub. L. No. 115-52, tit. VI, § 607(a)(1), 131 Stat. 1005, 1049-50 (2017) (emphases added). In doing so, Congress removed the words that FDA had argued were ambiguous. *See, e.g.*, *Depomed*, 66 F. Supp. 3d at 232; *see also* 57 Fed. Reg. at 62078 (claiming that "Congress left it to FDA to define 'such drug'").

Congress next addressed the specific fact pattern presented by *Depomed* (and later *Eagle*) by adding new subsection (c). The new provision mandates that FDA must require a showing of clinical superiority prior to granting a new exclusivity for a drug that has been previously approved to treat the same rare disease (so-called "serial exclusivity"). *See* 21 U.S.C. § 360cc(c)(1).[2] FDA concedes, however, that subsection (c) "does not address whether a subsequent drug's approval is blocked by another drug's [orphan-drug exclusivity]." AR1348. Congress chose not to grant such authority—even after the 2017 amendments there remain only two exceptions to orphan-drug exclusivity.

Finally, Congress addressed Judge Jackson's observation that FDA lacked rulemaking authority regarding orphan-drug exclusivity. *See Depomed*, 66 F. Supp. 3d at 222. Congress responded by adding subsection (d), which allows FDA to issue regulations—but only "for the implementation

---

approve a 'clinically superior' drug …." Michelle L. Butler & Kurt R. Karst, *Court Upends FDA's Clinical Superiority Requirement for Granting Orphan Drug Exclusivity; Decision Leaves a Lot of Questions to Be Answered*, The FDA Law Blog (Sept. 11, 2014) (Griffin Decl. Ex. 2).

[2] Subsection (c) also defines "clinically superior" to mean "a significant therapeutic advantage … in terms of greater efficacy, greater safety, or by providing a major contribution to patient care." 21 U.S.C. § 360cc(c)(2).

of **subsection (c)**." 21 U.S.C. § 360cc(d) (emphasis added). Thus, even after the 2017 amendments, FDA still lacks interpretative authority over subsections (a) or (b).[3]

## II.   Factual Background

### A.   Narcolepsy

Narcolepsy is a rare, chronic, and debilitating sleep condition with no known cure. A universal symptom is excessive daytime sleepiness ("EDS"), including periods of irrepressible sleep. AR1721. Other symptoms include cataplexy (a sudden loss of muscle tone while awake, leading to a loss of voluntary muscle control), AR1722, and disrupted nighttime sleep ("DNS"), AR1723. Patients with narcolepsy have high rates of cardiovascular comorbidities, including hypertension, stroke, myocardial infarction, cardiac arrest, and heart failure. *See* AR1731 (citing Jed Black et al., *Medical Comorbidity in Narcolepsy: Findings from the Burden of Narcolepsy Disease (BOND) Study*, 33 Sleep Medicine 13 (2017)); *see also* Compl. ¶ 89 (collecting additional studies).

### B.   Jazz developed and earned orphan-drug exclusivity for Xywav, the only safer, low-sodium oxybate treatment for patients with narcolepsy based on the Act's promise of seven years of exclusivity

Since 2002, Jazz and its predecessors have marketed Xyrem® (sodium oxybate). Xyrem was the first drug, and for a time the only drug,[4] approved by FDA to treat cataplexy or EDS in patients with narcolepsy. The active moiety of Xyrem (*i.e.*, the active portion of the drug) is oxybate, which is also known as gamma-hydroxybutyric acid. Oxybate is a strong central nervous system depressant that carries significant risks when abused or misused. For that reason, FDA has always required that Xyrem

---

[3] Subsection (d) also states that until FDA issues "regulations in accordance with this subsection," it may apply preexisting "definitions set forth in regulations," but only "to the extent such definitions are not inconsistent with the terms of this section, as amended." 21 U.S.C. § 360cc(d).

[4] Since 2002, other drugs have been approved to treat the symptoms of narcolepsy, including EDS and cataplexy, such as Wakix® (pitolisant) and Sunosi® (solriamfetol).

be distributed through a stringent risk management program, currently known as a risk evaluation and mitigation strategy.

Despite its risks, oxybate is a safe and effective treatment for narcolepsy, and is generally considered to be the gold standard for managing EDS and cataplexy. However, at the highest approved dose (which is also the most common dose), patients taking a ***sodium*** oxybate, including patients taking Lumryz, must ingest 1,640 mg of sodium every night, and they must presumptively do so for the rest of their lives. *See* AR1371 (narcolepsy is "a chronic neurological condition that requires potentially lifelong treatment"). That is a significant burden over a lifetime. Consuming so much sodium raises significant concerns about cardiovascular health for anyone, but the concern is especially grave for patients with narcolepsy who, as noted, are at higher risk for cardiovascular comorbidities. *See* AR1731; *see also* Compl. ¶ 89 (collecting sources). More broadly, "[s]odium reduction … is a critically important public health issue …." FDA, *Constituent Update: FDA Issues Sodium Reduction Final Guidance* (Oct. 13, 2021) (Griffin Decl. Ex. 3); *see also* Compl. ¶ 95 (collecting sources).

Jazz thus spent years and significant financial resources researching and developing a new oxybate product, Xywav, with far lower sodium levels. At the highest approved dose, patients taking Xywav ingest only 131 mg of sodium each night—a reduction of more than 1,500 mg or 92%.[5] *See* AR1372. In the short term, a reduction in daily sodium intake of 1,500 mg is expected to significantly reduce blood pressure for all patients:

---

[5] At the lowest approved adult dose (4.5 g), the difference between Lumryz and Xywav is about 750 mg of sodium every night. As shown below in the text, that amount is also clinically significant.

| Table 1: Range of Reported Summary Estimates of Mean Blood Pressure Reductions from Six Meta-analyses Following 851 -1,794 mg Reduction in Sodium Exposure[86] | | |
|---|---|---|
| | Mean Decrease in BP (mmHg) | |
| Population | SBP | DBP |
| All Participants | 3.2 – 3.9 | 1.5 – 2.2 |
| Hypertensives | 4.0 – 5.3 | 2.6 – 2.8 |
| Normotensives | 1.0 – 2.0 | 0.7 – 1.0 |
| All Participants (restricted to ambulatory BP)[a] | 5.51 | 2.94 |
| BP: blood pressure; DBP: diastolic blood pressure; SBP: systolic blood pressure [a] Results available from only one meta-analysis: 2012 WHO Sodium Guideline | | |

| Table 2: Reported decrease in BP associated with a 1,000 mg reduction in sodium exposure in subjects with a total daily exposure to sodium between 2,300 and 4,100 mg[87] | | |
|---|---|---|
| | Mean Decrease in BP (mmHg) | |
| Population | SBP | DBP |
| All Participants | 2.77 | 1.18 |
| Hypertensives | 3.65 | 2.02 |
| Normotensives | 1.54 | 0.76 |
| BP: blood pressure; DBP: diastolic blood pressure; SBP: systolic blood pressure | | |

AR1542; *see also* AR1535-36 (collecting studies showing statistically significant reductions in blood pressure when switching from high-sodium to sodium-free paracetamol tablets). Over a lifetime, a sodium reduction of such magnitude will materially reduce the risk of developing hypertension or cardiovascular disease. For instance, the National Academies of Sciences, Engineering, and Medicine ("NASEM") concluded that a 1,000 mg reduction in daily sodium intake reduces the risk of developing hypertension by 20% and the risk of developing cardiovascular disease by 27%. *See* AR1543. Another study showed that a 1,200 mg reduction in daily sodium intake reduces new cases of heart disease, stroke, and myocardial infarction by more than 30%. *See* AR1544. A third found that a 1,400 mg reduction in daily sodium intake decreases 10-year mortality from heart disease, stroke, and major cardiovascular disease. *See id.*; *see also* AR1699-1700 (collecting sources).

Based on this evidence, the Review Division found in November 2020 that the difference in sodium content between Xywav and Xyrem was "very likely to be clinically meaningful in all patients with narcolepsy." AR1650. Avadel opposed that finding and argued that the public health concern about elevated sodium intake had been "disproven." AR1657. The Review Division rejected Avadel's sodium denial, explained that the NASEM risk assessment was "authoritative and based on the latest

consensus opinions of experts in the field," and reiterated that Xywav's reduced sodium would "very likely … be clinically meaningful in all patients with narcolepsy." AR1671-72. OOPD therefore recognized Xywav's orphan-drug exclusivity under section 527(c), AR1702, and rejected Avadel's arguments, *see* AR1707 ("The relationship between daily salt intake and cardiovascular morbidity is widely accepted, as is the need for salt intake to be generally restricted **and not only in subjects** with conditions such as hypertension, cardiac failure, and impaired renal function.") (emphasis added). As a result, Xywav is protected by orphan-drug exclusivity until July 21, 2027.

