# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAZZ PHARMACEUTICALS, INC., Plaintiff,

v.

XAVIER BECERRA, *et al.*,  Defendants,

and

AVADEL CNS PHARMACEUTICALS, LLC, Intervenor-Defendant.

Case No. 1:23-cv-01819-APM

### Federal Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment

Of Counsel:

SAMUEL R. BAGENSTOS
General Counsel
U.S. Department of Health and Human
  Services

MARK RAZA
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

LEAH A. EDELMAN
Associate Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA L. LISKAMM
Director

JAMES W. HARLOW
Acting Assistant Director

NOAH T. KATZEN
ISAAC C. BELFER
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
(202) 305-2428 (Katzen)
(202) 305-7134 (Belfer)
(202) 514-8742 (fax)
Noah.T.Katzen@usdoj.gov
Isaac.C.Belfer@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

    I.    Statutory and Regulatory Background……………………………………………4

    II.   Factual and Procedural Background……………………………………………8

LEGAL STANDARD ..................................................................................................... 12

ARGUMENT ............................................................................................................... 13

    I.    The meaning of "same drug" excludes a "clinically superior" drug…………......13

      A.   Congress effectively ratified FDA's longstanding definition of
         "same drug"… ............................................................................ 13

      B.   Jazz's alternative statutory interpretation fails ................................. 16

    II.   FDA reasonably determined that Lumryz is clinically superior to Xywav………22

      A.   No policy requires FDA to find comparable safety and effectiveness…………23

      B.   FDA did not violoate its policies for resolving internal disputes..................... 27

      C.   Jazz fails to show that FDA's decision was arbitrary or capricious ................ 29

CONCLUSION ............................................................................................................ 33

TABLE OF AUTHORITIES

**Cases**   **Page(s)**

*Animal Legal Def. Fund, Inc. v. Perdue,*
872 F.3d 602 (D.C. Cir. 2017) .............................................................................. 16

*Apotex Inc. v. FDA,*
414 F. Supp. 2d 61 (D.D.C. 2006) ......................................................................... 21

*\*Baker Norton Pharm., Inc. v. FDA,*
132 F. Supp. 2d 30 (D.D.C. 2001) ...................................................................passim

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) ............................................................................................... 13

*Camp v. Pitts,*
411 U.S. 138 (1973) ............................................................................................... 12

*\*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................................................... 15

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971) ............................................................................................... 12

*\*City of Arlington v. FCC,*
569 U.S. 290 (2013) ............................................................................................... 21

*Conservation Law Found. v. Ross,*
374 F. Supp. 3d 77 (D.D.C. 2019) ......................................................................... 28

*Depomed v. HHS,*
66 F. Supp. 3d 217 (D.D.C. 2014) .......................................................... 5, 6, 15, 19

*Dickow v. United States,*
740 F. Supp. 2d 231 (D. Mass. 2010) .................................................................... 28

*Eagle Pharms., Inc. v. Azar (Eagle I),*
No. 16-cv-790, 2018 WL 3838265 (D.D.C. June 8, 2018) ........................ 6, 15, 19

*Eagle Pharms., Inc. v. Azar (Eagle II),*
952 F.3d 323 (D.C. Cir. 2020) ......................................................................... 15, 19

*FAA v. Cooper,*
566 U.S. 284 (2012) ............................................................................................... 17

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) ..................................................................................... 12, 22

*\*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ......................................................................................... 13, 14

*Genentech, Inc. v. Bowen*,
  676 F. Supp. 301 (D.D.C. 1987) ............................................................... 18

*George v. McDonough*,
  142 S. Ct. 1953 (2022) ............................................................................... 17

*Coal. for Common Sense in Gov't Procurement v. United States*,
  821 F. Supp. 2d 275 (D.D.C. 2011) ........................................................... 12

*Henley v. FDA*,
  77 F.3d 616 (2d Cir. 1996) ........................................................................ 28

*Johnson v. United States*,
  559 U.S. 133 (2010) ................................................................................... 13

*Mass. Fair Share v. Law Enforcement Assistance Admin.*,
  758 F.2d 708 (D.C. Cir. 1985) ................................................................... 28

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 12

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
  518 F. Supp. 2d 62 (D.D.C. 2007) ............................................................. 28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................................... 16

*Olpin v. Comm'r*,
  270 F.3d 1297 (10th Cir. 2001) ................................................................. 28

*Sturgeon v. Frost*,
  577 U.S. 424 (2016) ................................................................................... 13

*Taggart v. Lorenzen*,
  139 S. Ct. 1795 (2019) ............................................................................... 14

*United States v. Fischer*,
  64 F.4th 329 (D.C. Cir. 2023) ................................................................... 15

*United Therapeutics Corp. v. HHS*,
  No. 17-cv-01577, 2020 WL 6498619 (D.D.C. Sept. 2, 2020) ............... 19

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
  141 S. Ct. 2434 (2021) ............................................................................... 14

**Statutes**

5 U.S.C. §
  706(2)(A) ................................................................................................... 12
21 U.S.C. §
  355(d) ........................................................................................................ 31
  360cc ........................................................................................... 5, 13, 14, 17

360cc(a) ..................................................................................................... passim
360cc(b) ..................................................................................................... 16, 21
360cc(c) ..................................................................................................... 2, 5, 15
371(a) ........................................................................................................ 21
393(b)(4) ................................................................................................... 27
360bb ........................................................................................................ 5
Pub. L. No. 97-414 ........................................................................................ 4, 6
Pub. L. No. 115-52 ........................................................................................ passim

## Regulations

21 C.F.R. §

10.45(f) ...................................................................................................... 30
314.3(b) ..................................................................................................... 1
316.20(a) .................................................................................................... 5
316.3(b)(3) .................................................................................................. 1, 22, 23
316.3(b)(14) ................................................................................................ 17, 18, 19
316.3(b)(14)(i) ............................................................................................. 6, 7, 14, 18
316.34(a) .................................................................................................... 5

## Other Authorities

57 Fed. Reg. 62,076 (Dec. 29, 1992) ................................................................. 6, 7, 32
76 Fed. Reg. 64,868 (Oct. 19, 2019) .................................................................. 23
78 Fed. Reg. 35,177 (June 12, 2013) ................................................................... passim

## INTRODUCTION

Congress established orphan-drug exclusivity to promote the development of new drugs to treat rare diseases and conditions, such as narcolepsy. In doing so, it struck a balance. Sponsors of such drugs are rewarded for their investment with a seven-year period of marketing exclusivity. But to minimize delays in the marketing of innovative new treatments, exclusivity only bars approval of applications for the *same drug* for the same disease or condition. 21 U.S.C. § 360cc(a). Jazz Pharmaceuticals, Inc. (Jazz) now seeks to disrupt this balance.

FDA recognized orphan-drug exclusivity for Jazz's drug, Xywav, which is approved to treat symptoms of narcolepsy (a rare medical condition affecting sleep). That exclusivity, according to Jazz, barred approval of a competitor narcolepsy drug, Lumryz, because Lumryz has the same active moiety (oxybate).[1] However, the Food and Drug Administration (FDA) concluded that Lumryz is not the "same drug" as Xywav.

