UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> XAVIER BECERRA, Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT CALIFF, Commissioner of Food and Drugs; U.S. FOOD AND DRUG ADMINISTRATION, <br><br> *Defendants*, <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> *Intervenor-Defendant*. | Case No. 1:23-cv-1819-APM |

## NOTICE OF SUPPLEMENTAL EXHIBIT

Plaintiff Jazz Pharmaceuticals, Inc. ("Jazz") respectfully submits a newly disclosed document from the Defendant Food and Drug Administration ("FDA") in support of Jazz's claim that FDA arbitrarily and capriciously departed from a longstanding policy of requiring proof of comparable safety before finding that a drug makes a "major contribution to patient care" over prior versions of the same active moiety. *See generally* Jazz Br., ECF No. 34, 24-28 (Sept. 15, 2023); Jazz Reply, ECF No. 59, 24-34 (Nov. 15, 2023).

## BACKGROUND

Congress required FDA to timely publish a list of all clinical superiority findings, *see* 21 U.S.C. § 360cc(e)(2), which FDA does on its website. *See* FDA, *Clinical Superiority Findings* (content current as of May 2, 2024), http://bit.ly/Clinical_Superiority.

On or about May 2, 2024, FDA updated that list to disclose a clinical superiority finding for the drug Mycapssa® (octreotide) even though Mycapssa had been approved by FDA nearly four years earlier on June 26, 2020. Jazz is not aware of any statement by FDA acknowledging, much less explaining, the four-year delay in publishing this clinical superiority finding.

On May 4, 2024, counsel for Jazz caused a request to be submitted to FDA by a third-party service provider pursuant to the Freedom of Information Act ("FOIA") seeking "a copy of the disclosable portions of the orphan drug exclusivity memorandum(a) (or equivalent decisional decisions if no exclusivity memoranda exist) for Mycapssa." FDA FOIA Control No. 2024-4162. FDA produced a memorandum prepared by the Office of Orphan Product Development ("OOPD") for Mycapssa to the service provider on July 18, 2024. Due to an error at the service provider, the Mycapssa memo was not forwarded to counsel for Jazz until August 29, 2024.

The OOPD memorandum for Mycapssa is submitted herewith as Exhibit 48 to the Third Declaration of Sean C. Griffin (also submitted herewith). Exhibit 48 explains that the clinical superiority finding for Mycapssa was based on OOPD's determination that Mycapssa made a major contribution to patient care over prior versions of octreotide. On that basis, OOPD awarded orphan-drug exclusivity to Mycapssa.[1]

In making its major contribution determination, OOPD acted consistently with the comparable safety requirement. Before addressing the major contribution question, OOPD first confirmed that Mycapssa is "consistent with" and "comparable" to the older versions of octreotide in terms of both efficacy and safety. *See* Exhibit 48 at 4-5.

---

[1] A showing of clinical superiority was required for Mycapssa to earn orphan-drug exclusivity because prior versions of octreotide had already enjoyed orphan-drug exclusivity for the same rare disease. *See* 21 U.S.C. § 360cc(c)(1). Unlike the present case, there was no need to break through unexpired exclusivity because the prior exclusivities had long since expired.

The reason Jazz is submitting Exhibit 48 to the Court, however, is that OOPD also conceded that it had previously acknowledged the comparable safety requirement in two other (still undisclosed) documents related to Mycapssa:

> OOPD acknowledges that **the June 17, 2010, designation letter for Mycapssa erroneously stated, 'In order to obtain market exclusivity for your product when a New Drug Application (NDA) for octreotide (oral) is approved, clinical studies submitted with the NDA must demonstrate that the oral formulation of octreotide is comparable in efficacy and safety to the approved parenteral formulation.' OOPD made similar statements in its consult request submitted to [the Division of General Endocrinology] on July 23, 2020**. Despite these statements, OOPD is not aware of any past precedents that manifest application of such a policy upon approval when FDA is determining eligibility for ODE or when it is considering whether a drug may be approved in light of another sponsor's ODE. To OOPD's knowledge, agency precedent is devoid of instances in which we refused to find a MCTPC for a drug based only on a failure to show comparable safety or efficacy.