C. **FDA violated ordinary procedures to break Xywav's exclusivity and approve Avadel's high-sodium oxybate product, Lumryz**

Avadel submitted its application for Lumryz (sodium oxybate) in December 2020 under FDCA section 505(b)(2), an election that allowed Avadel to rely on FDA's prior findings that Xyrem is safe and effective, and thus to avoid the significant expenditures of time and money that sponsors typically must invest to demonstrate safety and effectiveness. Lumryz was intentionally designed to mimic Xyrem, *see, e.g.*, AR0083; AR0089-91, and it contains exactly the same high amount of sodium— up to 1,640 mg of sodium at the highest approved dose, AR553.

Both because it sought a new period of exclusivity for Lumryz and because it sought to overcome the exclusivity protecting Xywav, Avadel submitted (or caused to be submitted) several lengthy submissions (both with its application and after), trying to convince the agency that once-nightly dosing means that Lumryz is clinically superior under the 1992 regulations. *See* AR0001-45; AR0070-80; AR0846-50; AR1022-1132; AR1133-1202; AR1203-39; AR1289-90.

Although the government has withheld the relevant communications,[6] OOPD apparently twice asked the experts in the Review Division to assess Avadel's clinical superiority claims in July

---

[6] Jazz has sought those records both through the Freedom of Information Act ("FOIA") and as part of the administrative record of this case. The government has ignored the FOIA requests altogether and refused to include the records in the administrative record. *See* Griffin Decl. ¶¶ 3-21. Though the government's position is without merit, and in the interest of reaching a timely resolution of this

2021. AR0483. OOPD asked the Review Division for its opinion both because OOPD is required to do so by its own standard operating procedures, *see* AR2187; AR2188; AR2191, and because the Review Division is the unit within FDA that has had primary responsibility for oxybate since at least 2002. *See* Griffin Decl. ¶¶ 22-23. The Review Division also is the primary regulator for virtually all drugs that FDA has approved to treat sleep disorders. *See id.*

OOPD indicated that it was inclined to agree with Avadel. *See* AR476 (noting which of Avadel's arguments that "OOPD finds most persuasive" and asking if "the review division agree[s]"). But the Review Division disagreed, responding in a consultation memo dated August 21, 2021 that once-nightly dosing "cannot be considered a major contribution to patient care," AR480, and that Avadel had provided "no evidence … that Lumryz is clinically superior," AR482.

What happened next is unclear because the government withheld these documents as well. OOPD's standard operating procedures indicate that if the relevant Review Division disagrees with OOPD's position, OOPD staff should "follow-up with the [Review Division] to align with the exclusivity decision."[7] AR2191. OOPD staff are also required to document and preserve all such discussions. *See* AR2193. The record indicates that follow up conversations in fact occurred and that the Review Division's "consideration" of additional information provided by OOPD staff was "ongoing" as of July 8, 2022. AR0483. Additional communications likely occurred between July 2022 and May 2023. *See* AR0516.

---

matter, Jazz has moved for summary judgment without access to a complete record of the materials that were before the agency. Jazz believes that the available records are more than sufficient to show that the agency's decision to break Xywav's exclusivity was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

[7] "Alignment" is a term of art at FDA that means "a state of general support for a position to be taken or a decision to be made. Alignment does not necessarily mean full agreement by all disciplines and organizational components involved in a decision. Rather, alignment indicates that all involved individuals agree to support the action to be taken." FDA, *Staff Manual Guide 9010.2: Cross-Center Dispute Resolution at the FDA*, at 1 n.1 (June 21, 2019) (Griffin Decl. Ex. 4).

During that time,[8] it appears that OOPD staff and the Review Division eventually reached an impasse. At that point, OOPD's standard operating procedures indicated that the disagreement should be elevated to the Director of OOPD, to regulatory counsel, and/or leadership of the Center for Drug Evaluation and Research ("CDER").[9] *See* AR2192. That directive is consistent with FDA's Staff Manual Guide, which dictates that disputes between units of different Centers[10] be elevated through their respective chains of command and ultimately to the Office of the Commissioner. *See* FDA, *Staff Manual Guide 9010.2: Cross-Center Dispute Resolution at the FDA*, § 4 (June 21, 2019) (Griffin Decl. Ex. 4). Alternatively, OOPD staff had the option of presenting the issue to the "Orphan Drug Products Policy Council," which provides a forum for resolving "novel and precedent-setting orphan product determinations," including "when there are disagreements within the FDA" or when OOPD "would like to change an existing practice." FDA, *Staff Manual Guide 2010.19: FDA Orphan Drug Products Policy Council*, §§ 3(A)(2), 3(F)(3) (Sept. 17, 2020) (Griffin Decl. Ex. 8).

There is no evidence in the record that OOPD staff followed either procedure. Instead, they took the extraordinary step of soliciting a second opinion from an entirely different center, the Center for Devices and Radiological Health ("CDRH"). CDRH regulates medical devices, not drugs. *Cf. Genus Med. Tech. LLC v. FDA*, 994 F.3d 631, 644 (D.C. Cir. 2021) ("devices must be regulated as

---

[8] During that time, the parties also submitted additional information to FDA. Avadel thus sent additional correspondence and supporting materials to OOPD on August 30, 2022. AR1133-1202. Avadel also caused lengthy submissions to be sent to OOPD by third parties on November 29, 2022 and on January 3, 2023. AR1203-39; AR1240-88.

[9] CDER is the Center within FDA responsible for regulating prescription drugs. *See* FDA, *Center for Drug Evaluation and Research | CDER* (Aug. 14, 2023) (Griffin Decl. Ex. 5). CDER includes the Review Division. *See* FDA, *CDER Offices and Divisions* (Aug. 7, 2023) (Griffin Decl. Ex. 6). CDER reports to the Office of the Commissioner. *See* FDA, *Organization and Leadership Chart* (Sept. 2023) (Griffin Decl. Ex. 7).

[10] OOPD is not part of CDER. It is instead part of the Office of Clinical Policy and Programs, which is a peer to CDER and considered to be a Center that reports to the Office of the Commissioner. *See* FDA, *Organization and Leadership Chart* (Sept. 2023) (Griffin Decl. Ex. 7).

devices and drugs—if they do not also satisfy the device definition—must be regulated as drugs"). As evidenced by OOPD procedures, CDRH personnel have no role in applying the Orphan Drug Act or considering questions of clinical superiority under the 1992 regulations. *See* AR2188 (limiting the Centers to be consulted for claims of clinical superiority to "either CDER or CBER depending on which Center performed the marketing approval review"). Indeed, the government has produced at least 15 prior OOPD decisions in the record for this case, *see* Certified Index Nos. 36-48 and 53-54, and none of those decisions reflects involvement by CDRH. This case appears to be the first time in the 40-year history of the Orphan Drug Act that medical ***device*** reviewers have been asked to opine on a question of orphan-drug exclusivity.

The record does not explain why OOPD chose to involve CDRH rather than pursue the options available under its procedures or FDA's staff manual. The record also does not contain any communications between OOPD to CDRH. The record does not reveal, for instance, what information about Xywav or Lumryz was provided to CDRH, what CDRH was told about the sponsors of the drugs or the procedural posture of the dispute, or even the questions that the CDRH reviewers were asked to answer. All the government has revealed is the final response, in which CDRH staff agreed with OOPD staff that Lumryz's once-nightly dosing schedule should be considered a major contribution to patient care. AR0504. Notably, the CDRH team stressed that they were considering "solely Lumryz's once nightly dosing," *id.*, implying that they were aware that Lumryz presents increased cardiovascular risks, but did not consider that issue.

Armed with that CDRH memo, OOPD was able to convince the Review Division to reconsider its position. AR0516. Two days after the CDRH memo was signed, OOPD issued a 42-page letter determining that Lumryz could break Xywav's unexpired exclusivity. AR0524.

18

**ARGUMENT**

A reviewing court "shall … hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011).

## I.     FDA lacked statutory authority to break Xywav's orphan-drug exclusivity because Xywav and Lumryz are the same drug

Whenever possible, statutory interpretation begins and ends with the text. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Where the text has a clear meaning, FDA lacks power to change that meaning, whether through rulemaking or otherwise. *See Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("An agency may not disregard the Congressional intent clearly expressed in the text." (citation and quotation marks omitted)). This is true even if FDA claims to have identified a more preferable approach to the problem that Congress addressed. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (an agency cannot "rewrite clear statutory terms to suit its own sense of how the statute should operate").

The meaning of the exclusivity provision of the Orphan Drug Act is clear. FDA is expressly prohibited from approving any other company's application for "the same drug for the same disease" as Xywav until July 21, 2027, "[e]xcept as provided in subsection (b)." 21 U.S.C. § 360cc(a). No one contends that either of the exceptions in subsection (b) applies. All further agree that Lumryz was approved "for the same disease" as Xywav. From a statutory perspective, the only point of disagreement appears to be whether Lumryz and Xywav are "the same drug" within the meaning of section 527(a) of the FDCA. They most assuredly are.