FDA regulations define "same drug" to *exclude* a "clinically superior" drug, including one that makes a "major contribution to patient care." 21 C.F.R. § 316.3(b)(3), (14). Here, FDA found that Lumryz makes such a contribution. AR550-52, 565. Patients taking Lumryz need only take a single dose before they go to bed, whereas patients who take Xywav must wake up during the night to take a second dose. AR550-51. That matters, FDA found, because once-nightly dosing promotes normal nighttime sleep and

---

[1] "Active moiety" means the portion of a drug (excluding certain appendages) responsible for the physiological or pharmacological action. 21 C.F.R. § 314.3(b).

is inherently more convenient, easier, and less burdensome for patients with a chronic neurological condition that requires lifelong treatment. AR551-52.

Jazz challenges this determination under the Administrative Procedure Act (APA). It makes four arguments, all of which are meritless.

*First*, Jazz argues that the Orphan Drug Act precludes FDA's consideration of clinical superiority in determining that Lumryz is not the "same drug" as Xywav. ECF No. 34-2 (Pl.'s Mot.) 19-24. But history and context refute Jazz's cramped understanding that clinical superiority is irrelevant to whether two drugs are the "same drug." Since 1992, FDA's regulations implementing the Orphan Drug Act defined the term "same drug"—with the approval of another judge of this court—to exclude a clinically superior drug. *Baker Norton Pharm., Inc. v. FDA*, 132 F. Supp. 2d 30, 38 (D.D.C. 2001). And in 2017, Congress effectively ratified FDA's definition, by adding the term "same drug" to the statute (which previously used the term "such drug"). The 2017 statutory amendment also acknowledged that a "clinically superior" drug may be "*otherwise* the same" as an approved drug, 21 U.S.C. § 360cc(c), thereby confirming that a clinically superior drug is not *actually* the same drug.

*Second*, Jazz accuses FDA of ignoring a purported agency policy requiring a drug to have comparable safety and effectiveness before being deemed to make a major contribution to patient care. Pl.'s Mot. 24-28. No such policy exists, and Jazz's efforts to locate one fall short. Jazz cites a preamble to a *proposed* rule that would have established such a requirement, but the *final* rule rejected that proposal. Jazz identifies no instance in which FDA, when considering whether orphan-drug exclusivity blocks approval of a

drug, required an orphan drug sponsor to show comparable safety and effectiveness as a precondition for finding a major contribution to patient care.

*Third*, Jazz wrongly contends that FDA violated internal procedures for dispute resolution between agency components. Pl.'s Mot. 28-30. Before determining that Lumryz is clinically superior, FDA's Office of Orphan Products Development (OOPD)—the office responsible for clinical superiority determinations—consulted the Division of Neurology I and its predecessors (Review Division) in the Center for Drug Evaluation and Research (CDER), and sleep experts in the Center for Devices and Radiological Health (CDRH).[2] The Review Division initially opined that once-nightly dosing would not be a major contribution to patient care. AR584. But after further reflection, including consideration of the CDRH sleep experts' views, *see* AR587-95, the Review Division ultimately opined that once-nightly dosing is, in fact, a major contribution to patient care. AR569-70. No agency policy prohibits this scientific back-and-forth among subject matter experts within FDA. To the contrary, such deliberations lead to better outcomes, as they did here.

*Finally*, Jazz's various disagreements (some impermissibly based on extra-record evidence) are insufficient to overturn FDA's reasoned decision. Pl.'s Mot. 30-44. FDA carefully considered Lumryz's higher sodium content but concluded that, for a substantial number of patients, the benefit of reduced sleep disruption outweighed any difference in that one aspect of safety. AR553-56. Lumryz's once-nightly dosing

---

[2] OOPD is within the Office of Clinical Policy and Programs in the Office of the Commissioner.

3

eliminates the forced arousal required for Xywav's second dose of medication—a type of arousal that "necessarily" disrupts and fragments sleep, and can lead to "impairment of alertness and decline in cognitive performance the following day." AR591, 593-94. And Jazz's reliance on statements FDA made to Jazz regarding the effectiveness of its products erroneously conflates the distinct concepts of *effectiveness* and *major contribution to patient care*. The latter involves consideration of a broader range of factors, including convenience, ease of use, and treatment burden, AR532, that support FDA's finding that Lumryz makes a major contribution to patient care.

FDA's determination that Lumryz is not the "same drug" as Xywav is reasonable and well-supported by the record, and Jazz's attempt to expand its orphan-drug exclusivity to block approval of a meaningfully different product should be rejected. The Court should grant FDA's cross-motion for summary judgment and deny Jazz's motion for summary judgment.

BACKGROUND

## I.   Statutory and Regulatory Background

In 1983, Congress enacted the Orphan Drug Act to facilitate the development of new drugs to treat rare diseases or conditions—so-called "orphan drugs." *Baker Norton*, 132 F. Supp. 2d at 35; *see also* Pub. L. No. 97-414, § 1(b)(4), 96 Stat. 2039, 2040 (Jan. 4, 1983). As an incentive, Congress created a seven-year exclusive marketing period for such drugs. The Orphan Drug Act and its implementing regulations both (1) prescribe the circumstances under which an approved drug's orphan-drug exclusivity will be *recognized*, *see* 21 U.S.C. §§ 360bb, 360cc, and (2) define the *scope* of that exclusivity, *id.* §

4

360cc(a). *See also* 21 C.F.R. Part 316. Although this case presents a question of *scope*, answering that question also requires a brief overview of how exclusivity becomes *recognized*.

1. Before FDA will *recognize* a drug's orphan-drug exclusivity, the sponsor must request, and the drug must receive, an orphan-drug designation from FDA prior to the sponsor's submission of the drug application for approval. *Id.* § 360bb(a)(1).[3] When a designated orphan drug that is "otherwise the same" as an already-approved orphan drug for the same disease or condition is approved, the sponsor must demonstrate, as a condition of orphan-drug exclusivity for the newly approved drug, that the drug is "clinically superior" to the previously approved drug. *Id.* § 360cc(c).

Congress added this requirement in 2017 in response to *Depomed v. HHS*, 66 F. Supp. 3d 217 (D.D.C. 2014). *See* Pub. L. No. 115-52, tit. VI, § 607(a), 131 Stat. 1005, 1049-50 (Aug. 18, 2017) (2017 Amendments). Before *Depomed*, FDA's regulations and longstanding practice permitted a sponsor to obtain an orphan-drug designation for a drug that was "otherwise the same" as an already approved orphan drug for the same rare disease or condition, if the sponsor could present a "plausible hypothesis" that the new drug would be "clinically superior" to the already approved drug. 21 C.F.R. § 316.20(a). Once the new orphan drug had been approved, as a condition for exclusivity, FDA required the sponsor to demonstrate the drug's clinical superiority. *Id.* § 316.34(c);

---

[3] When a designated orphan drug is approved and eligible for orphan-drug exclusivity, FDA notifies the sponsor that the agency is recognizing that drug's  exclusivity. *See* 21 CFR § 316.34(a); AR1428.