Exhibit 48 at 5 n.7 (emphasis added). Because neither the 2010 designation letter nor the 2020 consult request are publicly available, counsel for Jazz caused a further FOIA request to be submitted for both documents on August 29, 2024. Jazz awaits a response.

## DISCUSSION

Even in the absence of the underlying documents, Exhibit 48 is highly relevant to this case because it (1) contradicts the government's litigation positions regarding the comparable safety requirement; (2) underscores the arbitrary and capricious nature of OOPD's decision to break through the unexpired orphan-drug exclusivity protecting Xywav®; and (3) highlights a gaping hole in the present administrative record.

**[1]** Rather than follow the comparable safety requirement (or even acknowledge that it was making a change in policy), OOPD reached the unprecedented conclusion that a less safe drug (Lumryz™) made a major contribution over a safer product (Xywav®) by denying that there ever was a comparable safety requirement. *See* AR0516; AR0545-46. In court, the government has defended

3

that denial by claiming the comparable safety requirement was merely a policy proposal in 2011 that was rejected in 2013. *See, e.g.*, FDA Br., ECF No. 45, 23-24 (Oct. 20, 2023); FDA Reply, ECF No. 71, 16 (Dec. 22, 2023). Exhibit 48 contradicts both sides of that claim. If the comparable safety requirement had been merely a proposal in 2011, why would OOPD have instructed the sponsor of Mycapssa **in 2010** that proof of comparable safety was required to earn exclusivity as a major contribution? And if the comparable safety requirement had been rejected in 2013, why would OOPD have instructed one of FDA's own review divisions **in 2020** that comparable safety was a prerequisite to a major contribution finding? Exhibit 48 thus shows that the comparable safety requirement was neither born in 2011 nor jettisoned in 2013.

The government alternatively argues that, if there is a comparable safety requirement, it applies only at the designation stage and not when FDA makes approval or exclusivity decisions. *See, e.g.*, FDA Br. 25; FDA Reply 16-17. Exhibit 48 refutes this argument as well. Exhibit 48 first quotes a letter in which OOPD instructed the sponsor of Mycapssa that it "'must'" submit "'clinical studies … **with the NDA [that] demonstrate**'" comparable safety "'**to obtain market exclusivity**'" based on a major contribution "'when [the drug] **is approved**.'" Exhibit 48 at 5 n.7 (emphases added). Thus, OOPD made clear in 2010 that comparable safety would be a prerequisite to a major contribution at the approval stage. Exhibit 48 further describes a consult request sent ten years later in which OOPD gave the same instruction to the responsible review division that was deciding—again, at the approval stage—whether exclusivity had been earned.[2]

**[2]**     In addition to refuting the government's litigation positions, Exhibit 48 provides critical context when assessing OOPD's actions in this matter. In July 2020, OOPD instructed the

---

[2] Avadel (but not FDA) has suggested that comparable efficacy and safety are "disjunctive" requirements such that either could suffice. *See, e.g.*, Avadel Reply, ECF No. 72, 17 n.12, 18 n.14 (Dec. 22, 2023). Exhibit 48 disproves that argument too.

FDA review division responsible for assessing the NDA for Mycappsa that, to earn a serial exclusivity, "the NDA must demonstrate that [the new drug] is comparable in efficacy and safety to the [older drugs]." Exhibit 48 at 5 n.7. About a year later, a different review division responsible for assessing the NDAs for Xyrem®, Xywav®, and Lumryz™ rejected Avadel's clinical superiority claims, including its claim that Lumryz™ made a major contribution. *See* AR0471-82. Rather than accept that rejection, OOPD reportedly conveyed the exact opposite instruction. *See* AR0516 ("OOPD has clarified … that a drug does not need to have comparable safety to another drug to make a [major contribution] over the other drug"). OOPD's volte-face is stunning and a clear violation of the Administrative Procedure Act.