19

### A.      "Drug" means "active moiety" in FDCA section 527(a)

The term "drug" has multiple meanings in the FDCA. However, a statutory term "that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Smith v. United States*, 508 U.S. 223, 233 (1993). For example, statutory context was enough to show that "drug" in 21 U.S.C. § 355(a) (the requirement that every new drug have FDA approval) unambiguously refers to a finished product. *See United States v. Generix Drug Corp.*, 460 U.S. 453, 454 (1983).

The parties appear to be in agreement that "drug" must mean "active moiety" in section 527. Neither FDA nor Avadel has suggested that "drug" could mean anything besides "active moiety" in that provision. Indeed, it is FDA's settled position that, in "the orphan drug provisions of the statute," the word 'drug' in the context of small molecule drugs like [oxybate] means 'active moiety.'" Memo from Elizabeth Dickinson, Office of the Chief Counsel, FDA to Tan Nguyen, Director, Office of Orphan Product Development, FDA, at 3 (Apr. 25, 2006) (Griffin Decl. Ex. 9).

Moreover, and as Judge Jackson recognized in *Depomed*, the scope of orphan-drug exclusivity largely depends on how "drug" is defined. *See* 66 F. Supp. 2d at 232 (definition of drug "operates [] to define the scope of the limit on the FDA's approval authority"). For instance, if "drug" referred to a finished product in section 527(a), then orphan-drug exclusivity would be a nullity: Every future product would be "different" because it would have a different brand name, trade dress, etc. and FDA could freely approve them all. Understanding drug to mean "active moiety" (the portion of the substance that is responsible for pharmacological activity) ensures that the prohibition against approving competing products in section 527(a) has meaningful reach and makes good on Congress's promise of seven years of orphan-drug exclusivity. *See Baker-Norton Pharms. v. FDA*, 132 F. Supp. 2d 30, 38 (D.D.C. 2001) ("The financial incentive … provided by the period of market exclusivity … would be undermined if other companies could develop drugs with the same active moiety but minor differences in inactive ingredients."); *see also Nat'l Pharm. All. v. Henney*, 47 F. Supp. 2d 37, 39-40

(D.D.C. 1999) (affirming FDA's interpretation that "drug" in the pediatric exclusivity provision, FDCA section 505a, means "active moiety").

### B.     "Same drug" means "same active moiety" in FDCA section 527(a)

"Same" is not a modifier that leaves a gap for an agency to fill. *See, e.g.*, *Hunter v. Town of Mocksville*, 897 F.3d 538, 550 (4th Cir. 2018) ("The word 'same' … is nontechnical and unambiguous."); *see also Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1308 (11th Cir. 2021) (holding that the phrase "same disease or condition" in section 527(a) is unambiguous). As the Eleventh Circuit explained, when Congress inserted the phrase "the same drug for the same disease" into section 527(a) in 2017 as a substitute for "such drug for such disease," Congress used "same" "in the sense of 'being the one under discussion or already referred to.'" *Catalyst*, 14 F.4th at 1308 (quoting Merriam-Webster's Collegiate Dictionary). The only "drug" under discussion or already referred to in section 527(a) is the drug protected by orphan-drug exclusivity. *See* 21 U.S.C. § 360cc(a). On that view, the "ordinary and plain meaning of 'same drug or condition' read in the context of this sentence yields only one result," *Catalyst*, 14 F.4th at 1308, which is that "same drug" unambiguously refers to the active moiety of the drug protected by exclusivity **and nothing more**.

Other sources similarly define "same" to mean "identical or equal," *Hunter*, 897 F.3d at 550 (cleaned up). Whether two active moieties are identical is generally a straightforward question of chemistry, and no one has questioned (or could question) that Lumryz and Xywav contain identical active moieties.

### C.     FDA lacks authority to read the concept of clinical superiority into the phrase "the same drug" in Section 527(a)

In its decision letter, OOPD did not offer a competing statutory construction. OOPD did not, for instance, present any argument that the statutory phrase "same drug" is ambiguous or attempt to identify a gap that Congress had left in the orphan-drug exclusivity provision that needed to be filled. From the outset and throughout its decision, OOPD relied solely on the definition of "same drug"

that FDA had adopted under the original, pre-2017 version of the statute. *See, e.g.*, AR1343 ("By regulation…."); AR1344 ("the 'same drug' … within the meaning of 21 C.F.R. § 316.3(b)(14)"); AR1348 ("FDA looks to the definition of "same drug" at 21 CFR § 316.3(b)(14)"); AR1360 ("the definition of 'same drug' in the orphan-drug regulations"). And, because that regulatory definition excludes a product that FDA deems clinically superior from the definition of "same drug," OOPD broadly declared that "**Clinical superiority can overcome [orphan-drug exclusivity]**." AR1360 (emphasis in original). OOPD's position is contrary to the text, structure, and history of the Orphan Drug Act.

1.     The words "clinical superiority" do not appear in section 527(a). But they do appear in section 527(c), a provision that establishes clinical superiority as an additional condition for obtaining a serial exclusivity. OOPD concedes that section 527(c) does not provide authority to break exclusivity. *See* AR1348. That Congress expressly included clinical superiority as a condition for serial exclusivity in subsection (c) shows that OOPD's effort to read clinical superiority into subsection (a) is meritless. FDA must "give effect" to Congress's "express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018).

2.     Using the concept of clinical superiority to "overcome" orphan drug exclusivity, as OOPD openly did here, AR1360, is tantamount to rewriting the statute to include a third exception to the prohibition in section 527(a). The Orphan Drug Act's exclusivity provision operates in two parts. First, subsection (a) contains a general prohibition that prevents FDA from approving competing drugs that applies "except as provided in subsection (b)." 21 U.S.C. § 360cc(a). Second, subsection (b) identifies two narrow exceptions for drug shortages and consent. *Id.* § 360cc(b). It is well settled that where Congress explicitly enumerates exceptions to a statute's general prohibition, agencies lack authority to create new exceptions. *See United States v. Johnson*, 529 U.S. 53, 58 (2000);

*Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980); *Shays v. FEC*, 528 F.3d 914, 934 (D.C. Cir. 2008); *In re England*, 375 F.3d 1169, 1178 (D.C. Cir. 2004).

**3.**    The history of these amendments confirms that "Congress act[ed] intentionally" when it included clinical superiority in subsection (c) but used "different language" in subsections (a)-(b). *See NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). When Congress amended the statute in 2017, FDA had been insisting for 25 years that clinical superiority restricted both (i) eligibility for serial exclusivity and (ii) the scope of initial exclusivity. *See Eagle II*, 952 F.3d at 333-34; *Depomed*, 66 F. Supp. 3d at 231-33. By codifying that view **only** as to serial exclusivity, Congress necessarily rejected the agency's additional theory that clinical superiority can break or overcome unexpired exclusivity. *See, e.g., Prestol Espinal v. Att'y Gen.*, 653 F.3d 213, 222 (3d Cir. 2011) (where "Congress specifically codified other regulatory limitations," but not the exception at issue, "[n]either we nor the agency should be permitted to override Congress' considered judgment").

**4.**    OOPD's reliance on the 1992 regulations is also misplaced because they were not, in fact, "validly promulgated." AR1348. An agency cannot "advance its own statutory construction" without a "delegation of interpretive authority." *City of Kansas City v. HUD*, 923 F.2d 188, 191 (D.C. Cir. 1991). Congress did not grant FDA authority to interpret the Orphan Drug Act's exclusivity provision in the original Act. *See Eagle II*, 952 F.3d at 334 n.14. Rather, Congress gave FDA a "merely ministerial role in the exclusivity process," *Depomed*, 66 F. Supp. 3d at 233, by enacting "exactly the kind of 'thou shalt not' statute that … expressly negates the existence of a claimed administrative power to interpret the circumstances in which the provision applies." *Id.* (cleaned up).

Nor did Congress include interpretive authority regarding exclusivity in the 2017 amendments. Congress authorized FDA to promulgate regulations, but only "**for the implementation of subsection (c)**." 21 U.S.C. § 360cc(d) (emphasis added). Until FDA exercises that authority (which it has not yet done), it may continue to interpret subsection (c) using the "definitions set forth in [the

23

1992] regulations," but only "to the extent such definitions are not inconsistent with" the amended statute. *Id.* Both provisions show that Congress saw no gap in subsections (a) or (b) that required elucidation by FDA.