5

78 Fed. Reg. 35,117, 35,128 (June 12, 2013). In *Depomed*, however, the court held that requiring a demonstration of clinical superiority after approval violated 21 U.S.C. § 360cc as then written. 66 F. Supp. 3d at 237. In 2017, Congress abrogated *Depomed* by requiring post-approval demonstration of clinical superiority as a condition for exclusivity. Pub. L. No. 115-52, tit. VI, § 607(a), 131 Stat. 1005, 1049-50.

2. As for the *scope* of exclusivity, the Orphan Drug Act originally provided that if FDA approves a designated orphan drug, the agency could not approve another application for "*such drug* for such disease or condition" for seven years. Pub. L. No. 97-414, § 2(a), 96 Stat. 2049, 2051 (emphasis added); *see also* 21 U.S.C. § 360cc(a) (1988). Because "such drug" could refer only to the previously approved drug, "the scope of the statute's exclusivity provision" turned on whether the new drug was the "same" as the previously approved drug. *Eagle Pharms., Inc. v. Azar* (*Eagle I*), No. 16-cv-790, 2018 WL 3838265, at *2 (D.D.C. June 8, 2018).

"The Orphan Drug Act d[id] not explain when two 'drugs' are the same or different." *Id.*; *see* 57 Fed. Reg. 62,076, 62,078 (Dec. 29, 1992) (observing that Congress "provided no guidance on the meaning of this term"). "Thus, it is within FDA's authority to define what is the 'same' and what is a 'different' drug." 57 Fed. Reg. at 62078. In 1992, FDA promulgated regulations resolving that ambiguity.

In lieu of the statutory language "such drug," FDA's regulations employed the term "same drug." 21 C.F.R. § 316.3(b)(14)(i). The term "same drug," as relevant here, means "a drug that contains the same active moiety as a previously approved drug and is intended for the same use as the previously approved drug . . . *except that if the*

6

*subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug.*" *Id.* (emphasis added). A drug is "clinically superior" if it is "shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug)" in any of three ways: (1) "[g]reater effectiveness," (2) "[g]reater safety," *or* (3) "[i]n unusual cases where neither greater safety nor greater effectiveness has been shown, a demonstration that the drug otherwise makes a major contribution to patient care." *Id.* § 316.3(b)(3). To determine whether a drug makes a "major contribution to patient care" with respect to a "severe or life-threatening disease[]," FDA may consider, on a "case-by-case basis," numerous factors, including: "convenient treatment locations; duration of treatment; patient comfort; improvements in drug efficiency; advances in the ease and comfort of drug administration; longer periods between doses; and potential for self-administration." 57 Fed. Reg. at 62079; *accord* 78 Fed. Reg. at 35125 (also mentioning "reduced treatment burden").

This court subsequently upheld FDA's interpretation of "such drug" because, among other things, "the regulation's manner of determining 'sameness'" served Congress's goal of protecting patients' interests by permitting "the approval of drugs which have the same active moiety but are clinically superior." *Baker Norton*, 132 F. Supp. 2d at 38. And in 2017, Congress replaced the original statutory term "such drug"

with the very term—"same drug"—used and defined in FDA's regulation.[4] Pub. L. No. 115-52, tit. VI, § 607(a), 131 Stat. 1005, 1049.

## II.    Factual and Procedural Background

Narcolepsy is a rare sleep disorder. While its "hallmark symptom" is "the inability to stay awake and alert during the day," AR50 (internal quotation marks omitted), untreated narcoleptics also "can spontaneously awaken several times during the night and have difficulty returning to sleep," AR535 (internal quotation marks omitted). These spontaneous arousals occur in addition to "very brief" arousals that occur in the normal adult sleep pattern, which "repeats 4-5 times per night." AR589. This type of brief arousal "is not typically remembered, is normal and does not contribute to sleep fragmentation, sleep loss, or daytime sleepiness." *Id.* But it is the spontaneous arousals that result in an "altered sleep architecture that may affect daytime performance." AR592-93. Excessive daytime sleepiness is the most common and chronic symptom of narcolepsy and "may be so severe that patients with narcolepsy can rapidly doze off with little warning." AR535. Cataplexy, an "emotionally-triggered transient muscle weakness," is another symptom of narcolepsy and can cause a patient to collapse. *Id.* "[T]he goals of therapy are to achieve 'normal' alertness during conventional waking hours or to maximize alertness at important

---

[4] Congress also replaced the term "such disease or condition" with "same disease or condition." Pub. L. No. 115-52, tit. VI, § 607(a), 131 Stat. 1005, 1049. The meaning of "same disease or condition" is not at issue in this case and is not discussed herein.

times of the day, … and to the extent possible promote normal sleep at night." *Id.* (internal quotation marks omitted).

On July 21, 2020, the agency approved Jazz's drug, Xywav for treatment of excessive daytime sleepiness and cataplexy in narcolepsy patients. AR538. The agency also recognized orphan-drug exclusivity for Xywav, which expires on July 21, 2027. *Id.* On May 1, 2023, FDA approved Lumryz, a new drug for treating narcolepsy sponsored by Avadel CNS Pharmaceuticals, LLC. AR539. Lumryz is similar to Xywav, in that both have the same active moiety (oxybate) and treat the same disease or condition. But Xywav requires twice-nightly dosing, whereas Lumryz requires only once-nightly dosing. AR551-52. Thus, patients must wake up in the night to take a second dose of Xywav, but they can take their one dose of Lumryz before bed. *Id.*

Based on that difference and the resulting benefits of once-nightly dosing, FDA determined that Lumryz is not the "same drug" as Xywav, and its approval therefore was not blocked by Xywav's period of orphan-drug exclusivity. The agency explained that having to "wak[e] up to take a second dose of . . . Xywav is antithetical to the goal of improving sleep." AR551. As FDA's sleep experts noted, it is "highly desirable to eliminate, or at least minimize, nocturnal arousals from sleep," AR587, because such arousals "fragment sleep and disrupt sleep architecture," thereby undermining "[t]he goal of treatment," which is "to restore a normal sleep pattern," AR588. Mapping onto additional factors that inform whether a drug provides a "major contribution to patient

care," AR532,[5] FDA found "it is inherently more convenient, easier, and less burdensome for patients to forgo [waking up to take a second dose] on a nightly basis," especially "in the context of a chronic neurological condition that requires potentially lifelong treatment."AR552. By eliminating a forced awakening to take a second dose of medication, Lumryz provides a "major contribution to patient care." *Id.* Thus, FDA concluded that Lumryz is "clinically superior" to Xywav and not the "same drug," and, therefore, that "Xywav's unexpired [orphan-drug exclusivity] does not block marketing approval of Lumryz." AR565.