Exhibit 48 also shows that OOPD draws an extremely fine line when says its "precedent is devoid of instances in which we refused to find a [major contribution] based only on a failure to show comparable safety." Exhibit 48 at 5 n.7. OOPD cannot deny that it told the world that there is comparable safety requirement—after all, Exhibit 48 concedes that OOPD told a sponsor exactly that in 2010 and told a review division the same thing in 2020.[3] Nor can OOPD deny that the world understood OOPD's instruction. *See, e.g.*, David C. Babaian, *Adopting Pharmacogenomics and Parenting Repurposed Molecules Under the Orphan Drug Act: A Cost Dilemma?*, 13 J. Marshall Rev. Intell. Prop. L. 668, 689 (2014) ("a drug may still be considered clinically superior without demonstrating greater

---

[3] Jazz has already presented evidence showing that OOPD repeatedly told the world that there was a comparable safety requirement. *See* 76 Fed. Reg. 64868, 64871 (Oct. 19, 2011) (major contribution "is meaningful only when the subsequent drug provides safety or effectiveness comparable to the approved drug"); *id.* (the change posited to be a major contribution must not "render[] the drug less safe or less effective"); *id.* at 64876 (describing the comparable safety requirement as "longstanding policy"); *see also, e.g.*, AR1470 (OOPD decision in May 2005 rejecting a major contribution hypothesis because comparable safety and efficacy had not been shown); AR1494 (OOPD decision in March 2009 rejecting a major contribution hypothesis because comparable safety and efficacy had not been shown); Second Griffin Decl. Ex. 44 (OOPD decision in April 2009 again rejecting a major contribution hypothesis because comparable safety and efficacy had not been shown); Griffin Decl. Ex. 1 (OOPD decision in 2012 rejecting a major contribution hypothesis because comparable safety and efficacy had not been shown).

effectiveness or safety—**though comparable**—if it makes a 'major contribution to patient care'") (emphasis added) (citation omitted).  OOPD also cannot deny that industry complied with its instruction and endeavored to show comparable safety when pursuing a major contribution.  *See, e.g.*, Jazz Reply 34 (showing that every prior applicant to demonstrate a major contribution at the approval stage had first established comparable safety).  But when Avadel eventually challenged the comparable safety requirement, OOPD claimed that it could freely ignore its own instruction simply because Avadel was the first to give OOPD cause to enforce it.

**[3]**     Finally, Exhibit 48 underscores the inadequacy of the record in this case.  The government's refusal to include relevant OOPD precedent (including the 2010 designation letter and the 2020 consult request described in Exhibit 48) in the administrative record has allowed the government to indulge in gamesmanship.  Had the government disclosed the **FDA** documents that impeach **FDA's** litigation positions—materials that were referenced in the decision letter at the center of this litigation, *see* AR0546 n.147 [4]—the government would not have been able to pursue either the meritless claim that the comparable safety requirement was proposed in 2011 and withdrawn in 2013 or the equally baseless argument that the comparable safety requirement applies only at the orphan-drug designation stage.

---

[4] The Court's ability to consider the full universe of OOPD precedent referenced at AR0546 n.147 is the subject of pending motions.  *See* Jazz Mot. for Judicial Notice, ECF No. 37 (Sept. 15, 2023); FDA Mot. to Strike, ECF No. 47 (Oct. 20, 2023); Avadel Mot. to Strike, ECF No. 42 (Oct. 20, 2023); Jazz Protective Mot. to Complete and Supplement the Record, ECF No. 61 (Nov. 15, 2023).  Because Exhibit 48 is similar to the other OOPD precedents that Jazz has submitted to the Court, *see, e.g.*, Griffin Decl. Exs. 1 and 10, Jazz respectfully requests that it be governed by the Court's decision as to those documents.

Dated: September 4, 2024

           Respectfully submitted,

           /s/ Sean C. Griffin
           Sean C. Griffin (D.C. Bar No. 499536)
           Kwaku A. Akowuah (D.C. Bar No. 992575)
           Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
           Peter A. Bruland (D.C. Bar No. 1600717)
           SIDLEY AUSTIN LLP
           1501 K Street N.W.
           Washington, DC 20005
           T: (202) 736-8000
           F: (202) 736-8711
           sgriffin@sidley.com
           kakowuah@sidley.com
           tlosseaton@sidley.com
           pbruland@sidley.com

           *Counsel for Plaintiff*
           *Jazz Pharmaceuticals, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2024, I electronically filed this motion using the Court's CM/ECF system. Consistent with the August 7, 2023 Protective Order entered in this case, all participants will be served with the Notice of Electronic Filing and the foregoing motion via email.

Date: September 4, 2024                                                           /s/ Sean C. Griffin
                                                                                              Sean C. Griffin