Because FDA lacks authority to interpret subsection (a)'s prohibition on approving follow-on products, this Court can "accept the agency's interpretation only if it is the best reading of the statute." *Guedes v. ATF*, 920 F.3d 1, 17 (D.C. Cir. 2019). It is not. Read in context, the phrase "same drug" simply refers back to the active moiety of the drug that earned exclusivity. *See Catalyst*, 14 F.4th at 1308. Because Lumryz contains the same active moiety as Xywav, they are the same drug and FDA had no authority to approve Lumryz.

## II.   OOPD's "major contribution to patient care" finding departs from longstanding FDA policy without acknowledgment or adequate explanation

FDA's decision to approve Lumryz could not be sustained even if its regulatory "clinical superiority" carve-out were consistent with the Orphan Drug Act. The 1992 regulations identify only three ways in which a drug can be clinically superior: by providing greater effectiveness than existing therapies, by providing greater safety than existing therapies, or by making a "major contribution to patient care." *See* 21 C.F.R. § 316.3(b)(3)(i)-(iii). OOPD conceded that the first two paths do not apply: it found "no evidence" of greater efficacy, and it concluded that Avadel failed to demonstrate greater safety. AR1369. OOPD did purport to find that once-nightly dosing makes a major contribution to patient care, but that finding was contrary to established FDA policy.

The major-contribution pathway is reserved for "unusual cases" where "neither greater safety nor greater effectiveness has been shown." 21 C.F.R. § 316.3(b)(3)(iii). It is "intended to constitute a narrow category" and "is not intended to open the flood gates to FDA approval." 56 Fed. Reg. at 3343. Relevant here, the major contribution pathway "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug." 76 Fed. Reg. at 64871. Thus, to be considered a major contribution, the new product's changes must not "render[] the drug less safe

or less effective than the approved drug." *Id.*; *see id.* at 64876 (the comparable safety and effectiveness requirement is FDA's "longstanding policy").

If FDA had applied that "longstanding policy" here, it necessarily would have found that Lumryz is not approvable through the major-contribution pathway because Lumryz's safety is ***not*** comparable to Xywav's. As OOPD conceded, Xywav is safer than Lumryz because of its far lower sodium content, which reduces the risk of hypertension and cardiovascular disease for all patients. *See* AR1373. That conclusion inexorably followed OOPD's 2021 finding that Xywav was entitled to its own period of orphan-drug exclusivity because its low-sodium formulation makes it safer than Xyrem—inexorably because Xyrem and Lumryz have the same high sodium burden.

Unable to satisfy the comparable-safety policy, OOPD simply denied that this agency policy exists. OOPD conceded that "certain language in agency documents ... could be interpreted as suggesting FDA has such a policy," but declared that "none of FDA's past precedents that OOPD reviewed manifest ***application*** of such a policy." AR1365 n.147 (emphasis added). The claim that the policy has never been applied is false—as discussed below, Jazz has identified examples of OOPD requiring comparable safety and efficacy before finding a major contribution. In fact, this case appears to be the first and only time that OOPD has departed from that requirement.

But more broadly, OOPD's about-face is arbitrary and capricious. Although an agency can change its policies, it must "display awareness that it *is* changing position" and provide "a reasoned analysis for the change," including "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 515-16. That did not happen here.

What is more, the policy statements in question were made in a preamble published in the Federal Register. FDA regulations elevate the agency's preamble statements to the status of "advisory opinions"—which bind the agency until revoked through another Federal Register notice. *See*

21 C.F.R. § 10.85(d)(1), (e), (g). This is an independent reason why OOPD cannot simply disavow the policy statements at issue.

OOPD tried to avoid these problems by claiming that Jazz is relying on a never-adopted proposal. *See* AR1364. Not so. True, **one place** where the policy has been stated was in the preamble to the 2011 proposed rule. 76 Fed. Reg. at 64871. FDA made clear that this was not a proposal to establish a new policy but rather to "**clarify** the definition of clinical superiority **to make explicit**" that a major contribution requires "safety and effectiveness comparable to the approved drug." *Id.* at 64876 (emphases added). FDA further said that this "minor clarification" was "consistent with longstanding policy." *Id.* And FDA was right because, *contra* OOPD, the agency had previously applied the comparable safety and efficacy requirement in adjudications prior to 2011. *See* AR1470-71 ("for us to consider … a major contribution to patient care … you should first demonstrate with reasonable certainty that GT4P … would offer at least comparable safety and effectiveness"). FDA also applied that requirement while the proposed rule was pending, which it could not have done if the policy were new. *See* Griffin Decl. Ex. 1, at 2 (the major contribution path "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug").

Although FDA withdrew this proposed edit in 2013, it did so in response to comments expressing confusion about its application, and in particular the evidence necessary to show comparable safety and effectiveness. *See* 78 Fed. Reg. 35117, 35124 (June 12, 2013). At no point did FDA question the wisdom or existence of the requirement itself. Commentators understood that no policy change was made and that comparable safety and efficacy would still be required for any major contribution to patient care. *See, e.g.*, David C. Babaian, *Adopting Pharmacogenomics and Parenting Repurposed Molecules Under the Orphan Drug Act: A Cost Dilemma?*, 13 J. Marshall Rev. Intel. Prop. L. 668, 689 (2014) ("a drug may still be considered clinically superior without demonstrating greater effectiveness or safety—**though comparable**—if it makes a 'major contribution to patient care'")

(emphasis added) (citing the final rule). Moreover, OOPD has continued to follow the comparable safety and efficacy requirement when adjudicating claims of a major contribution. *See* AR1639 (finding a major contribution where "non-inferiority" was shown for efficacy and "the safety profile of [the drugs]" were "similar"); *see also* FDA Division of Metabolism and Endocrinology Products, *Orphan Drug Exclusivity for Pasireotide LAR*, at 3 (Aug. 30, 2018) (Griffin Decl. Ex. 10) (finding a major contribution where the "overall safety and efficacy profiles of both [products] are similar to and consistent with the safety and efficacy profiles of [the drug class]"). Simply put, FDA has never before purported to find that a ***less safe*** drug makes a major contribution.

In addition to denying the existence of the agency's longstanding policy, OOPD posits a new standard that cannot be squared with the statute's text. According to OOPD, a drug can be deemed to make a "major contribution," and thus "overcome" unexpired exclusivity, if it merely "meet[s] FDA's safety and effectiveness standards." AR1351; AR1360. The effect of that construction is to restore to FDA exactly the power that Congress took away in the Orphan Drug Act. While the Act says FDA "may not" approve drugs that would otherwise be approved as safe and effective during the 7-year exclusivity, OOPD claims that FDA may do so on a "case-by-case basis."

Finally, OOPD's suggestion that its "precedents" could disprove the existence of a publicly stated policy, AR1365 n.147, is just wrong. For one thing, as shown above, the agency followed the comparable safety and efficacy requirement for the major contribution pathway before, during and after the 2011-2013 rulemaking. But perhaps more importantly, when OOPD refers to "precedent," it does not mean judicial decisions or even public FDA pronouncements. It means its own internal— and usually confidential—memos. Thus, even if OOPD could identify one or more past decisions supporting its current position, they would not justify its departure from the agency's publicly adopted policy in this case. As far as the APA is concerned, "agency interpretations are only relevant if they

are reflected in public documents." *United States v. Lachman*, 387 F.3d 42, 54 (1st Cir. 2004); *cf.* 5 U.S.C. § 552(a)(1)(D), (2)(B).

## III.   OOPD's clinical-superiority determination was arbitrary and capricious

OOPD's major contribution determination was also procedurally and substantively flawed. OOPD conceded that "Xywav is safer than Lumryz in all [patients with narcolepsy]" due to Xywav's significantly reduced sodium. AR1373. OOPD also conceded that there is "no evidence suggesting" that Lumryz is any more effective than Xywav. AR1369. Despite those concessions, OOPD asserted that Lumryz makes a major contribution to patient care, thereby creating a contradiction in which a product that provides no enhanced efficacy and is ***less safe*** than an existing drug has been declared to be the clinically ***superior*** product. OOPD tried to justify that contradiction by claiming that "Lumryz's once-nightly dosing outweighs the safety concern raised by its increased sodium content." AR1373. Setting aside the fact that FDA's major-contribution policy forbids that sort of tradeoff, *see supra* § II, OOPD's decision to elevate the speculative benefits of once-nightly dosing over the authoritatively established cardiovascular benefits of reduced sodium was arbitrary, capricious, and an abuse of discretion.

### A.   OOPD acted arbitrarily and capriciously by departing from agency procedures without explanation

When rights are at stake, "it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *see also Mazaleski v. Treusdell*, 562 F.2d 701, 717 n.38 (D.C. Cir. 1977) ("Procedural rules … are binding upon the agency issuing them."). Agencies must follow not just their regulations but also "self-imposed procedural rules that limit otherwise discretionary decisions." *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)); *accord Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) ("[J]udicially manageable standards 'may be found in formal and informal policy statements and regulations ….'" (citation omitted)). When agencies depart from such policies without

a reasoned explanation, the resulting action must be vacated and set aside for that reason alone. *See INS v. Yang*, 519 U.S. 26, 32 (1996); *see also Reuters Ltd. v. FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986) ("*Ad hoc* departures from [agency] rules, even to achieve laudable aims, cannot be sanctioned, for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action." (citation omitted)).