To be sure, FDA acknowledged that Lumryz's higher sodium content presents a "safety concern" that "is not present with Xywav." AR554. But FDA concluded that the benefit of reduced sleep disruption outweighed this safety concern for a substantial number of patients. *Id.* For patients who are not sensitive to sodium intake, the agency found, "the benefit offered by once-nightly dosing … outweigh[ed] the risk of increased sodium intake" because "disrupting sleep contributes to chronic sleep loss, which is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health," and because "there are other ways such patients may reduce sodium in their diet." AR555.

FDA determined that the risk to "certain sodium-sensitive patients" is mitigated by Lumryz's labeling, which contains an appropriate warning for sodium-sensitive

---

[5] *See also* 78 Fed. Reg. at 35125; *supra* p.7.

patients. [6] AR554-55; *see also* AR408-09. Ultimately, "healthcare practitioners would need to weigh the benefits of once-nightly dosing against the severity of the patient's sodium sensitivity and the nature of their comorbidities to determine whether, in the practitioner's judgment, use of Lumryz or Xywav was appropriate." AR555. Because "[n]either the statute nor regulations required a [major contribution to patient care] to benefit the entire patient population for which a drug is intended," and because "a substantial number of narcolepsy patients" would benefit from once-nightly dosing even at the cost of increased sodium, AR554, FDA determined that Lumryz's higher sodium content did not prevent a finding of clinical superiority.

Moreover, as FDA explained, Lumryz does not need to be as safe as Xywav to make a major contribution to patient care. "[S]afety concerns could inform the [major contribution to patient care] analysis, but a safety concern present in a subsequent drug that was not present in the previous drug would not automatically defeat a [major contribution to patient care] finding." AR533. Rather, "[t]hat determination would be made on a case-by-case basis and depend upon the nature of the safety concern weighed against the benefits of the [major contribution to patient care]." *Id.* Although "certain language in agency documents . . . could be interpreted as suggesting that FDA has" a "policy" of requiring a showing of "comparable safety or efficacy" to establish a

---

[6] Jazz's predecessor narcolepsy drug Xyrem, for which FDA has recognized multiple periods of orphan-drug exclusivity, AR536-37, includes a similar warning in its labeling to address its higher sodium content. AR2202. Xyrem remains on the market as an available oxybate therapy to treat narcolepsy and still has two years of orphan-drug exclusivity for the treatment of cataplexy or excessive daytime sleepiness in pediatric patients seven years of age and older with narcolepsy. AR537.

major contribution to patient care," a review of its precedents led FDA to conclude that "those statements do not reflect such an agency policy" in determining whether orphan-drug exclusivity blocks approval of a drug. AR546 n.147.

On June 22, 2023, Jazz commenced this action under the Administrative Procedure Act, challenging FDA's determination that Xywav's orphan-drug exclusivity does not block approval of Lumryz. ECF No. 1. Avadel then intervened as a defendant. ECF No. 9, 15. On September 15, Jazz moved for summary judgment. Pl.'s Mot. The Federal Defendants now cross-move for summary judgment and oppose Jazz's motion.

## LEGAL STANDARD

The Court must grant summary judgment to an agency in an APA case unless, based on the Court's review of the administrative record, *Camp v. Pitts*, 411 U.S. 138, 142 (1973), it finds that the challenged agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *See Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). The reviewing court may not "substitute its judgment for that of the agency," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), but must uphold the agency's action if it is "rational, based upon consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

**ARGUMENT**

FDA reasonably applied the governing legal standards and its scientific expertise to conclude that Lumryz is not the "same drug" as Xywav and may therefore be approved without violating Xywav's orphan-drug exclusivity. In so concluding, FDA provided a thorough and reasoned explanation. *See* AR524-65. The APA requires nothing more.

Jazz's various challenges should be rejected. *First*, FDA did not err in considering whether Lumryz is clinically superior to Xywav because a clinically superior drug is not the "same drug," and thus is not blocked by orphan-drug exclusivity. *Second*, no FDA policy requires showing comparable safety and effectiveness to demonstrate a "major contribution to patient care." *Third*, FDA did not violate its internal dispute resolution procedures. And *fourth*, FDA's consideration of the evidence and weighing of the factors was reasonable.

## I.     The meaning of "same drug" excludes a "clinically superior" drug

### A.  Congress effectively ratified FDA's longstanding definition of "same drug"

FDA did not violate 21 U.S.C. § 360cc(a) by considering clinical superiority in determining that Xywav's orphan-drug exclusivity did not prevent approval of Lumryz. Beginning "with the language of the statute," *Kingdomware Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002), 21 U.S.C. § 360cc(a) provides that FDA may not approve another application for the "*same drug* for the same disease or condition" as an approved orphan drug until the approved drug's exclusivity expires, *id.* (emphasis added). The statute does not define "same drug."

13

But because "[u]ltimately, context determines meaning," *Johnson v. United States*, 559 U.S. 133, 139 (2010), "a reviewing court should not confine itself to examining a particular statutory provision in isolation," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). "[T]he words of a statute must be read . . . with a view to their place in the overall statutory scheme," *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quotation omitted), including the "backdrop" against which Congress acted, *Brown & Williamson*, 529 U.S. at 144. Here, history and context provide the keys to unlocking the statutory meaning.

The term "same drug" first appeared in 21 U.S.C. § 360cc(a) in 2017, when Congress substituted it for the original phrase "such drug." Pub. L. No. 115-52, tit. VI, § 607(a), 131 Stat. 1005, 1049. By then, the meaning of "same drug" had been firmly established by a quarter-century of regulatory practice and had survived judicial review. *See Baker Norton*, 132 F. Supp. 2d at 38; *see also Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2445 (2021) (reading "statutory language as a term of art . . . when the language was used in that way at the time of the statute's adoption"). To recap:

- **1983:** Congress enacted 21 U.S.C. § 360cc(a) with the term "such drug";

- **1992:** FDA promulgated a regulation that used "same drug" in lieu of "such drug" and defined "same drug" to exclude a "clinically superior" drug;

- **2001:** *Baker Norton* upheld FDA's "same drug" regulation implementing § 360cc(a);

14

- **2017:** Congress replaced the statutory term "such drug" with "same drug."

*See supra* pp. 6-8.

By conforming the statutory language to FDA's regulatory definition, Congress in 2017 "effectively ratified" or endorsed FDA's interpretation. *Brown & Williamson*, 529 U.S. at 144. "When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019). Here, that means "same drug" cannot be understood without reference to the regulatory definition. And that definition excludes a "clinically superior" drug. 21 C.F.R. § 316.3(b)(14)(i).

21 U.S.C. § 360cc(c), which also was part of the 2017 Amendments, further corroborates that meaning. Under § 360cc(c), an orphan drug that is "otherwise the same" as an approved drug must demonstrate that it is "clinically superior" to the approved drug to be eligible for exclusivity. "Otherwise" means "in a different manner." *United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023) (citing dictionaries). To say that a "clinically superior" drug may be "*otherwise* the same" as another drug is to say that the "clinically superior" drug is, by virtue of its clinical superiority, *not* "the same" as that other drug.