*Massachusetts Fair Share v. Law Enforcement Assistance Administration*, 758 F.2d 708 (D.C. Cir. 1985), is instructive. *Massachusetts Fair Share* involved a grant program where the "procedures for processing applications" were not established by statute or regulation, but were instead set forth in subregulatory documents. *See id.* at 709 ("memorandum of agreement," "decision memorandum," and "guideline manual"). The petitioner alleged that its application had been denied through a process that departed from those documents. *Id.* at 710-11. The D.C. Circuit found the departure sufficient cause to vacate the denial. As the court explained, "[i]t has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated"—including rules that have not "attain[ed] the status of formal regulations." *Id.* at 711.

As discussed above, *see* supra at § II.C, OOPD departed from both its own Standard Operating Procedures and the Staff Manual Guide that applies to the entire agency. When it reached an impasse with the Review Division about Avadel's clinical superiority claim, those policies instructed OOPD staff to either (1) elevate the dispute through OOPD's own chain of command; (2) elevate the dispute through the Review Division's chain of command; or (3) refer the dispute to the Orphan Drug Products Policy Council. *See supra* § II.C; *see also* AR2191-92; Griffin Decl. Ex. 4; Griffin Decl. Ex. 8. Like the subregulatory documents in *Massachusetts Fair Share*, OOPD's Standard Operating Procedures and Policies and FDA's Staff Manual Guide set forth "self-adopted rules by which the interests of others are to be regulated." 758 F.2d at 711. Both help to ensure that FDA does not break a sponsor's

29

statutory right to orphan-drug exclusivity without input from and alignment with the experts who are most directly involved in regulating a given drug.

There is no evidence that OOPD complied with these policies. Instead, the record shows that OOPD sought a second opinion from a medical device team in CDRH that has no role in regulating drugs in general or oxybate in particular. The government has withheld the communications between OOPD and CDRH, so it is not known what the CDRH team was told about the various oxybates. The only document that has been disclosed is the final response in which the CDRH team agreed with OOPD. AR0504-12. OOPD then used that decision to force the Review Division into alignment with OOPD's preferred outcome. *See* AR0513-21. Such "*[a]d hoc* departures from [agency] rules … cannot be sanctioned." *Reuters*, 781 F.2d at 950.

### B.    OOPD's determination was inconsistent with prior FDA determinations and the scientific literature

OOPD claims to have based its clinical superiority determination "on its scientific expertise and consultation of the literature," AR1381, but the APA requires more than the invocation of "technical jargon [or] puffery about agency expertise." *NRDC v. Regan*, 67 F.4th 397, 412 (D.C. Cir. 2023) (Pan, J., concurring); *see Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986) (agencies cannot rely on "conclusory statements"). Agencies are required to actually grapple with the evidence—they must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 184 (D.C. Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)). And to meet that standard, they must square up to and fairly acknowledge the facts before them—including facts that cut against the agency's preferred position. OOPD failed to do so here.

For at least three reasons, OOPD's decision to elevate the convenience of once-nightly dosing over the cardiovascular benefit of reduced sodium was contrary to the scientific literature and other

evidence before FDA. First, OOPD irrationally minimized the clinical significance of reduced sodium for all narcolepsy patients. Second, OOPD overstated the downsides of twice-nightly dosing by baselessly asserting that twice-nightly dosing is antithetical to improving sleep, fragments sleep, disrupts sleep architecture, will lead to chronic sleep loss, and increases the risk of harm and even death for patients with narcolepsy. Third, OOPD inflated the upside of once-nightly dosing by baselessly asserting that once-nightly dosing confers new a medical benefit by allowing patients with narcolepsy to achieve "normal" sleep and sleep architecture. For all these reasons, "'the record belies [FDA's] conclusion," and "the Court must undo its action.'" *Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 84 (D.D.C. 2020) (Mehta, J.) (alterations omitted).

### 1. OOPD irrationally minimized the importance of sodium reduction for all narcolepsy patients

When balancing once-nightly dosing against reduced sodium, OOPD had to cheat both sides of the scale. On the sodium side, OOPD minimized the importance of Xywav's lower sodium by omitting any discussion of its clinical significance and by claiming that patients can readily achieve an equivalent reduction through dietary changes. In doing so, OOPD failed to grapple honestly with a critical aspect of the problem before it.

a.    Lumryz imposes a significantly higher sodium burden on patients than Xywav. Patients taking 9 g of Lumryz ingest 1,640 mg of sodium every night, AR1372, thereby consuming more than 71 percent of FDA's recommended daily limit of 2,300 mg/day. AR1356. In contrast, a patient taking 9 g of Xywav ingests only 131 mg of sodium, AR1357, thereby reducing their daily sodium burden by more than 1,500 mg versus Lumryz.

Although OOPD acknowledges the numerical difference in sodium content, OOPD never grapples with its clinical significance. OOPD addresses the risks of high sodium and the benefits of reduced sodium only in vague generalities. *See, e.g.*, AR1357 (high sodium "would increase cardiovascular risks") AR1382 (low sodium "generally would be clinically meaningful in reducing

cardiovascular morbidity"). Such statements obscure the clinical superiority of Xywav by implying that the sodium difference between Xywav and Lumryz is something minor, like not adding table salt to a meal. The unrebutted evidence before FDA showed that Xywav actually achieves a transformative benefit for all patients with narcolepsy. *See supra* at § II.B. To give one example, the NASEM has determined that, for people whose daily sodium intake ranges between 2,300 mg and 4,100 mg (a range that includes essentially all Americans[11]), a reduction of 1,000 mg/day lowers the risk of developing hypertension by 20% and the risk of developing cardiovascular disease by 27%. *See* AR1543.[12] Other studies have shown statistically significant reductions in blood pressure when switching away from similar high-sodium medications. *See* AR1535-36. And others have shown reductions in new cases of heart disease, stroke, and myocardial infarction as well as decreases in 10-year mortality from heart disease, stroke, and major cardiovascular disease. *See* AR1544; *see also* AR1699-1700 (collecting sources).

OOPD ignored this record evidence when it concluded that "the risk of increased sodium" is outweighed by once-nightly dosing AR1374. OOPD never acknowledged the weight of interests at issue on the "risk" side of the balance—material reductions in patients' blood pressure, material increases in the likelihood that any given patient will develop hypertension and/or cardiovascular disease, and material decreases in cardiovascular morbidities. Nor did OOPD try to explain how ***those*** specific, quantifiable benefits could be "outweighed" by a more convenient dosing schedule. OOPD's conclusory and unsupported balancing is far from sufficient to satisfy the APA.

---

[11] According to FDA, more than 90% of Americans consume more than 2,300 mg of sodium, while sodium intake averages 3,400 mg/day and ranges up to 5,000 mg/day. *See* FDA, *Sodium Reduction: The Public Health Need* (Mar. 24, 2023) (Griffin Decl. Ex. 11).

[12] Notably, the Review Division and OOPD both previously recognized that the NASEM analysis is "authoritative," *see* AR1670-72; AR1712-13; a point that OOPD emphasized in correspondence with Avadel, *see* AR1705-08.

**b.**     OOPD also disregarded FDA's own findings when it blithely suggested that narcolepsy patients could achieve equivalent sodium reduction through "other ways" or "other means." *See* AR1374 ("there are other ways [narcolepsy] patients may reduce sodium in their diet"); AR1374 n.210 ("we have concluded that sodium can be reduced by other means for patients who would benefit from taking this drug"). OOPD did not identify those ways and means, but presumably is claiming that patients can reduce their sodium intake by 1,500 mg/day through dietary changes. FDA has acknowledged elsewhere that such efforts generally do not succeed, given the structural prevalence of sodium in the food supply and in medications.