At the very least, FDA's "same drug" definition is reasonable and entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Courts in this Circuit affirmed *repeatedly* that the pre-2017 statutory term "such drug"

15

was ambiguous, both in *Baker Norton* itself, *see* 132 F. Supp. 2d at 36, and in the cases

Jazz relies most heavily on, *see Eagle Pharms., Inc. v. Azar* (*Eagle II*), 952 F.3d 323, 326

(D.C. Cir. 2020) (noting, without disapproval, that FDA had defined "such drug"

because the statute did not); *Eagle I*, 2018 WL 3838265, at *2 (acknowledging this precise

ambiguity); *Depomed*, 66 F. Supp. 3d at 232 (noting the "'such drug' ambiguity identified

in *Baker Norton*").

 *Baker Norton*, moreover, held that FDA had authority to resolve that ambiguity.

*See* 132 F. Supp. 2d at 36. And FDA's regulation reasonably did so because FDA's

"manner of determining sameness" effectuated congressional intent by permitting

approval of clinically superior drugs. *Id.* at 38. So even if the Court were to determine

that Congress did not effectively ratify the established meaning of "same drug," the

question of when two drugs are the "same drug" is no less ambiguous now than it was

before 2017, and FDA's resolution of that ambiguity is no less reasonable. *See Animal

Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 617 (D.C. Cir. 2017) ("This is precisely the

type of statutory gap-filling that 'involves difficult policy choices that agencies are

better equipped to make than courts,' and to which federal courts must defer, so long as

the agency's construction is reasonable.") (quoting *Nat'l Cable & Telecomms. Ass'n v.

Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

## B. Jazz's alternative statutory interpretation fails

 Jazz does not deny that, when Congress changed "such drug" to "same drug,"

FDA had long defined "same drug" as not extending to a clinically superior drug. Nor,

apparently, does Jazz disagree with *Baker Norton*. Instead, it offers a series of unpersuasive arguments.

1. Jazz argues that defining "same drug" to not extend to a clinically superior drug is "tantamount" to creating an "exception" to the "general rule" that orphan-drug exclusivity prohibits FDA from approving the "same drug" for seven years. Pl.'s Mot. 22. As Jazz notes, the general rule is subject to two statutory exceptions specified in 21 U.S.C. § 360cc(b). By specifying these exceptions, Jazz argues, Congress precluded others.

This argument simply assumes Jazz's answer to the very question in dispute: whether a clinically superior drug is the "same drug" as a previously approved drug. The subsection (b) exceptions matter only if subsection (a) otherwise applies. And if "same drug" does not include a clinically superior drug, then subsection (a) does not apply and the subsection (b) exceptions are irrelevant.

2. Jazz argues that "same drug" in 21 U.S.C. § 360cc(a) means "same active moiety." Pl.'s Mot. 21.  The phrase "same active moiety" is found nowhere in the Orphan Drug Act. In defining "same" and "drug" separately, Jazz neglects the long history of the phrase "same drug" that preceded Congress's substituting that phrase for "such drug" when Congress amended the statute. FDA's regulations defined "same drug," but not as "same active moiety." *See*  21 C.F.R. § 316.3(b)(14). Thus, Congress, in adopting the term "same drug," necessarily adopted FDA's chosen phrase that carried with it FDA's full regulatory definition. *See George v. McDonough*, 142 S. Ct. 1953, 1963 (2022) (The "point of the old-soil principle is that 'when Congress employs a term of

art,' that usage itself suffices to 'adop[t] the cluster of ideas that were attached to each borrowed word.'" (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012))).

*Baker Norton* further undermines Jazz's mode of statutory interpretation. Recognizing that the meaning of "drug" was inherently ambiguous, the court upheld FDA's regulatory definition at *Chevron* step two because the regulation's "manner of determining sameness" permitted FDA to approve a drug that had the same active moiety but was clinically superior. *Baker Norton*, 132 F. Supp. 2d at 38. The court found that FDA's definition served the statutory purpose of increasing treatments for rare diseases and conditions. *Id.*; 78 Fed. Reg. at 35122 (observing that FDA implemented the Orphan Drug Act "to fulfill Congress' aim" of ensuring that the scope of exclusivity "does not preclude significant improvements in treating rare diseases") (internal quotation marks omitted); *cf. Genentech, Inc. v. Bowen*, 676 F. Supp. 301, 312 (D.D.C. 1987) (looking to "the Act's broad policy objectives" to inform whether two drugs were the same).

Jazz brushes aside the statutory history and *Baker Norton* by proclaiming that FDA's "settled position" is that "drug" means active moiety. Pl.'s Mot. 20 (citing Griffin Decl. Ex. 9). But the internal FDA memorandum upon which Jazz relies itself relies on both *Baker Norton* and FDA's regulatory provision defining "same drug" to mean a drug with the same active moiety *unless it is clinically superior to the previous drug*. Griffin Decl. Ex. 9 at 3; *see* 21 C.F.R. § 316.3(b)(14)(i). That express qualification is fatal to Jazz's attempt to extract agency support for its misinterpretation of "same drug."

Even if "drug" is read in isolation from the term "same drug" (as it should not be), Jazz offers no reason why "drug" must mean only "active moiety." Jazz itself admits that "drug" "has multiple meanings in the FDCA." Pl.'s Mot. 20. Jazz assumes that if "drug" did not mean "active moiety" it would have to mean the entire "finished drug product," *id.*, but Jazz does not explain why that is so. For example, with respect to large molecule drugs, FDA has defined "same drug" to focus not on the "active moiety," but on the "principal molecular structural features." 21 C.F.R. § 316.3(b)(14)(ii).

3. Jazz's invocation of *Depomed*, *see, e.g.*, Pl.'s Mot. 10, is inapposite. As explained above, *Depomed* (and later cases) addressed whether, under the pre-2017 statute, FDA could deny orphan-drug exclusivity to a designated and approved orphan drug if the sponsor failed to demonstrate clinical superiority. *See supra* pp. 5-6. *see also Eagle I*, 952 F.3d 323; *United Therapeutics Corp. v. HHS*, No. 17-cv-01577, 2020 WL 6498619 (D.D.C. Sept. 2, 2020); *Eagle I*, 2018 WL 3838265. The answer to that question, which addresses the availability of exclusivity upon approval, had no bearing on the *scope* of exclusivity, as then-Judge Jackson recognized:

> Defendants are wrong to suggest that the holding in [*Baker Norton*] has any bearing on the Chevron step-one analysis here. Properly understood, the term "such drug" in the exclusivity provision operates only to define the scope of the limit on the FDA's approval authority once a 'designated drug' has been 'approved' as required for exclusivity to attach. The court in *Baker Norton* was concerned only with the permissibility of FDA's interpretation of what counted as "such drug" (and thus must not be approved within the seven-year preclusion period) under the FDA's regulatory framework.