*According to FDA*, most sodium ingested by Americans comes from fixed sources, including medications. *See, e.g.*, 61 Fed. Reg. 17798, 17798 (Apr. 22, 1996) ("a substantial portion of daily sodium intake can come from [medications], especially those used frequently"); 69 Fed. Reg. 13765, 13766 (Mar. 24, 2004) (same quote); FDA, *Draft Guidance for Industry: Quantitative Labeling of Sodium, Potassium, and Phosphorus for Human Over-the-Counter and Prescription Drug Products* 2 (Sept. 2022) (Griffin Decl. Ex. 12) (sodium is "present in drug products in amounts that may represent a significant portion of an individual's total daily intake"); *see also* Griffin Decl. Ex. 11 ("The majority of sodium consumed comes from processed, packaged and prepared foods, not from table salt added to food when cooking or eating."). *According to FDA*, sodium in fixed sources "makes it difficult for all of us to control how much sodium we consume." Griffin Decl. Ex. 11; *accord* FDA Statement, *To Improve Nutrition and Reduce the Burden of Disease, FDA Issues Food Industry Guidance for Voluntarily Reducing Sodium in Processed and Packaged Foods* (Oct. 13, 2021) (Griffin Decl. Ex. 13) ("Although many consumers may want to reduce their sodium intake, about 70% of the sodium we eat comes from packaged, processed and restaurant foods, making it challenging to limit sodium."). *According to FDA*, that difficulty is why prior efforts to reduce sodium intake "have generally not been successful." FDA, *Guidance for Industry: Voluntary Sodium Reduction Goals: Target Mean and Upper Bound Concentrations for Sodium in Commercially Processed,*

*Packaged, and Prepared Foods*, 6 (Oct. 2021) (Griffin Decl. Ex. 14). Indeed, that difficulty is the premise of FDA's efforts to reduce sodium levels in the food supply, *see id.* ("without an overall reduction of the level of sodium in the food supply, consumers will not be able to reach intakes recommended by the *Dietary Guidelines*"), as well as calls among public health experts for increased regulation of the sodium in medicine. *See, e.g.*, Aletta Shutte & Bruce Neal, *The Sodium Hidden in Medication: A Tough Pill to Swallow*, 43 Eur. Heart J. 1756, 1758 (2022) ("The weight of the evidence makes ongoing inaction on sodium-containing medications untenable.") (Griffin Decl. Ex. 15).

OOPD disregarded all of the above when it claimed that a 1,500 mg/day reduction in sodium is easily achievable by individual patients. The truth is that the ***only*** practical way for most narcolepsy patients taking oxybate to eliminate 1,500 mg of daily sodium (and thereby lower their long-term risk of hypertension and cardiovascular disease) is to switch to Xywav. It was arbitrary and capricious for OOPD to pretend otherwise.

### 2.   Claims that twice-nightly dosing disrupts sleep or harms patients are demonstrably false

At several points, OOPD suggests that twice-nightly dosing harms patients. OOPD repeatedly asserts that waking up to take a second dose of oxybate "fragments sleep and disrupts sleep architecture." AR1381; AR1370 ("Awakening to take a second dose necessarily disrupts sleep and causes fragmented sleep."). OOPD also repeatedly asserts that twice-nightly dosing "is antithetical to oxybate's goal of improving sleep." AR1374; AR1370 ("waking up to take a second dose of Xyrem and Xywav is antithetical to the goal of improving sleep"). OOPD even claims that twice-nightly dosing "contributes to chronic sleep loss" and will lead to "reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health" for patients with narcolepsy. AR1374.

These claims are demonstrably false, and they must be rejected. As an initial matter, none of OOPD's claims are supported by any evidence. OOPD does not, for instance, identify any studies

suggesting that twice-nightly oxybate therapy leads to chronic sleep loss among patients with narcolepsy. More broadly, these outlandish claims cannot be squared with FDA's repeated approvals of Xyrem and Xywav as safe and effective treatments. Indeed, even Avadel has recognized Xyrem as "the established gold standard in the treatment of narcolepsy." Clete Kushida et al., *Response to: Once-Nightly Sodium Oxybate (FT218) in the Treatment of Narcolepsy: a Letter to the Editor Commenting on the Recent Publication by C. Kushida et al.*, 45(6) Sleep (2022) (co-authored by Avadel officers David Seiden and Jennifer Gudeman) (Griffin Decl. Ex. 16).

In addition, OOPD's claims fail to account for the clinical reality of narcolepsy. Most patients with narcolepsy suffer from disrupted nighttime sleep ("DNS"), and no treatment yet invented is capable of restoring "normal" sleep to a patient with DNS caused by narcolepsy. However, a mountain of studies—including multiple large, double-blind, placebo-controlled clinical trials—have shown that twice-nightly oxybate is highly effective at reducing DNS in patients with narcolepsy, at consolidating their sleep, at increasing the quality of their sleep, and at improving their sleep architecture. In other words, the actual literature shows the ***precise opposite*** of OOPD's current claims.

> **a.   Patients with narcolepsy generally experience disrupted nighttime sleep, but even healthy individuals experience multiple nighttime awakenings and arousals**

Sources cited by OOPD show that DNS is a common symptom of narcolepsy. For example, OOPD relied on a 2023 article observing that, "[m]any patients with narcolepsy also have fragmented sleep …. Patients with narcolepsy generally fall asleep rapidly but can spontaneously awaken several times during the night and have difficulty returning to sleep." AR2001. As another example, OOPD relied on a literature review and meta-analysis from 2021 that evaluated DNS in patients with narcolepsy and identified differences between the sleep of patients with narcolepsy and the sleep of healthy controls:

**As compared to healthy controls, patients with narcolepsy suffer from:**

| Significantly increased | Significantly decreased |
| --- | --- |
| Wakefulness after sleep onset (WASO) | Sleep latency |
| Number of nighttime awakenings | Sleep efficiency |
| Percentage of light sleep | Percentage of deep sleep |
| Number of stage shifts per hour | |

AR2091; *see* AR2092 (Table 1, entries with p-value < 0.05 or lower). The authors also attempted to

quantify those differences. For example, their meta-analysis showed that healthy individuals averaged

2.3 awakenings per hour, while patients with narcolepsy averaged more than double that amount.

AR2092 (Table 1, "AWN") (reporting an average of 5.9 awakenings per hour). A prior literature review

similarly found that narcolepsy patients experienced significantly more nighttime "arousals" (brief

sleep interruptions that are less likely to be remembered than awakenings) than healthy controls. *See*

Thomas Roth et al., *Disrupted Nighttime Sleep in Narcolepsy*, 9(9) J. Clin. Sleep Med. 955, Table 4 (2013)

(collecting prior studies showing that "normal" individuals experience about 29 arousals per night, or

about 9 arousals per hour, while patients with narcolepsy experience about 80 arousals per night, or

more than 21 arousals per hour) (Griffin Decl. Ex. 17).

The CDRH reviewers acknowledged in passing that nocturnal arousals (which they described

euphemistically as "brief return[s] to stage Wake") are "part of the normal structure of sleep" and do

not "contribute to sleep fragmentation, sleep loss, or daytime sleepiness." AR0506. But neither the

CDRH reviewers nor OOPD grappled with that clinical reality. The CDRH memo, for instance, went

on to erroneously assume that the goal of a treatment for narcolepsy should be "to eliminate"

nighttime arousals. *See* AR0504 ("From a therapeutic perspective, it is highly desirable to eliminate, or

at least minimize, nocturnal arousals from sleep …."), AR0511 ("in treating a sleep disorder, it is best

to eliminate or minimize nocturnal arousals"). That assumption was central to OOPD's conclusion

that eliminating even a single arousal would be clinically meaningful. *See* AR0536. But it is a false

assumption. As shown above, nocturnal arousals are a natural part of a normal sleep cycle and are experienced nightly by healthy individuals—it is impossible to eliminate them. OOPD did not and cannot explain how a single nighttime awakening to take a second dose of medicine could be clinically meaningful to patients with narcolepsy when even healthy individuals experience multiple awakenings and/or arousals every night as part of their normal sleep cycle.

> **b.    Twice-nightly oxybate reduces disrupted nighttime sleep among patients with narcolepsy by consolidating sleep, improving sleep quality, and improving sleep architecture**

Sources cited by OOPD also show that twice-nightly dosing is effective at reducing DNS and improving sleep in patients with narcolepsy. *See* AR2100 (Zhang et al., 2021) ("Previous studies suggest … that sodium oxybate is beneficial for decreasing [stage shifts, nighttime awakenings, WASO, and N1 percentage], and increasing [slow wave sleep and sleep efficiency] in narcolepsy"); AR1734 (Ahmed and Thorpy, 2022) ("Sodium oxybate … is an effective medication in the treatment of … sleep disruption in narcolepsy"); AR1736 (Ahmed and Thorpy, 2022) ("sodium oxybate **taken at bedtime and again during the night** increases slow wave sleep, decreases light sleep (stage N1 sleep), and decreases the number of arousals") (emphasis added). OOPD nowhere addressed these findings even though they were contained in the few, handpicked sources that it reviewed.