*Depomed*, 66 F. Supp. 3d at 232. Far from supporting Jazz's position, *Depomed* and *Eagle* confirmed that the term "such drug" under the pre-2017 statute was ambiguous. *See Eagle II*, 952 F.3d at 326 (noting that the Orphan Drug Act "does not define 'such drug'" as used in the pre-2017 § 360cc(a) and turning to FDA regulations to explain its meaning); *Eagle I*, 2018 WL 3838265, at *2 ("The Orphan Drug Act does not explain when two 'drugs' are the same or different, even though that distinction controls the scope of the statute's exclusivity provision."); *Depomed*, 66 F. Supp. 3d at 232 (noting "the 'such drug' ambiguity identified in *Baker Norton*").

4. Jazz contends that Congress, by including a clinical superiority requirement in § 360cc(c), implicitly forbade consideration of clinical superiority in § 360cc(a). Pl.'s Mot. 22, 23. But "[v]irtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context." A. Scalia & B. A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012). And Jazz applies the canon with no regard for context.

Recall the point of subsection (c). That provision—including its clinical superiority requirement—was intended to abrogate *Depomed*, which had held unlawful FDA's decision not to recognize orphan-drug exclusivity for a drug unless it was first shown to be clinically superior to the already-approved orphan drug. *See supra* pp. 5-6. By contrast, in *Baker Norton*, this Court had *upheld* FDA's "same drug" definition, which excluded clinically superior drugs from the scope of exclusivity under subsection (a). Thus, there was no similar need for Congress to add an express clinical superiority requirement limiting the scope of exclusivity under subsection (a). Congress could (and

20

did) accomplish the same thing by simply adopting the term ("same drug") that FDA had long defined to exclude a clinically superior drug.

Jazz's negative inference also conflicts with the text of the 2017 Amendments itself, which expressly preserved FDA's previous "determinations." *See* Pub. L. No. 115-52, tit. VI, § 607(b), 131 Stat. 1005, 1050 ("Nothing in the amendments made by subsection (a) shall affect any determination under [§§ 360bb and 360cc] made prior to the date of enactment of [the 2017 Act].").  Such "determinations" encompassed FDA's decision to define "same drug" to exclude a clinically superior drug. *See, e.g.,* "Determination," Meriam-Webster, https://www.merriam-webster.com/dictionary/determination (defining "determination" to include "the act of deciding definitely and firmly").

In the end, subsection (c) is relevant only because it contemplates a "clinically superior" drug being "*otherwise* the same" as another drug, thus confirming that the 2017 Congress did not regard the two as the "same drug." *See supra* p. 15.

5. Finally, Jazz contends that FDA lacks rulemaking authority to implement 21 U.S.C. § 360cc(a). But Congress effectively ratified FDA's definition of "same drug," *see supra* pp. 14-15, thereby mooting the question of the agency's authority to define that term. In any event, and as *Baker Norton* held, Jazz is wrong: FDA has authority to implement subsection (a) by regulation. 132 F. Supp. 2d at 36 (holding that Congress "left it to FDA to determine" what "such drug" meant). The FDCA gives FDA general rulemaking authority to implement its provisions. 21 U.S.C. § 371(a); *Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 67 (D.D.C. 2006), *aff'd*, 226 F. App'x 4 (D.C. Cir. 2007). That is enough

to trigger *Chevron* deference. *See City of Arlington v. FCC*, 569 U.S. 290, 306 (2013) ("What the dissent needs, and fails to produce, is a single case in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field. There is no such case . . . .").

## II.    FDA reasonably determined that Lumryz is clinically superior to Xywav

Acting within its statutory authority, and applying its expertise and longstanding regulations, FDA reasonably determined that Lumryz was clinically superior to Xywav. A drug is "clinically superior" to a previously approved drug if it makes a "major contribution to patient care," even if does not offer greater safety or effectiveness. 21 C.F.R. § 316.3(b)(3). FDA determined that Lumryz makes a major contribution to patient care because once-nightly dosing is less disruptive to sleep than twice-nightly dosing and therefore furthers one of the goals of treatment: promoting, to the extent possible, normal nighttime sleep for narcolepsy patients. AR550-52. In addition, FDA also considered that once-nightly dosing is "inherently more convenient, easier, and less burdensome for patients," especially "in the context of a chronic neurological condition that requires potentially lifelong treatment." AR552. FDA acknowledged that Lumryz has a higher sodium content than Xywav and, in that respect, is less safe. AR554. But the agency concluded that, on balance, the benefits of less-disrupted sleep outweighed this safety concern for a substantial number of patients. AR553-55. FDA thus "acted within a zone of reasonableness and, in particular,

has reasonably considered the relevant issues and reasonably explained the decision."
*Prometheus Radio Project*, 141 S. Ct. at 1158.

### A. No policy requires FDA to find comparable safety and effectiveness

Jazz objects to FDA's clinical superiority determination as "contrary to established FDA policy," which purportedly required FDA to assess whether Lumryz's safety and effectiveness was comparable to Xywav's. Pl.'s Mot. 24. However, after a careful review of past regulatory actions (AR546-49), the agency identified no such policy. While comparable safety and effectiveness *may* be relevant to whether a drug makes a major contribution to patient care, nothing in the regulation or any policy makes comparable safety and effectiveness a legal requirement. AR545.

As FDA explained (and Jazz does not dispute), FDA's regulations themselves do not establish comparable safety and effectiveness as a requirement for a major contribution to patient care. *Id.* The only references to "safety" or "effectiveness" in 21 C.F.R. § 316.3(b)(3) concern "greater safety" and "greater effectiveness." The regulation also expressly provides that a major contribution to patient care may be found even "where neither greater safety nor greater effectiveness has been shown." 21 C.F.R. § 316.3(b)(3)(iii).

Jazz nevertheless attempts to find a supposed policy in the preamble to a *proposed* rule. *See* Pl.'s Mot. 24-25. Although FDA had considered requiring a sponsor to "demonstrat[e] that the drug provides safety and effectiveness comparable to the approved drug," 76 Fed. Reg. 64,868, 64,878 (Oct. 19, 2011), the *final* rule did *not* adopt the proposed change. The agency explained that it "did not intend" to "propose a new

standard for major contribution to patient care" or "suggest that direct proof of comparability to the already approved drug would be required." 78 Fed. Reg. at 35,124. FDA's view remained that "major contribution to patient care determinations can be complex and encompass consideration of a number of factors that potentially implicate safety and effectiveness, which are evaluated on a case-by-case basis for each drug product." *Id.* That is the standard FDA applied here.

Jazz's reliance on agency precedent is equally misplaced. *See* Pl.'s Mot. 26-27. As an initial matter, Jazz never asked FDA to consider one of the precedents upon which it relies (Griffin Decl. Ex. 1), did not ask FDA to consider the exhibit upon which it relies regarding another (Griffin Decl. Ex. 10; *cf.* AR549 § n.167 (discussing a different document regarding the same drug)), and did not move to supplement the administrative record. Since these materials are not part of the record before the agency, they offer no basis to overturn agency action under the APA. *See* Fed. Defs.' Mem. in Support of Their Mot. to Strike the Decl. of Sean C. Griffin and Attachments and Exhibits Thereto, and in Opp. to Jazz's Mot. for Judicial Notice.