Those sources, however, barely scratch the surface of the literature. An overwhelming number of studies have shown that twice-nightly oxybate consolidates sleep and improves sleep architecture in narcolepsy patients. Early examples include:

| 1980 | PSG data from 14 patients with narcolepsy who received oxybate 2 or 3 times per night for up to 10 days showed significant reductions in light sleep and stage shifts, along with significant increases in sleep efficiency and deep sleep. Roger Broughton & Mortimer Mamelak, *Effects of Nocturnal Gamma-Hydroxybutyrate on Sleep / Waking Patterns in Narcolepsy-Cataplexy*, 7(1) Can. J. Neurol. Sci. 23 (1980) (Griffin Decl. Ex. 18). |
|------|------|

| 1985 | PSG data from 30 patients with narcolepsy who received twice-nightly oxybate for up to 30 weeks showed significant reductions in sleep latency and nocturnal awakenings and a significant increase in sleep efficiency. |
| | Martin B. Scharf et al., *The Effects and Effectiveness of Gamma-Hydroxybutyrate in Patients with Narcolepsy*, 46(6) J. Clin. Psych. 222 (1985) (Griffin Decl. Ex. 19). |
| 1989 | A double-blind, cross-over study of 20 patients with narcolepsy showed that twice-nightly oxybate therapy caused a significant reduction in self-reported nocturnal arousals. |
| | Lawrence Scrima et al., *Efficacy of Gamma-Hydroxybutyrate Versus Placebo in Treating Narcolepsy-Cataplexy: Double-Blind Subjective Measures*, 26(4) Biol. Psych. 331 (1989) (Griffin Decl. Ex. 20). |
| 1990 | PSG data from a double-blind, cross-over study of 20 patients with narcolepsy showed that twice-nightly oxybate therapy caused significant increases in deep sleep, as well as significant decreases in stage shifts and nocturnal awakenings. |
| | Lawrence Scrima et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479 (1990) (Griffin Decl. Ex. 21). |
| 1993 | PSG data from a double-blind, cross-over study of 24 patients with narcolepsy showed that twice-nightly oxybate therapy caused a significant decrease in nocturnal awakenings and a trend of increasing deep sleep. |
| | G. J. Lammers et al., *Gammahydroxybutyrate and Narcolepsy: a Double Blind Placebo Controlled Study*, 16(3) Sleep 216 (1993) (Griffin Decl. Ex. 22). |

Thus, long before FDA approved Xyrem, the "general effect" that twice-nightly oxybate therapy had on improving "slow-wave sleep augmentation and deep sleep induction" had been "well documented." Jed Black & Christian Guilleminault, *Medications for the Treatment of Narcolepsy*, 6(2) Expert Opin. Emerging Drugs 239, 243 (2001) (Griffin Decl. Ex. 23).

The studies supporting FDA's original approval of Xyrem also are relevant. One was a double-blind, placebo-controlled trial involving 136 patients with narcolepsy, which showed that twice-nightly oxybate (at a 9 g dose) resulted in a significant reduction in self-reported nocturnal awakenings. *See* U.S. Xyrem Multicenter Study Group, *A Randomized, Double Blind, Placebo-Controlled Multicenter Trial Comparing the Effects of Three Doses of Orally Administered Sodium Oxybate with Placebo for the Treatment of Narcolepsy*, 25(1) Sleep 42, 48 (2002) (Griffin Decl. Ex. 24). Another was an open label study of 25 patients with narcolepsy, which showed a significant decrease in nocturnal awakenings and a significant increase in deep sleep. Mortimer Mamelak et al., *A Pilot Study on the Effects of Sodium Oxybate*

*on Sleep Architecture and Daytime Alertness in Narcolepsy*, 27(7) Sleep 1327, 1329-30 (2004) (Griffin Decl. Ex. 25). Although FDA declined to approve Xyrem as a treatment for DNS, FDA acknowledged that the studies had shown that Xyrem "has a reproducible beneficial effect on the duration of Stage 1 sleep, the duration of Stage 3 and 4 sleep, the duration of non-REM sleep, and delta power." FDA, Not Approvable Ltr., at 1 (Feb. 2, 2007) (Griffin Decl. Ex. 26).[13]

Since FDA's original approval of Xyrem, more sources (including multiple large clinical trials) have confirmed that twice-nightly oxybate is effective at consolidating sleep and improving sleep architecture:

| 2006 | **A double blind, placebo-controlled trial of 285 patients** showed that twice-nightly oxybate caused statistically significant improvements in daytime activity level and vigilance and social outcomes for patients with narcolepsy. <br><br> Terri E. Weaver, et al. *A Randomized Trial Evaluating the Effectiveness of Sodium Oxybate Therapy on Quality of Life in Narcolepsy*, 29(9) Sleep 1189 (2006) (Griffin Decl. Ex. 28). |
|---|---|
| 2009 | **A double-blind, placebo-controlled clinical trial of 278 patients** with narcolepsy showed that twice-nightly oxybate, alone or in combination with modafinil, caused a significant increase in deep sleep and a significant decrease in stage 1 sleep and nocturnal awakenings. <br><br> Jed Black et al., *The Nightly Administration of Sodium Oxybate Results in Significant Reduction in the Nocturnal Sleep Disruption of Patients with Narcolepsy*, 10(8) Sleep Med. 829, 831 (2009) (Griffin Decl. Ex. 29). |
| 2010 | **A double-blind, placebo-controlled clinical trial of 228 patients** with narcolepsy showed that twice-nightly oxybate caused significant decreases in nocturnal awakenings and WASO as well as a significant increase in deep sleep. <br><br> Jed Black et al., *The Nightly Use of Sodium Oxybate Is Associated with a Reduction in Nocturnal Sleep Disruption: A Double-Blind, Placebo-Controlled Study in Patients with Narcolepsy*, 6(6) J. Clin. Sleep Med. (2010) (Griffin Decl. Ex. 30). |

---

[13] FDA reiterated that conclusion in 2013. *See* FDA, Written Responses, at 3 (Dec. 7, 2013) (Griffin Decl. Ex. 27). ("Xyrem had a reproducible benefit on a number of polysomnography-derived parameters believed relevant to 'disrupted nighttime sleep' in narcolepsy ....").

| 2012 | A retrospective study of PSG data from children with narcolepsy in France and Spain showed that more than 94% of the children who reported DNS at baseline reported improved sleep and further showed "a dramatic reduction of the number and intensity of … nocturnal awakenings." |
|---|---|
| | Michel Lecendreux et al., *Tolerance and Efficacy of Sodium Oxybate in Childhood Narcolepsy with Cataplexy: a Retrospective Study*, 35(5) Sleep 709, Table 1, 711 (2012) (Griffin Decl. Ex. 31). |
| 2013 | A panel of international narcolepsy experts developed a consensus opinion to characterize DNS in patients with narcolepsy and noted that two "randomized clinical trials" had shown that "treatment with sodium oxybate increased slow wave sleep, decreased S1 sleep, and produced dose-dependent reductions in the number of nocturnal awakenings experienced by patients with narcolepsy." |
| | Thomas Roth et al., *Disrupted Nighttime Sleep in Narcolepsy*, 9(9) J. Clin. Sleep Med. 955, 963 (2013) (Griffin Decl. Ex. 17). |
| 2014 | An observational study comparing 16 adults with narcolepsy to healthy controls showed that twice-nightly oxybate led to statistically significant reductions in sleep latency, nocturnal awakenings, stage shifts, and WASO, as well as statistically significant increases in sleep efficiency and deep sleep. |
| | Giuseppe Plazzi et al., *Impact of Acute Administration of Sodium Oxybate on Nocturnal Sleep Polysomnography and on Multiple Sleep Latency Test in Narcolepsy with Cataplexy*, 15(9) Sleep Med. 1046, Table 2 (2014) (Griffin Decl. Ex. 32). |
| 2017 | A post-hoc analysis of PSG data from the 278-patient trial showed that patients receiving twice-nightly oxybate experienced highly significant reductions in stage shifts and significant improvements in self-reported sleep quality. Overall, the authors concluded that twice-nightly oxybate "significantly consolidated sleep and improved patient-reported sleep quality relative to placebo." |
| | Yves Dauvilliers et al., *Effect of Sodium Oxybate, Modafinil, and Their Combination on Disrupted Nighttime Sleep in Narcolepsy*, 40 Sleep Med. 53 (2017) (Griffin Decl. Ex. 33). |
| 2017 | A post-hoc analysis of PSG data from the 228-patient trial showed that patients receiving twice-nightly oxybate experienced significant reductions in stage shifts and reported significant improvements in sleep quality. |
| | Thomas Roth et al., *Effect of Sodium Oxybate on Disrupted Nighttime Sleep in Patients with Narcolepsy*, 26(4) J. Sleep Rsch. 407, 412 (2017) (Griffin Decl. Ex. 34). |
| 2018 | A study of pediatric patients with narcolepsy using wrist actigraphy showed that one year of twice-nightly oxybate therapy caused significant increases in total sleep time ("TST") and sleep efficiency, as well as significant decreases in WASO and nocturnal awakenings. The study also showed significant sleep consolidation. At baseline, the patients averaged an estimated longest sleep period of 64 minutes. After a year of treatment with twice-nightly oxybate, however, that measure had doubled to approximately 128 minutes |
| | Marco Filardi et al., *In-Field Assessment of Sodium Oxybate Effect in Pediatric Type 1 Narcolepsy: An Actigraphic Study*, 41(6) Sleep, Table 1 (2018) (Griffin Decl. Ex. 35). |

| 2019 | **A double-blind, placebo-controlled clinical trial of 106 pediatric patients** with narcolepsy demonstrated improvements in DNS, including significantly decreased nighttime arousals and significantly increased time in deep (N3) sleep. |
| | Emmanuel Mignot et al., *Effects of Sodium Oxybate Treatment on Sleep Architecture in Paediatric Patients with Narcolepsy*, World Sleep (2019) (Griffin Decl. Ex. 36). |

In sum, and *contra* OOPD, it is well established that twice-nightly sodium oxybate improves and consolidates sleep. OOPD neither acknowledged that overwhelming scientific consensus nor pointed to any contradictory evidence. It merely spun together a chain of inferences that led it to an utterly meritless conclusion.