In any event, Jazz has not identified any instance where FDA did what Jazz wants it to do now: determine that a drug that otherwise demonstrated a major contribution to patient care, was blocked by another orphan drug's exclusivity because the later drug failed to show comparable safety and effectiveness. One prior decision simply recognized the "similar" safety profiles of two drugs as a reason for finding that one did not offer "greater safety," before finding a major contribution to patient care for reasons unrelated to safety. AR1639-40. Another simply noted that two drugs had

similar safety profiles without claiming this was necessary to the major contribution to patient care determination. Griffin Decl. Ex. 10. At most, these actions confirm that FDA may, but is not required to, consider similarity in safety and effectiveness as part of an overall assessment of major contribution to patient care.

The other two precedents concern whether a drug is entitled to an orphan-drug designation prior to approval. *See* AR1471; Griffin Decl. Ex. 1. To receive an orphan-drug designation for a drug that is "otherwise the same" as an already-approved drug for the same disease or condition, a sponsor must offer a "plausible hypothesis" of clinical superiority. *See supra* pp. 5-6. But at the pre-approval stage, "FDA does not have full safety, efficacy, and other data for the drug necessary to make a definitive determination about clinical superiority." AR547-48. Therefore, in assessing a "plausible hypothesis" of clinical superiority, FDA "generally assume[s] that the drug provides comparable safety and efficacy" unless a safety or efficacy concern is "readily apparent." AR548. When, as in one of Jazz's examples, a safety concern prevents FDA from relying on its usual assumption, the agency may request more information to evaluate a designation request, including by asking the sponsor to show comparable safety and effectiveness. AR1468, 1471.

But that does not translate into a policy requiring the sponsor to show comparable safety and effectiveness to establish a major contribution to patient care at the approval stage. If the safety data that the sponsor submits at the approval stage falls short of showing comparable safety, the safety concern "could inform the [major contribution to patient care] analysis but . . . would not automatically disqualify the

drug from obtaining a [major contribution to patient care] finding." AR548. In other words, FDA may assume or ask for evidence of comparable safety and effectiveness to fill a gap in the information about safety and effectiveness at the "plausible hypothesis" stage, but the ultimate showing of a major contribution to patient care does not require comparable safety and effectiveness.

In contrast to the agency precedent that Jazz cites—which does not address the issue here—FDA has stated in other precedent that, while "an assessment of the safety or effectiveness" of a drug "*might* be considered in determining whether the drug made a major contribution to patient care," the agency need not compare the new drug to a previously approved drug on all factors pertaining to safety and effectiveness. AR1440 ("There is no additional requirement that the subsequent product, although clinically superior in one parameter, must also be shown to be at least equal in all others."); *see also* AR531-32. Even if certain agency precedent supported Jazz's position (which none do), the precedent identified by FDA shows that the agency does not have the general policy that Jazz attributes to it.

As a last-ditch effort, Jazz accuses FDA of adopting a "new standard," under which a sponsor demonstrates a major contribution to patient care merely by satisfying the FDCA's safety and effectiveness requirements. Pl.'s Mot. 27. FDA did no such thing. Rather, the agency simply observed that, because safety and effectiveness are generally applicable requirements for drug approval, a sponsor seeking to show a major contribution to patient care would—like the sponsor of any other drug—still have to show safety and effectiveness before it can bring its drug to market. AR532.

### B.  FDA did not violate its policies for resolving internal disputes

Jazz next claims that FDA violated its internal procedures for resolving disputes between different agency components. Pl.'s Mot. 28-30. Jazz's theory starts with the Review Division's initial response that Lumryz's once-nightly dosing was not a major contribution to patient care. According to Jazz, if OOPD (the office that makes clinical superiority determinations) disagreed with the Review Division, FDA's Standard Operating Procedures and Staff Manual Guides required it to elevate the matter. Instead, Jazz says, OOPD improperly consulted with sleep experts in CDRH.

Jazz misconstrues the applicability of the agency procedures it cites. FDA's Standard Operating Procedure applies only to the process of determining eligibility for exclusivity, not to whether one drug's exclusivity blocks the approval of another. *See* AR2186-87. And the Staff Manual Guides' dispute resolution process is not triggered when agency components reach consensus, as happened here.[7] After its initial consult response, AR576, the Review Division noted that it was still considering the issue and the initial response was not its final position. AR483. True to its word, the Review Division ultimately concluded that once-nightly dosing was a major contribution to patient care and explained its shift in reasoning. AR569-70. FDA is not bound "to what were, by their own terms, the preliminary recommendations of one section of one of its

---

[7] Even if OOPD and the Review Division had disagreed (which they did not), the Staff Manual Guides encourages "staff to make every effort to address disagreement informally at the lowest possible organizational level." Griffin Decl. Ex. 4 at 1; see also Griffin Decl. Ex. 8 at 1 ("*If needed*, the Council can serve as a forum to resolve disagreements" between OOPD and CDRH) (emphasis added).

divisions or require it to offer an additional explanation . . . as a penalty for engaging in an iterative, deliberative discussion." *Logic Tech. Dev. LLC v. FDA*, No. 22-3030, 2023 WL 6887338, at *10 (3d Cir. Oct. 19, 2023). Even if there had been disagreement, "[r]easoned disagreement among civil servants is the stuff of good government, not APA violations." *Id.*

Jazz's assertion that OOPD turned to CDRH sleep experts for a "second opinion" to somehow "force the Review Division into alignment," Pl.'s Mot. 30, is baseless. OOPD consulted sleep experts in CDRH because they were well positioned to answer questions about the benefits of once-nightly dosing. No statute, regulation, or policy forbids experts in one part of FDA from consulting with colleagues in another part. *Cf.* 21 U.S.C. § 393(b)(4) (FDA may "consult with experts in science, medicine, and public health"). Likewise, nothing prohibited the Review Division from choosing to "reconsider[] its conclusion in light of several factors, including scientific, legal, and regulatory considerations raised by OOPD and the expert opinion of FDA's sleep team." AR569.

Even if FDA acted inconsistently with Standard Operating Procedures or Staff Manual Guides (which it did not), that would not be a basis for relief to Jazz. The Standard Operating Procedure and Staff Manual Guides do not set forth rules "by which the interests of [Jazz] are to be regulated," as required for them to form the basis of an APA claim. *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985). Rather, the "purpose" of those documents "is to govern [FDA's] internal affairs," not to "confer any legal rights" upon Jazz. *See Dickow v. United States*,

740 F. Supp. 2d 231, 239 (D. Mass. 2010) (citing *Olpin v. Comm'r*, 270 F.3d 1297, 1301 (10th Cir. 2001)).

### C. Jazz fails to show that FDA's decision was arbitrary or capricious

Jazz contends that the Lumryz determination was "inconsistent with prior FDA determinations and the scientific literature" in three ways. Pl.'s Mot. 30. Not so.