>**3.**    **The record contains no support for OOPD's claim that once-nightly oxybate provides additional "medical benefits"**

OOPD claims that once-nightly dosing provides "medical benefits" that cannot be achieved by twice-nightly oxybate, AR1371, because once-nightly dosing "provides an opportunity for narcolepsy patients ***to achieve normal sleep architecture*,**" AR1371 (emphasis added). There are several problems with this claim.

First, Lumryz is not approved to improve, much less "normalize," disrupted nighttime sleep. To date, FDA has refused to approve any oxybate for that use.

Second, as explained above, *see supra* at § III, the claim implies that Lumryz is more effective than Xywav. Any suggestion of greater efficacy is contradicted by OOPD's concession that there "is no evidence suggesting that the efficacy of Lumryz is different from that of [Xywav]." AR1369. In other words, there is no evidence that Lumryz provides medical benefits different from the medical benefits of twice-nightly oxybate.

Third, OOPD's claim is implausible on its face. No treatment yet invented can restore "normal" sleep to a patient suffering from DNS as a result of narcolepsy. Unsurprisingly, OOPD cites no evidence of any sort showing that such normalization is possible.

Fourth, OOPD's position is again contrary to the literature. There is scant evidence evaluating the impact of Lumryz on DNS. At present, all that has been published is a post-hoc analysis of the trial that Avadel conducted to support FDA approval. *See* Thomas Roth et al., *Effect of FT218, a Once-Nightly Sodium Oxybate Formulation, on Disrupted Nighttime Sleep in Patients with Narcolepsy: Results from the Randomized Phase III REST-ON Trial*, 36(4) CNS Drugs 377 (2022) (Griffin Decl. Ex. 37). One of the measures included in the post-hoc analysis was the number of nocturnal arousals as measured by polysomnogram. At the start of the trial, all participants averaged ***about 80 arousals*** per night. After treatment, patients receiving Lumryz still experienced ***about 40 arousals*** per night. *See id.* at Figure 1. Thus, once-nightly oxybate therapy caused a statistically significant reduction in the number of arousals detected by polysomnogram, but it did not "normalize" the sleep of narcolepsy patients.

Data from a recent clinical trial of twice-nightly Xyrem involving 106 pediatric patients showed remarkably similar results regarding the effect of oxybate on nocturnal arousals. In that trial, "naïve" patients (those who had not previously been treated with oxybate) had a baseline of ***about 78 arousals*** per night, almost exactly the same as the baseline seen in Avadel's post hoc analysis. After a full year of treatment with Xyrem, the "naïve" group had improved to ***about 42 arousals*** per night. *See generally* Mignot 2019, *supra* (Griffin Decl. Ex. 36).

Comparing the results of separate clinical trials is always difficult due to differences in study populations, design, etc. However, because Avadel has not conducted a head-to-head comparison of Lumryz and either of Jazz's products, the results from single-drug studies are the only data available regarding the effects that these drugs have on DNS. Together, Avadel's post-hoc analysis and the Xyrem pediatric trial suggest that dosing schedule does not materially impact oxybate's ability to reduce nocturnal arousals:

|  | Avadel Post-Hoc Analysis | Xyrem Pediatric Trial |
|---|---|---|
| **Baseline before treatment** | About 80 arousals / night | About 78 arousals / night |
| **After treatment** | About 40 arousals / night | About 42 arousals / night |

OOPD conspicuously ignored this data, which is remarkable given the importance that OOPD assigns to minimizing nocturnal arousals, *see, e.g.*, AR1355 ("oxybate products are intended to decrease nocturnal arousals"); AR1370 ("nocturnal arousals should be avoided"); AR1375 ("This decision … relies on the scientific understanding about treating narcolepsy by minimizing nocturnal arousals …."); not to mention the erroneous claim of the CDRH reviewers that the goal of treatment should be "to eliminate" arousals, *see supra* at § III.B.2.a (discussing AR0504 and AR0511). Once again, the actual literature clearly contradicts OOPD's surmise that once-nightly dosing will magically restore narcolepsy patients to "normal" sleep or reduce the number of arousals per-night below the level experienced by patients taking twice-nightly oxybate.

OOPD's position that a single awakening or arousal is medically relevant also cannot be squared with FDA's past statements to Jazz. FDA has consistently blocked Jazz's efforts to develop oxybate as a treatment for DNS in patients with narcolepsy. FDA first refused to approve Xyrem as a treatment for DNS in 2007—notwithstanding the "reproducible beneficial effect" on sleep architecture—because FDA did not think that sleep architecture measures were clinically meaningful. (Griffin Decl. Ex. 26, at 1). In 2013, FDA explained that improving sleep architecture is just the mechanism by which oxybate improves daytime symptoms of narcolepsy and that only the latter are clinically or medically meaningful. (Griffin Decl. Ex. 27, at 2-3 (arguing that there is no evidence "that the effect of Xyrem on the many polysomnographic measures and measures of sleep quality" is distinct from "the effect of Xyrem on excessive daytime sleepiness and/or cataplexy")). Most recently, FDA discouraged Jazz from continuing to study the effect of oxybate on sleep architecture or DNS. *See* FDA, Written Responses (Dec. 10, 2020) (Griffin Decl. Ex. 38) This is yet another reason why it was arbitrary and capricious for OOPD to conclude that the impact of a once-nightly dosing schedule on

sleep architecture could be so important that it outweighs the known cardiovascular risks associated with Lumryz's high sodium content.

Finally, once-nightly dosing may be a matter of convenience or preference for some providers, patients, or their partners or caregivers. But those are subjective factors that are not universally shared—a point that Avadel's own investigators have underscored. *See, e.g.*, Michael J. Thorpy, *Recently Approved and Upcoming Treatments for Narcolepsy*, 34(1) CNS Drugs 9, 21 (2020) ("Note: for some patients, twice-nightly dosing is not bothersome and in some cases may be preferred") (Griffin Decl. Ex. 39).[14] Preferences held by some cannot reasonably outweigh increased risks of cardiovascular morbidity to everyone. OOPD reached the opposite conclusion only by disregarding scientific consensus, distorting the record before it, and ignoring its own procedures and conclusions regarding the serious public health risks associated with high sodium intake.

## IV.   Approval for Lumryz must be vacated.

The APA says that the reviewing court "shall … hold unlawful and set aside agency action … found to be …arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). As a result, vacatur is the "presumptively appropriate remedy" for an APA violation, *Cigar Ass'n of Am. v. FDA*, No. 16-cv-01460 (APM), 2023 WL 5094869, at *3 (D.D.C. Aug. 9, 2023) (Mehta, J.) (quoting *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010)), including for FDA approvals that were unlawfully granted. *See, e.g.*, Order Upon Remand, *Catalyst Pharms., Inc. v. FDA*, No. 19-cv-22425 (S.D. Fl. Jan. 31, 2022), ECF No. 118 (vacating approval).

## CONCLUSION

The Court should grant Jazz summary judgment and vacate FDA's approval of Lumryz.

---

[14] The author, Dr. Thorpy, was one of the principal investigators for Lumryz.

September 15, 2023

Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Peter A. Bruland (D.C. Bar No. 1600717)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
tlosseaton@sidley.com
pbruland@sidley.com

*Counsel for Plaintiff Jazz Pharmaceuticals Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on September 15, 2023, I electronically filed the foregoing motion and accompanying documents using the Court's CM/ECF system. Consistent with the August 7, 2023 Protective Order entered in this case, all participants will be served with the Notice of Electronic Filing and the foregoing motion via email.


Date: September 15, 2023                                      /s/ Kwaku A. Akowuah
                                                             Kwaku A. Akowuah