1. FDA did not "minimize[] the importance of Xywav's lower sodium." Pl.'s Mot. 31. The agency acknowledged that Xywav's lower sodium was "clinically meaningful" and therefore Lumryz posed a "safety concern" that Xywav did not. AR554. Applying its scientific expertise, FDA considered that as well as the benefits of once-nightly dosing, and concluded that, on balance, Lumryz still provided a major contribution to patient care. *Id.* "FDA possesses the requisite know-how to conduct such [scientific] analyses, by sifting through the scientific evidence . . . ." *Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996). Jazz may have weighed those considerations differently but that "does not render" FDA's expert assessment "irrational." *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 105 (D.D.C. 2019); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) (holding that "mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful").

Similarly unavailing is Jazz's attack on FDA's finding that "there are other ways [sodium-sensitive] patients may reduce sodium in their diet." AR555. For starters, Jazz does not actually claim that it is impossible for patients to reduce sodium in their diets. The extra-record documents it improperly cites and takes out of context, *see* Pl.'s Mot. 33-34 (citing Griffin Decl. Exs. 11-15), do not take that position either. Moreover, Jazz

ignores almost all other aspects of FDA's analysis of the sodium issue, including its emphasis on Lumryz's labeling, which warns against use by patients sensitive to sodium intake. AR408-09.

2. Far from being "demonstrably false" or "outlandish," Pl.'s Mot. 34-35, FDA's finding that twice-nightly dosing disrupts sleep more than once-nightly dosing is supported by science (and common sense). Jazz falsely frames the matter as an all-or-nothing proposition: Because no one has figured out how to eliminate nighttime arousals, minimizing such disruptions should not be an important goal of therapy. Pl.'s Mot. 36-37. Just because a harm cannot be eliminated does not mean it should not be mitigated. Indeed, for patients with narcolepsy, minimizing disrupted sleep *is* itself a "goal[] of therapy." AR535.

Jazz also conflates the different types of awakenings during the sleep cycle with a forced awakening to take medication. There is a significant difference between (1) the very brief normal arousals people without sleep disorders typically experience, AR589, (2) awakenings that narcoleptics have throughout the night because they do not have normal sleep architecture, AR592, and (3) a forced awakening that requires a narcoleptic patient to wake up to take a second dose of medication, AR588, 591. Xywav requires the third type of arousal; Lumryz does not. AR593. Substantial evidence chronicled by FDA's sleep experts shows that such forced awakenings, often accompanied by full consciousness and difficulty falling back asleep, disrupt and fragment sleep architecture and interfere with optimal next-day functioning, in contravention of the goals of therapy. *See* AR587-95 and accompanying footnotes.

Relying mainly on extra-record studies that it never asked the agency to consider and that are not properly before the Court,[8] Jazz further argues that twice-nightly dosing reduces disrupted sleep. Pl.'s Mot. 37-38, 39-41. FDA does not dispute oxybate therapy, even when dosed twice nightly, can have that effect. However, oxybate products like Xywav (or Jazz's other oxybate treatment, Xyrem) still require waking up to take a second dose, which is more disruptive of sleep than once-nightly dosing. As FDA's sleep experts explained, "an oxybate product that is dosed once nightly provides an opportunity for narcolepsy patients to achieve normal sleep architecture, which is not a possibility for a patient with Xyrem or Xywav." AR594.

3. Jazz's assertion that the record "contains no support" for FDA's finding that once-nightly dosing provides a major contribution to patient care is wrong. Pl.'s Mot. 41. FDA relied on extensive evidence to support its findings that promoting more normal sleep is a goal of narcolepsy treatment and that once-nightly dosing furthers that goal. *See* AR550-52, 587-95; *supra* pp. 9-11. FDA also found that Lumryz's once-nightly dosing is necessarily more convenient, easier, and less burdensome for patients than twice-nightly dosing, especially for patients with a chronic, often lifelong condition. AR552.

Jazz next mistakes a major contribution to patient care for greater effectiveness. Pl.'s Mot. 41. FDA determines "effectiveness"—a basic requirement for approval—by

---

[8] *See* 21 C.F.R. § 10.45(f) ("An interested person who wishes to rely upon information or views not included in the administrative record shall submit them to the Commissioner with a new petition to modify the action under § 10.25(a).").

assessing whether "the drug will have the effect it purports to or is represented to have under the conditions of use prescribed, recommended, or suggested in [its] labeling." 21 U.S.C. § 355(d). By contrast, a "major contribution to patient care" involves consideration of the many ways a patient can benefit from a drug, including: "convenient treatment locations; duration of treatment; patient comfort; improvements in drug efficiency; advances in the ease and comfort of drug administration; longer periods between doses; and potential for self administration." 57 Fed. Reg. at 62079; *see also* AR532. FDA did not find that Lumryz is more effective than Xywav, but it did find that Lumryz provides a major contribution to patient care by supporting the goal of therapy to reduce sleep disruption to the extent possible, and by being "inherently more convenient for patients, an advancement in the ease of drug administration, and a reduction in treatment burden." AR552.

That distinction shows why Jazz's reliance on "FDA's past statements to Jazz" is misplaced. Pl.'s Mot. 43. Those extra-record statements were made in the context of Jazz seeking FDA approval for products for treating disrupted sleep—*not* in the context of a clinical superiority determination. *See* Griffin Decl. Exs. 26 at 2 (denying supplemental application to approve Xyrem for an indication for treatment of disrupted nighttime sleep and explaining that "were you . . . able to document an independent, clinically meaningful effect on Xyrem on the sleep of patients with narcolepsy … it might be reasonable to grant your proposed claim"), 27 (similarly explaining why that supplemental application was not approvable), 38 (addressing proposed efficacy study). Because the *effectiveness* required for FDA approval for a drug to treat disrupted

32

sleep and the *major contribution to patient care* that may support a finding of clinical superiority are distinct concepts, the statements that Jazz cites are irrelevant here.

C<span style="font-variant:small-caps">ONCLUSION</span>

FDA correctly determined that Lumryz is not the "same drug" as Xywav, and thus may be approved notwithstanding Xywav's orphan-drug exclusivity. The Court should therefore grant Federal Defendants' cross-motion for summary judgment and deny Jazz's motion for summary judgment.

October 20, 2023                   Respectfully submitted,


                                  */s/ Noah T. Katzen*
                                  NOAH T. KATZEN
                                  ISAAC C. BELFER
                                  Trial Attorneys
                                  Consumer Protection Branch
                                  Civil Division
                                  U.S. Department of Justice
                                  P.O. Box 386
                                  Washington, DC  20044-0386
                                  (202) 305-2428 (Katzen)
                                  (202) 305-7134 (Belfer)
                                  (202) 514-8742 (fax)
                                  Noah.T.Katzen@usdoj.gov
                                  Isaac.C.Belfer@usdoj.gov